1 | **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2 | Name ___TO_____WAYLAND_____(None)_____

3 |     (Last)      (First)      (Initial)

**FILED**

3 | Prisoner Number _____D-48864_____

4 |

AUG 2 8 2008

4 | Institutional Address ___P.O. Box 689 (Z-212U)____

5 | RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

5 | ___Soledad, CA 93960-0689_____

6 |

7 | **UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

8 | __WAYLAND  TO_____

  (Enter the full name of plaintiff in this action.)

9 | CV ) 08     **4113**

vs. ) Case No. _____

10 | ) (To be provided by the clerk of court)

11 | —BEN  CURRY  (Warden)———————— ) **PETITION FOR A WRIT**
**OF HABEAS CORPUS** JSW

12 | _____ ) Evidentiary Hearing Requested

13 | _____ )

14 | _____ ) (PR)

(Enter the full name of respondent(s) or jailor in this action)

**E-filing**

16 | <u>Read Comments Carefully Before Filling In</u>

17 | <u>When and Where to File</u>

18 |      You should file in the Northern District if you were convicted and sentenced in one of these

19 | counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20 | San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21 | this district if you are challenging the manner in which your sentence is being executed, such as loss of

22 | good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23 |      If you are challenging your conviction or sentence and you were <u>not</u> convicted and sentenced in

24 | one of the above-named fifteen counties, your petition will likely be transferred to the United States

25 | District Court for the district in which the state court that convicted and sentenced you is located. If

26 | you are challenging the execution of your sentence and you are not in prison in one of these counties,

27 | your petition will likely be transferred to the district court for the district that includes the institution

28 | where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS     - 1 -

1  Who to Name as Respondent

2       You must name the person in whose actual custody you are. This usually means the Warden or

3  jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4  you are imprisoned or by whom you were convicted and sentenced. These are not proper

5  respondents.

6       If you are not presently in custody pursuant to the state judgment against which you seek relief

7  but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8  custody you are now and the Attorney General of the state in which the judgment you seek to attack

9  was entered.

10  A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11       1. What sentence are you challenging in this petition?

12       (a)    Name and location of court that imposed sentence (for example; Alameda

13              County Superior Court, Oakland):

14       <u>Superior Court of Alameda, County, Alemada, California</u>

15              Court                        Location

16       (b)    Case number, if known <u>AQF 952 6040700</u>

17       (c)    Date and terms of sentence <u>15 years to life; Aug. 29, 1986</u>

18       (d)    Are you now in custody serving this term? (Custody means being in jail, on

19              parole or probation, etc.)           Yes <u>X</u>    No _____

20              Where?

21              Name of Institution: <u>CTF-Central</u>

22              Address: <u>Soledad, California</u>

23       2. For what crime were you given this sentence? (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known. If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26  <u>This petition adresses a parole suitability denial by the Board</u>

27  <u>of Prison Terms via due process as stated in the instant petition.</u>

28  _____

PET. FOR WRIT OF HAB. CORPUS        - 2 -

1     3. Did you have any of the following?

2          Arraignment:               Yes _X___    No _____

3          Preliminary Hearing:       Yes _X___    No _____

4          Motion to Suppress:       Yes _____    No _X___

5     4. How did you plead?

6          Guilty _X___   Not Guilty _____   Nolo Contendere _____

7          Any other plea (specify) __Pleas agreement for 15 years to life.__

8     5. If you went to trial, what kind of trial did you have?   **Plea bargain, no trial**

9          Jury _____    Judge alone_____   Judge alone on a transcript _____

10    6. Did you testify at your trial?          Yes _____    No _X___

11    7. Did you have an attorney at the following proceedings:

12        (a)    Arraignment          Yes _____    No _X___

13        (b)    Preliminary hearing     Yes _____    No _X___

14        (c)    Time of plea          Yes _____    No _X___

15        (d)    Trial               Yes _____    No _X___

16        (e)    Sentencing          Yes _____    No _X___

17        (f)    Appeal           Yes _____    No _X___

18        (g)    Other post-conviction proceeding   Yes _____    No _X___

19    8. Did you appeal your conviction?         Yes _____    No _x___

20        (a)    If you did, to what court(s) did you appeal?   **Does not apply**

21             Court of Appeal        Yes _____   No _____

22             Year: __N/A__   Result: _____N/A_____

23             Supreme Court of California    Yes _____   No _____

24             Year: __N/A__   Result: _____N/A_____

25             Any other court        Yes _____   No _____

26             Year: __N/A__   Result: _____N/A_____

27

28        (b)    If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS    - 3 -

**Does not apply to this petition**

1    petition?                                    Yes _____    No_____

2    (c)    Was there an opinion?                 Yes _____    No_____

3    (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4                                                 Yes _____    No_____

5    If you did, give the name of the court and the result:

6    **Does not apply to this petition**

7    _____

8    9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9    this conviction in any court, state or federal?       Yes _____    No_____

10   [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11   challenged the same conviction you are challenging now and if that petition was denied or dismissed

12   with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13   for an order authorizing the district court to consider this petition. You may not file a second or

14   subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15   U.S.C. §§ 2244(b).]

16   (a)    If you sought relief in any proceeding other than an appeal, answer the following

17          questions for each proceeding. Attach extra paper if you need more space.

18   I.     Name of Court: **Superior Court of Alameda (Oakland) CA.**

19          Type of Proceeding: **Habeas Corpus petition**

20          Grounds raised (Be brief but specific):

21          a. **Exactly those stated in this instant petition**

22          b._____

23          c._____

24          d._____

25          Result: ~~Relief denied~~          Date of Result: **11-14-2007** ~~11-14-~~

26   II.    Name of Court: **Court of Appeal First Appellate District**

27          Type of Proceeding: **Habeas Corpus petition**

28          Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS        - 4 -

a. __Exactly those stated in this instant petition__

b._____

c._____

d._____

Result: ~~Relief denied~~_____Date of Result: 12-13-2007

III.    Name of Court: __Supreme Court of California__

Type of Proceeding: __Habeas Corpus petition__

Grounds raised (Be brief but specific):

a. __Exactly those stated in this instant petition__

b._____

c._____

d._____

Result: __Relief denied_____Date of Result: __7-2008__

IV.    Name of Court: __No other court available at state level__

Type of Proceeding: _____

Grounds raised (Be brief but specific):

a._____

b._____

c._____

d._____

Result: _____Date of Result:_____

(b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

Yes _____    No __X__

Name and location of court: __Does not apply_____

**B. GROUNDS FOR RELIEF**

State briefly every reason that you believe you are being confined unlawfully. Give facts to

support each claim. For example, what legal right or privilege were you denied? What happened?

Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS         - 5 -

1     need more space. Answer the same questions for each claim.

2        [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3   petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4   499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5        Claim One:_____ **See attached petition in full**

6

7     Supporting Facts:_____ See attached petition in full

8

9

10

11        Claim Two:_____ **See attached petition in full**

12

13     Supporting Facts:___ **See attached petition in full**

14

15

16

17        Claim Three:_____ **See attached petition in full**

18

19     Supporting Facts:___ **See attached petition in full**

20

21

22

23        If any of these grounds was not previously presented to any other court, state briefly which

24   grounds were not presented and why:

25   **All grounds/claims contained in this instant petition have been presented**

26   **to the above 3 courts, Superior, Appellate and state Supreme as are**

27   **exactly presented to this Court.**

28

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3    of these cases:

4    Controlling case citations, both federal and state and U.S. Supreme

5    Court precedents are presented throughout this instant petition.

6    _____

7    Do you have an attorney for this petition?                    Yes_____     No _X_

8    If you do, give the name and address of your attorney:

9    Being assisted by fellow inmate Samuel A. Dubyak, D-54700, layman at
     law, as is obvious by the instant petition presented to this Court.
10   WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11   this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13   Executed on  8/6/08 _____                 Wayland To

14             Date                              Signature of Petitioner

15

16

17

18

19

20   (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS           - 7 -

**S160025**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re WAYLAND TO on Habeas Corpus

The petition for writ of habeas corpus is denied.

SUPREME COURT
**FILED**

JUL **-9** 2008

Frederick K. Ohlrich Clerk

_____

Deputy

**GEORGE**
Chief Justice

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

In re WAYLAND TO,

on Habeas Corpus.

A119994

(Alameda County
Super. Ct. Case No. 85646A)

FILED
Court of Appeal First Appellate District

DEC 1 3 2007

Diana Herbert, Clerk
By_____Deputy Clerk

THE COURT:*

The petition for a writ of habeas corpus is denied.

POLLAK, J.

DEC 1 3 2007
Dated: _____

_____ Acting P.J.

_____

* Pollak, Acting P.J., Siggins, J., & Horner, J. (Judge of the Alameda Sup. Ct., assigned
by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.), participating.

IN THE SUPERIOR COURT

FOR THE STATE OF CALIFORNIA

Petitioner herein appeals from the Superior Court of California, County of Alameda's "ORDER" denying relief, attached hereto, (Dated November 14th, 2007 and received by Petitioner on November 19th). Petitioner incorporates his habeas corpus, and, all other documents as though set forth in full.

Petitioner asserts that there was more than ample evidence to support a prima facie case for relief as Petitioner has established that there is no evidence in the record to support the denial of suitability, and, a term setting under equal protection independent of the suitability finding.

The Superior Courts 'finding' that "Petitioner has not demonstrated that he is being treated differently from "similarly situated" prisoners." Citing to Cleburne, as did Petitioner, is completely blind to the record. Petitioner and Schiold's "similarly situated facts" are, both have a second degree murder conviction under P.C. §187, both are/were serving a "to life" term under Proposition 7's guidelines and legislative intent, both are foreign nationals with an INS hold, both must appear before the parole board, both are subject to deportation. Yet, Schiold (and Rosenkrantz) were given a term setting "INDEPENDENT" of being found suitable for release on parole. There was more than ample facts to support Petitioner's claim of Equal Protection under CLASS OF ONE, Willowbrook, thus the Superior Court failed to follow U.S. Supreme Court law.

The Court cited to "some evidence" supporting denial but as Petitioner asserted in his habeas petition, "some evidence" is not the standard in California law and constitution. California Evidence Code §115 "preponderance of evidence" is the standard by an act of the Legislature and Federal law cannot over-ride §115 and replace it with "some evidence" or "modicum or evidence". (See habeas petition in full).

Given the fact that the courts still apply the defunct "some evidence"

1

standard; the test is not whether some evidence supports the excuses for denying parole, but whether some evidence indicates a parolee's release "unreasonably endangers public safety." See, In re Lee (2006) 143 Cal.App.4th 1400, 1408;  In re Weider (2006) 145 Cal.App.4th 570; Elkins, 144 Cal.App.4th 475.

In In re Lee, supra, 143 Cal.App.4th 1400, Division Eight, Second Appellate District interpreted the "some evidence" rule as requiring an evidentiary nexus between an inmate's current record and the Board's finding that an inmate posed an unreasonable risk to the public safety if released on parole.

In In re Scott, 133 Cal.App.4th at 595: "The commitment offense can negate suitability for parole only if the circumstances of the crime rationally indicate that the offender will present an unreasonable public safety risk if released from prison." The court in Lee reasoned that "some evidence" of the existence of a particular factor relied on by the decision maker "does not necessarily equate to some evidence that the parolee's release unreasonably endangers public safety." (Lee, at p.1408).

Elkins, supra, 144 Cal.App.4th 515: The Court of appeal reinstated the Board's suitability finding on grounds that the Governor's decision did not meet the "some evidence" standard because it was based on immutable circumstances beyond the defendant's ability to change. (Elkins, at p.523).

The Lawrence court found that the recent interpretation of the state constitution's due process "some evidence" standard prohibited the use of a commitment murder as the sole basis of denying parole decades after the crime's commission. Citing In re Smith, supra; In re Scott, supra; and In re Elkins, supra, the Lawrence court concluded that the "nature and age" of the defendant's commitment offense failed to supply "some evidence" that she was a "present threat to public safety". (In re Lawrence, supra, WL1475283 at p.28.) Lacking a nexus between the defendant's present record of reform and her unsuitability for parole, the Court of Appeal reversed the Governor's decision. (Id. at pp.29-34). See also,

2

1  In re Barker, (2007) ___ Cal.App.4th ___.

2       The requirement for more therapy and/or self help failed to meet the "some
3  evidence" standard, because the defendant's recent psychological evaluations were
4  positive and made no such recommendations. The Board's finding that the defendant's
5  rehabilitation gains were recent was likewsie unsupported by "some evidence",
6  as the defendant had been "disciplinary-free since 1995" and had taken
7  responsibility for his crimes since at least 1995 – and perhaps as early as 1990.
8  The Board's decades old historic facts likewise did not prove the defendant
9  presently posed an unreasonable risk to public safety. (Barker, supra).

10       The Federal Courts have addressed the issue of immutable parole factors under
11  "some evidence" in Biggs v. Terhune, 334 F.3d at 917 (9th Cir.), citing to
12  Greenholtz and Allen, 482 at p.373; Rosenkrantz v. Marshall (C.D. Cal. 2006) 444
13  F.Supp.2d 1063, 1065, 1070.

14       The Superior Court's reliance on Petitioner's rules violation in 2003, for
15  having a home made "hot plate" fashioned from a broken down hot pot that is an
16  approved item possessed by inmate's forms no nexus to establish a threat or risk
17  to society, furthermore counseling chronos, CDC-128's are a simple part of prison
18  life and an inmate can receive such a chrono simply because he brought back a
19  slice of bread, from dinner, to feed the birds.

20       The Superior Courts rote/form language was obviously taken directly from
21  the Respondents and Boards pre-printed denials; "Unreasonable risk of danger to
22  society". Nowhere is there any evidence, under any standard, that establishes
23  a nexus to a current threat or risk to society withion the legislative intent
24  of P.C. §3041(b). Petitioner's psychological report establishes just the opposite.

25       "Petitioner's failure to profit from society's previous attempts to correct
26  his criminality and his prior criminality". All such references in the record
27  are "historical events" and are incapable of being changed. See, Irons v. Warden
28  of California State Prison – Solano (E.D. Cal. 2005) 358 F.Supp.2d 936, 939:

1

2

3

4

5

6

7

> "[I]mportant ... in assessing any due process violations is the fact that continuous reliance on unchanging circumstances transforms an offense for which California law provides eligibility for parole into a de facto life imprisonment without the possibility of parole. The courts asks rhetorically—what is it about the circumstances of petitioner's crime or motivation which are going to change" The answer is nothing. The circumstances of the crimes will always be what they were, and petitioner's motive for committing them will always be trivial...Given that no one seriously contends lack of seriousness or lack of triviality at the present time, the potential for parole in this case is remote to the point of non-existence. Petitioner's liberty interest should not be determined by such an arbitrary, remote possibility."

8

9

10

11

Compare the facts of Petitioner's circumstances for suitability, not for parole in California within the intent of P.C. §3041(a), but, for release to INS for deportation. Petitioner can never be paroled nor can the Board ever find Petitioner "suitable for parole" within the Legislative intent of California law.

12

13

14

15

In In re Smith, 109 Cal.App.4th at pp.492-493, 134 Cal.Rptr.2d 781: The prisoner, a drug dealer, was convicted for his role in the shooting, beating, and drowning of another drug dealer some 15 years before the grant of parole the Governor had reversed.

16

17

18

19

In In re Scott, 133 Cal.App.4th at p.579, 34 Cal.Rptr.3d 905: A wayward wife told her husband she was leaving her lover and returning to the husband, but then didn't show up. In a rage, the husband drove over to the lover's house and shot him in the head with a rifle.

20

21

22

23

In In re Lee, 143 Cal.App.4th at p.1404, 49 Cal.Rptr.3d 931: A man seeking to collect on a business debt brought a gun and a box of bullets along to a meeting and when refused a payment fired five shots, wounding the debtor but killing the debtor's wife.

24

25

26

27

28

In In re Weider, 145 Cal.App.4th at pp.575-576, 52 Cal.Rptr.3d 147: Another distraught husband took a gun into a public restaurant and fired twice at the man who had been living with his estranged wife for two years but missed, then threatened to kill himself and in the ensuing fracas managed to kill not only the other man, but wounded two innocent restaurant patrons, one of them fatally.

4

In In re Elkins, 144 Cal.App.4th at pp.480-481, 50 Cal.Rptr.3d 503: In order to rob a sleeping friend he owed money for drugs, a 19-year-old addict who was on probation for another offense struck the victim with a baseball bat then pummeled him to death with the bat, drove into the wilderness and dumped it down a remote embankment, stole more of the victim's belongings from a storage locker, and fled the state.

In Rosenkrantz v. Marshall, 444 F.Supp.2d at p.1065; In re Rosenkrantz, 29 Cal.App.4th at pp.627-629, 128 Cal.Rptr.2d 104, 59 P.3d 174: A young man provoked by being "outed" by his brother and a friend acquired an automatic weapon, planned and even rehearsed the shooting for a week before blasting his victim with a fusillade from a gun.

In Martin v. Marshall, 431 F.Supp.2d at p.1040: A drug user shot his drug dealer whom he owed money, and two other innocent restaurant patrons, killing both dealer and one of the patrons.

All of the above murders involved at least as "shockingly vicious use of lethality" and "exceptionally callous disregard for human suffering" as did Lawrence's murder of her paramour's wife. Several resulted in the killing or wounding of multiple victims. Several had economic as opposed to emotional motives, and several prisoners were involved in other criminal activities at the time of the offense. Yet state appellate courts and/or federal courts found these earlier commitment offenses failed to provide "some evidence" of the perpetrator's present dangerousness if released to the outside world. (In re Lawrence, 59 Cal.Rptr.3d 537 (Cal.App.2d Dist. 2007).

The Shaputis court held that reliance on a parole applicant's "former life style" prior to imprisonment to deny parole, that such reliance on such an "historical relic" is an "arbitrary and capricious [decision] within the differential standards articulated by Rosenkrantz, supra, 29 Cal.App.4th 616." (Shaputis, 37 Cal.Rptr.3d at 335; Rosenkrantz v. Marshall, 444 F.Supp.2d 1063,

2006 WL2327085 at *15 (C.D. Cal. 2006) [citing Shaputis for the same proposition]);

Biggs v. Terhune, supra, 334 F.3d 910 (9th Cir. 2003); Martin v. Marshall, 431

F.Supp.2d 1038 (N.D. Cal. 2006); Sanchez v. Kane, 444 F.Supp.2d 1049 (C.D. Cal.

2006); See also, Johnson, 2006 WL195159 at *8.

"His somewhat unstable social history": The record establishes that Petitioner

was born in Vietnam to a Vietnamese mother and an alleged American "G.I." father.

As the record shows Petitioner was thrown into the streets of Vietnam at the age

of six (6) to fend for himself because he was a "CHILD OF THE DUST" by cultural

standards, a mixed half-breed for a lack of a better politically correct term.

He was brought to America by a man that posed as his father to perpetrate a scam

to get money. Again Petitioner was to fend for himself. It appears that Petitioner

is being blamed and condemned by the Board and now the Courts, for being born

when the weight of unstable social history is laid on his back, he had no control

over his childhood, nor lack of guidance during his early teenage years and was

very susceptible to an older person taking him down the wrong path of life,

historical relics that are unchangeable events in his life. These events are now

converting Petitioner's second degree commitment offense, under a plea bargain,

of 15 years to life TO life without the possibility of parole because the Board

and Courts are now and appears that they always will use the same factors to deny

release even though Petitioner has served more than the minimum for a first degree

murder term and is into the realm of serving a life without the possibility of

parole term under P.C. §190.2.

"Limited institutional programming": Petitioner asserts that he has maintained

a prison job over the years, with excellent work history chronos, he has attended

"AA" even if he could not remember the twelve steps at his hearing, he had

continued to educate himself acquiring a G.E.D.. Nowhere in P.C. §3041(a)(b) is

there a requirement for 'institutional programming' nor is there a nexus to

'limited institutional programming' to establish a current threat or risk to public

safety to support the denial of suitability. However, it must be remembered that Petitioner cannot be paroled within the Legislative intent of P.C. §3041(a)(b), but, only deported. P.C. §3041(a)(b) is vague and ambiguous regarding the issue of foreign nationals that cannot be found suitable for parole but only deported.

"Insufficient parole plans": Again, Petitioner cannot be paroled and he cannot have parole plans, job offers, residence offers, or, offers of support in California. He is not required to have parole plans in China (Hong Kong). California law stops at the border/state line. (See, Petition for case citations and argument). The Superior Court has failed to establish a nexus as to how Petitioner having "marginal" parole plans, in China, has any bearing on his <u>current</u> threat or risk to public safety when Petitioner will never be released on parole but only deported to China.

"Need for self-help": and, lack of insight. Apparently the Superior court failed to notice that the Psychological Evaluation does not require any self-help as Petitioner is not in need of any such help.

Self-help, thus (lack of insight) are not "factors specified by statute and regulations" that authorize the findings of unsuitability based on the Boards supposition that a parole applicant lacks 'insight' into the commitment offense. No where in P.C. §3041 or Cal. Code of Regs., Title 15 §2402(c) does it state or even hint that lack of "insight" is authority, as "some evidence" that contains an "indicia of reliability" to base a finding of unsuitability. Superintendent v. Hill, 472 U.S. 455-457 (1985); Biggs v. Terhune, 334 F.3d 910, 915 (9th Cir. 2003); In re Scott, 119 Cal.App.4th 871, 899 (2004); Rosenkrantz, supra, 29 Cal.App.4th at 658.

No where is there any 'hint' that the Superior Court even considered Petitioner's age at the time of the offense, reiterated here as was presented in full in Petitioner's informal reply to the Respondents informal answer:

"A further issue to be considered by the facts and proceedings of this case

7

is the significance of Petitioner's age at the time of the offense. Petitioner, restated, was 16 years old at the time of the offense and therefore had not reached the age of maturity. In Roper v. Simmons, 125 S.Ct. 1183, 543 U.S. 551, 161 L.Ed.2d 1 (2005), the United States Supreme Court recently recognized the predictive value of the conduct of such a young person is less than that of an adult and invalidated the sentence imposed on a 17 year old explaining:

> "Three general differences between juveniles under 18 and adults demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders. First, as any parent knows and as the scientific and sociological studies respondent and his amici cite tend to confirm, a lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions [] The second area of difference is that juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure. [] The third broad difference is that the character of the juvenile is not well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed. [] These differences render suspect any conclusions that a juvenile falls among the worst offenders. The susceptibility of juveniles to immature and irresponsible behavior means 'their irresponsible conduct is not as morally reprehensible as that of an adult.' Thompson v. Oklahoma, 487 U.S. 815, 835 (1988) (plurality opinion). Their own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment. See, Stanford v. Kentucky, 492 U.S. 361, 395 (1989) (Brennan, J. dissenting). The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that minor's character deficiencies will be reformed. Indeed, "[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside.' Johnson v. Texas, 509 U.S. 350, 368 (1993)." (Id. 125 S.Ct. at 1195, 161 L.Ed.2d at 21-22, 543 U.S. at 561-562; See also, Rosenkrantz, supra, 444 F.Supp.2d 1063, 2006 WL2327085 at 16, citing Roper for the same proposition]).

The United States Supreme Court acknowledged that "The qualities that distinguish juveniles from adults do not disappear when an individual turns 18," (Id. at 1197), but decided that for the purpose of a categorical rule, applicable at the time the sentence is imposed, "a line must be drawn." (Id. at 1198). In

a case involving a 17 year old when the offense occurred and received a sentence of 15 years to life with the possibility of parole, the above reasons young offenders "cannot with reliability be classified among the worst offenders," which reasons "do not disappear when an individual turns 18," may preclude a parole denial based solely on an examination of the offense under "some evidence" standard. When the offense has to be seen as an example of youthful ignorance and "underdevelop[ment]," and the inmate's subsequent record shows he has, at age 45, become an adult who has grown past those immaturities, the crime itself is not enough to, alone, permit a parole denial for the fifth time.

In the circumstances of Petitioner's case, the Board's reliance upon its belief's of Petitioner's involvement in the offense (classifying his involvement as more than that of the other crime partners) (Note* "All" crime partner's which included the actual shooter have already been paroled) for the 8th time violates due process. First, continued reliance on the unchanging or unchangeable factors makes a sham of California's parole system and amounts to an arbitrary denial of Petitioner's "liberty interest in release on parole," "expectation that he will be granted parole", and his "presumption that parole release will be granted." (See, McQuillion v. Duncan, 306 F.3d 895, 902 (9th Cir. 2002); Biggs, supra, 334 F.3d at 914-915; Rosenkrantz, supra, 29 Cal.4th at 654, 661).

### 8th PAROLE SUITABILITY DENIAL

Petitioner has been denied parole on 8 occassions. Continued reliance on these unchanging factors amounts to converting his parolable offense into a term of life without the possibility of parole (see, P.C. §190.2(a)(14)), also, Irons, supra, 358 F.Supp.2d at 947 ["continuous reliance on the unchanging circumstances transforms an offense into a de facto life imprisonment without the possibility of parole"]; Scott, supra, 34 Cal.Rptr.3d at 919-920, 133 Cal.App.4th at 594-595; Shaputis, supra, 37 Cal.Rptr.3d at 335. Second, the circumstances of the commitment offense that occurred over 21 years ago do not now amount to some evidence

supporting the conclusions that Petitioner **currently** poses an unreasonable risk

of danger if released. (See, In re Smith, 114 Cal.App.4th 343, 370, 372 (2003)

[evidence must show "that a prisoner <u>currently</u> would pose an unreasonable risk

of danger if released at this time."]; Shaputis, supra 37 Cal.Rptr.3d at 334-335

[same]; Wen Lee, supra, 2006 DJDAR at 13965 ["To deny parole, the reason must

relate to a defendant's <u>continued</u> unreasonable risk to public safety"]);

Dannenberg, supra, 34 Cal.4th at 1071, 1080 [same]).

### ESPECIALLY HEINOUS, ATROCIOUS OR CRUEL

The Superior Court, at page 2 of the ORDER stated that: "The evidence supports

the findings that the offense was committed in an especially heinous, atrocious

or cruel manner."

Petitioner asserts here and in his petition that these factors do not apply

and cannot be applied to second and first degree murder convictions under P.C.

§187. The phraseology above was adopted by the Board for its rules and regulations

§2402, from P.C. §190.2 (Death penalty or life imprisonment without parole; <u>special</u>

<u>circumstances</u>), specifically the language at (a)(14):

> "The murder was especially heinous, atrocious, or cruel, manifesting
> exceptional depravity. As used in this section, the phrase "especially
> heinous, atrocious, or cruel, manifesting exceptional depravity" means
> a conscienceless or pitiless crime that is <u>unnecessarily tortutous</u> to
> the victim." (Emphasis added).

P.C. §190.2(a)(14)'s language regarding "particularly egregious, atrocious

or cruel" is only intended to differentiate and separate crimes of murder in the

first and second degree (under P.C. §187) from execution style murders and/or

"particularly egregious, heinous, atrocious or cruel murders" (under P.C. §190.2).

Many courts have applied the terminology of "common scenario", "typical", "normal"

(citations omitted) when comparing crimes of murder. "Particularly egregious,

heinous, atrocious or cruel" are applied to virtually all suitability denials.

The Board has effectively circumvented the Legislative intent of P.C. §187 by

'lumping' all crimes of murder into a neatly scribed Rules and Regulations where

1  'all' crimes of murder are treated under the language found in P.C. §190.2 (Death

2  penalty or life imprisonment without the possibility of parole).

3      The Superior Court of California, County of Santa Clara, FILED AUG 30, 2007,

4  In re DONNELL JAMEISON, No. 71194 authorized a study of some 2690 randomly chosen

5  cases (parole suitability denials), where it was established that "particularly

6  egregious" or "especially heinous, atrocious or cruel" (15 C.C.R. §2402(c)(1))

7  were found to contain the same language.

8      The key phrase, by Legislative intent, to separate offenses of murder under

9  P.C. §187 (1st and 2nd degree), from P.C. §190.2 (death penalty and life

10 imprisonment without parole) offenses is in (a)(14): "A conscienceless or pitiless

11 crime that is <u>unnecessarily torturous</u> to the victim." (Emphasis added). Thus,

12 the language of "especially heinous, atrocious or cruel" (relied on by the Board

13 & Superior Court to deny release) cannot be applied to offenses under P.C. §187,

14 unless, "unnecessarily torturous" was found to be true by a jury.

### EQUAL PROTECTION

16     Petitioner submits that his Equal Protection, Class of One claim, as though

17 set forth in full herein does establish he is/was treated distinctly different

18 than a "similarly situated" prisoner. (See, ORDER, page 5). Both Petitioner and

19 Schiold were sentenced to second degree murder offenses under P.C. §187; See habeas

20 petition at page 7 for "similarly situated" circumstances.

### SELF HELP

22     A most recent case from the California Court of Appeal, First Appellate

23 District, Division Two, In re David Barker, 2007 DJDAR 7548, Filed May 24, 2007,

24 at 7555, the court held that:

25         In speaking to the psychological report: "These conclusions, of course,
26         are the opinions of trained experts, all of whom said Barker did not
           need therapy. We are troubled therefore by a contrary finding, especially
           in light of the uncontradicted evidence in the record. And we are
27         particularly troubled by the mere presence of this finding, which appears
           to be, yet again, a boilerplate finding that seems to make its way into
28         every denial of parole, whatever the record--and despite repeated

11

criticisms from the courts. The harsh criticism by Division Three of this court in In re Ramirez, (2001) 94 Cal.App.4th 549 (Ramirez), disapproved on another ground in In re Dannenberg, (2005) 34 Cal.4th 1061, 1086-1087, 1100 (Dannenberg), is illustrative. There, Justice Parrilli first described the finding of the "need for further therapy" as an even "more troubling aspect" of the Board's decision, explaining why it was utterly unfounded. She then concluded as follows; "This finding was an affront not only to Ramirez, whose progress in therapy was undisputedly exemplary, but also the Department of Corrections, which provided the therapeutic programs and found Ramirez's participation in them to be outstanding. The Board's readiness to make a finding so at odds with the record supports Ramirez's claim that his parole hearing was a sham. It is not surprising that the trial court regarded the Board's findings with deep suspicion." (Etc., at page 7556.)

In Hendking v. Smith, 781 F.2d 850 (11th Cir. 1986) ["I]t is a matter of general knowledge that except for professional killers, few people commit more than one murder in a life time. It is a crime involving a specific interpersonal crisis, and not a habitual offense."]; Rosenkrantz, 444 F.Supp.2d 1063, 2006 WL2327085 at *12-17).

### CONCLUSION

The record does establish that Petitioner was not the shooter, and, all other crime partners have been paroled, and, that there was no opposition from the county of commitment (District Attorney's Office) to parole being granted, in fact, the record additionally establishes that the last three hearings had no opposition from the District Attorney's Office and actually gave encouragement to the Board to give more favorable consideration to a release date for Petitioner. Petitioner will be deported to China (Hong Kong), he has family support and employment when he arrives. The psychological evaluation establishes that Petitioner is not a threat or risk to the public, there is no nexus recited in the Board's denial to establish otherwise.

Respectfully submitted,

Wayland To

12

ENDORSED
FILED

SUPERIOR COURT OF THE STATE OF CALIFORNIA COUNTY

COUNTY OF ALAMEDA    NOV 1 4 2007

CLERK OF THE SUPERIOR COURT
FIL R. CRUZ
By _____
Deputy

IN RE    No. 85646A

WAYLAND TO,    ORDER DENYING PETITION
FOR WRIT OF HABEAS CORPUS
on Habeas Corpus.

This Court having reviewed the petition for writ of habeas corpus ("Petition") filed on August 21, 2007, by WAYLAND TO ("Petitioner"), the informal response to the Petition filed by the Attorney General for the State of California on September 26, 2007, and the informal reply filed by the Petitioner on October 4, 2007, NOW HEREBY ORDERS:

The Petition is DENIED for failure to make a prima facie case for relief.

In 1986, Petitioner pled guilty of second degree murder and was sentenced to 15 years to life with the possibility of parole. On February 13, 2007, the Board of Parole Hearings ("Board") found Petitioner unsuitable for parole.

Petitioner filed the instant Petition seeking relief from the Board's decision. Petitioner claims that the Board's decision to deny him parole has denied him due process and equal protection. Petitioner has failed to meet his burden of making a prima facie relief under either claim.

Our Supreme Court held in *Rosenkrantz* that "the judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but that in conducting such a review, the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation. If the decision's consideration of the specified factors is not supported by some evidence in the record and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas corpus and should order the Board to vacate its

1

decision denying parole ...." (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 658 (*Rosenkrantz*); see also *In re Jacobson* (2007) 154 Cal.App.4th 849, 853, 859-862.)

"Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." (Cal. Code of Regs., tit. 15, § 2402, subd. (a).) The Board has discretion in the manner in which the specified factors relevant to parole suitability are considered and balanced, and the resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the Board. This court cannot reweigh the factors and substitute its judgment. (*Rosenkrantz, supra,* 29 Cal.4th at p. 677.) The Board's decision is subject to limited review under the "some evidence" standard of review. (*Rosenkrantz, supra,* 29 Cal.4th at p. 652.) Only a modicum of evidence is required. (*Id.* at p. 626.) The evidence in support of the Board's decision "'must have some indicia of reliability,'" (*In re Scott* (2005) 133 Cal.App.4th 573, 591 (*Scott*), quoting *Biggs, supra,* 334 F.3d at p. 915) and "'must have some basis in fact [.]'" (*In re Elkins* (2006) 144 Cal.App.4th 475, 489, (*Elkins*), quoting *Scott, supra,* 133 Cal.App.4th at p. 590.)

The Board found Petitioner unsuitable for parole based on the commitment offense, Petitioner's failure to profit from society's previous attempts to correct his criminality, his somewhat unstable social history, his prior criminal record, his institutional behavior, his limited programming, and minimal parole plans.

As our Supreme Court noted in *Dannenberg,* "[t]he regulations do set detailed standards and criteria for determining whether a murderer with an indeterminate life sentence is suitable for parole. (Citation omitted.) Among the specified circumstances of the commitment offense that "tend to indicate unsuitability for release" are that "the prisoner committed the offense in an especially heinous, atrocious or cruel manner." (Citation omitted.)" (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1080 (*Dannenberg*)). In finding that Petitioner would pose an unreasonable risks of danger if released on parole, the Board specifically stated that the offense was carried out in a very callous and cold manner in that it was calculated, multiple victims were attacked, and the motive for

2

the crime was very trivial in that it was basically for money. The Board pointed out that Petitioner and his crime partners planned out the robbery in that they drove around and spotted the Feng Yuan restaurant in order to rob it. One of the crime partners went in and cased the restaurant. Petitioner and two other crime partners first ordered a meal, and then waited until they got word from the leader to rob the restaurant. The group took various positions, and gathered all customers and workers in the back of the restaurant. Petitioner was armed with a knife. One of the crime partners shot a waiter, killing him without provocation.[1] The evidence supports the finding that the offense was committed in an especially heinous, atrocious or cruel manner.

The evidence also supports the findings that Petitioner had failed to profit from society's previous attempts to correct his criminality, that he had a previous record, and that he had a somewhat unstable social history. Prior to the commitment offense, Petitioner had been made a ward of the court after two finding on felonies involving a burglary and an assault, and one finding on misdemeanor trespassing. Petitioner's record contained assaultive behavior at an early age. Petitioner was also in and out of different group homes, then ran away from his last placement and dropped out of school. He lived on his own since a very young age, and was involved in criminal activity. There is "some evidence" to support these factors.

The Board also relied on Petitioner's institutional behavior as a factor in denying parole. The Board noted that Petitioner's had six CDC 115 while in prison, the last one

---

[1] Under both *Dannenberg* and *Rosenkrantz*, the Board can look at the circumstances of the offense and rely the facts of the crime alone, so long as it points to factors beyond the minimum elements of the crime, in determining that a prisoner is unsuitable for release. (*Dannenberg, supra,* 34 Cal.4th 1061, pp. 1070-1071; *Rosenkrantz, supra,* 29 Cal.4th 616.) Despite the fact Board relied on other factors in addition to the commitment offense, the circumstances of this murder went beyond those for second degree. Here, Petitioner suffered a conviction for second degree murder, which simply requires the killing be with malice aforethought. (Penal Code §§ 187(a), 188, and 189.) However, a murder committed in the perpetration and/or attempted perpetration of a robbery is murder in the first degree. (Penal Code § 189.) This is some evidence that the murder occurred during the commission of a robbery. Therefore, the circumstances of this murder went beyond the minimum necessary for second degree murder.

3

being on July 2001, as well as nine CDC 128, with the last one in 2003. A CDC 115 documents misconduct that is believed to be a violation of law or is not minor in nature, and a CDC 128 documents incidents of minor misconduct. (See *In re Gray* (2007) 151 Cal.App.4th 379, 389 and Cal. Code Regs., tit. 15, § 3312, subd. (a)(2) & (3).) The record supports this finding.

Additionally, the Board denied Petitioner parole based on his limited programming. One of the criteria for suitability is that "[i]nstitutional activities indicate an enhanced ability to function within the law upon release." (Cal. Code of Regs., tit. 15, § 2402, subd. (d)(9).) Thus, lack of such activities is relevant information that may be considered by the Board. (Cal. Code of Regs., tit. 15, § 2402, subd. (b).) The Board found that Petitioner needed additional documented self-help in order to understand and cope with stress in a non-destructive manner, to help Petitioner from making the same bad mistakes he did when he was a youngster, and help Petitioner become an active member of the community. The record before the Board revealed that in his 19 years of incarceration Petitioner participated in only a few self-help programs, although he was on wait lists on some new programs at the time of the hearing. There is "some evidence" to support this finding.

Finally, the Board found that Petitioner's parole plans were "marginal at best." The Board noted that Petitioner, a foreign national with an Immigration and Naturalization Service hold to China, did have the support of his sister who resided in Hong Kong, who offered to provide Petitioner with housing and financial support. The Board found that Petitioner did not have acceptable employment and that he did not really have a marketable skill. In terms of Petitioner's vocational history while in prison, Petitioner admitted that he did not complete courses in machine shop and watch repair. Although the certificate of completion was not in his file and the file indicated reassignment, Petitioner claimed he finished a course in silk screening that he attended from 1990 to 1992. Petitioner stated that his marketable skill was cooking, and his first choice was culinary work. He told the Board that he would like to take a culinary art class when he was released. Petitioner did not provide any documentation of his attempts

4

to enroll in such classes because he was relying on the help of a former teacher and friend to do that for him. Petitioner expressed a desire to open his own restaurant and stated that is why he took a job in the food manager's office. When the Board pressed Petitioner about his parole plans, Petitioner stated that "[his] plan is get a job[,] have [his] own restaurant." Petitioner also told the Board that he had his sister in Hong Kong and his teacher here in the United States to help him right now, and the longer they kept him in custody, the harder it would be for others to help him. The Board pointed out that Petitioner needed to do more on his own, instead of having someone else look for things for him, such as culinary school. Petitioner claimed he had a "whole bunch of letters" saying that people would hire him, but the letters were not in Petitioner's file. Although Petitioner had letters documenting housing and financial support, Petitioner's lack of documentation as to job prospects and his reliance on others to look for schools and jobs for him support the finding that he lacked realistic plans for release, whether he was allowed to remain in the United States, or was deported to China upon release. There is "some evidence" to support the finding that Petitioner's parole plans were "marginal at best."

The Board's determination that Petitioner poses an unreasonable risk of danger to society took into consideration all relevant and reliable factors and is supported by some evidence. Thus, the Board's denial of release on parole does not violate due process, and is supported by some evidence.

His second claim for relief for denial of equal protection also fails. Petitioner contends that his right to equal protection was violated when he was treated differently than Mikael Schiold, who was convicted of second degree murder and later released to Sweden as part of a settlement agreement. Petitioner has not demonstrated that he is being treated differently from "similarly situated" prisoners. (*Cleburne v. Cleburne Living Center* (1985) 473 U.S. 432, 439.)

NOV 1 4 2007

DATED: _____

LARRY J. GOODMAN

HON. LARRY GOODMAN
JUDGE OF THE SUPERIOR COURT

5

Comes now Wayland To, in pro per. Based upon facts, grounds, authorities and exhibits herein, Petitioner respectfully seeks habeas corpus relief in an order reversing the February 27, 2008, decision by the Board of Parole Hearings (herein after 'Board') denying Petitioner at his 9th 'subsequent' parole suitability hearing and that this Court will direct the Board to release Petitioner to the INS for deportation proceedings.

## PETITIONER'S OFFENSE, SENTENCE AND COMMITMENT
### OFFENSE IN SUMMARY

Petitioner along with 3 co-defendants held up (robbed) a restaurant. During the robbery a co-defendant shot one of the waiter's which resulted in his death. Petitioner was armed with an empty gun and was not the actual shooter. Petitioner has taken full responsibility for his actions and his part in the offense. (See, Exhibit A & B). 'All' other crime partners/co-defendants have been released on parole which includes the actual shooter.

Petitioner took a plea bargain for second degree murder and a sentence of 15 years to life. Petitioner did have a juvenile history of criminal activity. (See, Exhibit A & B).

The commitment offense occurred on January 4, 1986 when Petitioner was 16 years of age. Currently Petitioner has been incarcerated for approximately 30 years (with earned credits) on a 15 year to life sentence.

### PETITIONER'S POST CONVICTION RECORD AND SELF-HELP

Petitioner's rules violations during incarceration consist of (Exhibit B); six CDC 115's and nine 128A's: His 115's were for Obeying Rules, Regulations & Procedures (3/12/88), Refused to Work/Foul Language (12/11/89), Participating in Work Strike (7/05/94), and Refusing to Work (10/10/99), Mutual Combat (10/21/00), and Contraband (10/28/03). His 128A's were for, Failed to report to Acad. Assignment (12/08/89), Sleeping in Class (11/30/89), Failed to Stand for

**1**

count (6/27/90), Absent from education (7/26/96) and Failed to report to Acad. Assignment (11/24/98-8/4/99-8/6/99), Left job site without permission (10/21/00) and Failure to report (7/15/01).

Petitioner completed his GED on 11/17/99, completed Tabe Testing in 1999, vocational training in Machine shop, Watch Repair, Silk Screen. He has taken "Self-help" which include: Alternative to Violence Workshop, Impact workshop, Stress and Anger Management Class, Alcoholics Anonymous 12 Step and 12 Traditions, Time and Money Management, Ethics and Values, A-MER-CAN, Science of Mind Treatment and Meditation, and Under Cover Class. His supervisors letters of support and work history begin on page 40 of Exhibit A, all speak highly of his work ethics and his positive performance on the job (contrary to the 128A's).

## PETITIONER'S RESIDENCE AND EMPLOYMENT WHEN PAROLED

Petitioner 'will' be deported to China, the Patriot Act is clear on this issue. Petitioner has family support in Hong Kong (Exhibit A), he has an opportunity to be employed with his family's business in Hong Kong. Petitioner has marketable skills for employment, in Hong Kong. The law does not require, nor can Petitioner obtain, letters of support and offers of employment in the United States, which would be in violation of federal law.

## EVALUATION OF PETITIONER'S PAROLE RISK

Exhibit B, page 7: OVERALL RISK ASSESSMENT; "...the undersigned's opinion is that this inmate represents a Low risk of violence and general recidivism." "It is important to note, however, that the following factors decrease the inmate's risk of violence in the community. The inmate does not have an Axis I major mental illness, which has been shown to increase one's risk of violence. He has social support network which has been shown to insulate his risk of future violence. The level of contact with these individuals has been regular and steady during his incarceration. The inmate's social support does not appear to have been involved in criminal and or gang activities. The inmate does not currently appear

1   to associate with individuals in the community who have engaged in antisocial
2   behavior. He has tangible vocational skill that may translate to stable work,
3   protecting him from some of the effects of poverty. While the inmate has no history
4   of substance abuse, he has participated in substance abuse treatment, and appears
5   to have abstained from drug and alcohol use despite readily available access to
6   substances within the institution. The inmate expressed a consistent regret and
7   remorse for his actions, and was able to identify the impact his actions have
8   had on the victim and the victim's family. Finally, he received low scores on
9   the PCL-R, HCR-20, and LS/CMI, psychological measures that have been
10  well-correlated with future risk of violence and general recidivism."

11      At page 8 of Exhibit B: "...he has demonstrated a pattern of institutional
12  programming aimed at bettering himself...": "The inmate's parole plans appear
13  to be realistic...": "Various clinical factors mentioned throughout this report
14  provide an overall risk assessment estimate which suggests that the inmate poses
15  a low likelihood of becoming involved in a violent offense if released into the
16  free community." "The undersigned opines that the inmate has taken full
17  responsibility for the controlling offense." At page 9; There is no mandatory
18  requirement for any additional self-help or group help.

19              <u>THE PRESCRIBED MINIMUM AND MAXIMUM PRISON TERM</u>
20              <u>FOR THE FACTS OF PETITIONER'S COMMITMENT OFFENSE</u>

21      Petitioner became eligible to be released on parole (to the INS for
22  deportation proceedings) in 1996 (MEPD date of 10 years on 15 years sentence,
23  see Proposition 7). It is established throughout other parole suitability hearings
24  that his crime partners/co-defendants, which include the actual shooter, have
25  been paroled, Petitioner being the youngest of the four is the only one
26  incarcerated at present.

27                      <u>2008 PAROLE SUITABILITY HEARING</u>

28      This was Petitioner's 9th parole suitability hearing, Petitioner's previous

                                        3

1  parole suitability denials were based mainly or entirely on his commitment offense

2  and prior juvenile criminal conduct.

3      The 2008 Board concluded: DECISION at p.73-81:

4      "...you are not suitable for parole, and you would pose an unreasonable risk

5  of danger to society or a threat to public safety if released from prison."

6      The Board recited the following factors in support of its decision:

7      "...first, by the commitment offense." "Noting that certainly this offense

8  was carried on, (sic), especially cruel, very callous manner, manner which

9  demonstrates an exceptional callous disregard for human life." (page 75), "We

10  note that the motive of this was certainly trivial..." "...certainly is very

11  trivial." (page 75), "...the inmate's criminal history as a juvenile." (page 76),

12  "...he does fall into the category of an unstable social history, prior

13  criminality.", "We find that he does have some disciplinary issues..." (page 77),

14  "We note that your parole plans, Mr. To, seem to be inadequate." (page 79),

15  "...opposition of suitability, and that's specifically from the Alameda County

16  District Attorney's Office who voiced their opposition." "We do recommend ...

17  that you avail yourself to further self-help..."

### REQUIREMENTS OF DUE PROCESS; STANDARD OF REVIEW

19      1). State parole law provides inmates a liberty interest in parole protected

20  by due process. (In re Rosenkrantz (2002) 29 Cal.4th 616, 621; McQuillion v. Duncan

21  (9th Cir. 2002) 306 F.3d 895, 901-903).

22      2). Petitioner's protected liberty interest required his being granted parole

23  because he has been eligible to parole since 1996 and has been evaluated NOT to

24  pose an "unreasonable risk of danger" to public safety, the state's parole

25  suitability standard. (See, 15 C.C.R. §§2401, 2402(a).)

26      3). Due process required the findings supporting Petitioner's parole decision

27  to be based on a weighing of all relevant, reliable evidence in the record (In

28  re Minnis (1972) 7 Cal.3d 639, 646; In re Ramirez (2001) 94 Cal.App.4th 549, 569-

4

572; See also, Rosenkrantz, 29 Cal.4th at p.655; 15 C.C.R. §2402(b), using the preponderance of the evidence standard. Decisions determining parole **must** be based on "good cause". (In re Powell (1988) 45 Cal.3d at p.901; In re Brown (1967) 67 Cal.2d 339, 342; In re McClain (1960) 55 Cal.2d 78, 87; In re Caswell (2001) 92 Cal.App.4th 1017, 1024; In re Clutchette (1974) 39 Cal.App.3d 561, 565; In re Monzo (1973) 33 Cal.App.3d 144, 147.) The Board's regulations define "good cause" as "a preponderance of the evidence". (See, 15 C.C.R. §2000(b)(50).)

4). The California Supreme Court recently stated, March 26, 2008, in the case of In re Ronald Singler, 73 Cal.Rptr.3d 864 at p.874 (Cal.App.3d 2008): "Accordingly, the relevant test is not whether some evidence supports the reasons cited for denying parole, "but whether some evidence indicates [an inmate's] release unreasonably endangers public safety." (In re Lee, 143 Cal.App.4th at p.1408, fn. & italics omitted; See also, In re Tripp (2007) 150 Cal.App.4th 306, 313 [58 Cal.Rptr.3d 64] ["evidence **must** substantiate the ultimate conclusion that the prisoner's release currently poses an unreasonable risk of danger to the public"].) (Emphasis added).

5). Parole denial based solely on some evidence of an egregious commitment offense may violate due process if the panel did not duly consider and weigh in its decision all of the evidence in the record favoring parole suitability. (In re Scott (2005) 133 Cal.App.4th 573, 594 et seq.; See also, 15 C.C.R. §2402(b); In re Minnis, supra, 7 Cal.3d at p.646; In re Capistran (2003) 107 Cal.App.4th 1299, 1306.)

6). Although a prisoner like Petitioner who qualifies for parole may initially be found unsuitable if the commitment offense was particularly egregious compared to other instances of the offense, such cases are exceptions, and commitment offenses or prior criminal conduct cannot justify repeated or interminable parole denials. (See, Biggs v. Terhune, 334 F.3d 910, 916 (9th Cir. 2003); Sass, 461 F.3d 1123 (9th Cir. 2006); Irons v. Carey, 479 F.3d 658 (9th Cir. 2007); Hayward

1  v. Marshall, 512 F.3d 536, 545-547 (9th Cir. 2008); In re Scott (2005) 133

2  Cal.App.4th 573, 595; In re Lawrence (2007) 150 Cal.App.4th 1511, 1554-1556; In

3  re Gray (2007) 151 Cal.App.4th 379; In re Barker (2007) 151 Cal.App.4th 346, 374-

4  375; Martin v. Marshall (N.D. Cal. 2006) 431 F.Supp.2d 1038, 1046-1047 amended

5  at 448 F.Supp.2d 1143; Sanchez v. Kane (C.D. Cal. 2006) 444 F.Supp.2d 1049, 1062;

6  Rosenkrantz v. Marshall (C.D. Cal. 2006) 444 F.Supp.2d 1063, 1080-1087.)

7      7). If the Board uses offense facts and other unchangeable factors to justify

8  a finding of parole unsuitability, it must articulate some nexus to the State's

9  codified standard by explaining how such factors make Petitioner a current

10 "unreasonable risk of danger" to public safety if paroled; otherwise such offense

11 factors do not amount to "some evidence" that granting parole creates an

12 "unreasonable risk of danger" to public safety. See, 15 C.C.R. §§2401, 2402(a);

13 In re Lee (2006) 143 Cal.App.4th 1400, 1407-1412; In re Elkins (2006) 144

14 Cal.App.4th 475, 502.

15     8). If the Board's forensic psychologists, having considered the entire record

16 including the commitment offense, determine that Petitioner's parole poses a low

17 risk of danger to public safety, the Board, whose commissioners have no particular

18 qualifications by education of training to predict recidivism, in reciting that

19 Petitioner's parole would pose an unreasonable risk of danger to public safety,

20 must point to evidence demonstrating the contrary to be true, i.e., evidence in

21 the record showing that the factors the Board recites render Petitioner as

22 unreasonable public safety risk despite their forensic experts' contrary

23 determinations. See, In re Roderick (2007) 154 Cal.App.4th 242, 272, fn.27; In

24 re Smith (2003) 114 Cal.App.4th 343, 348-349 (such findings amount to

25 "unsubstantiated speculation and as such are arbitrary and capricious.").

26     9). Denial of parole based solely on the facts of the commitment offense

27 and prior criminality may deny due process also when the prospective parolee has

28 served a prison term in excess of that prescribed by the regulations of an offense

1  with those facts, particularly if the term served at that point exceeds "the

2  minimum number of years to which he had been sentenced", (Irons v. Carey (9th

3  Cir. 2007) 479 F.3d 658, 664-665), or if it exceeds the term prescribed for the

4  most aggravated form of the offense. Rosenkrantz, 29 Cal.4th at pp.689-690.

5              PETITIONER'S STATE AND FEDERAL CONSTITUTIONAL CLAIMS

6          The Denial Of Petitioner's Parole Based On Arguably Applicable Facts

7          Of A 22-Year Old Offense And Other Immutable Factors Violated His Rights

8          To Due Process Under California Constitution Article I, §7(a) And United

9          States Constitution Fourteenth Amendment Because Petitioner Has Been

10         Determined Forensically To Pose A Low To No Risk To Public Safety,

11         Because The Facts Recited Bear No Nexus To His Current Parole Risk,

12         And, Since Neither Those Immutable Facts Nor The Maximum Level Of Parole

13         Suitability He Has Otherwise Achieved Can Ever Improve, The Process

14         Has Converted Petitioner's Prison Term To Life Without The Possibility

15         Of Parole And Extinguished His Protected Liberty Interest In Parole.

16

17         A. NO EVIDENCE SUPPORTS THE NOTION THAT PETITIONER POSES AN

18         "UNREASONABLE RISK OF DANGER TO SOCIETY OF A THREAT TO PUBLIC

19         SAFETY."

20                                    GROUND

21         The sole ground stated by the Board for denying Petitioner parole was its

22  boilerplate statement that his parole would pose "an unreasonable risk of danger

23  to society of a threat to public safety" (Exhibit A, p.73), the state's codified

24  suitability standard which a parole date "shall" be set. See, P.C. §3041; 15 C.C.R.

25  §§2401, 2402(a). The findings set forth by the Board in support of that conclusion

26  are detailed in the following section. Preclusion of parole on this ground denied

27  due process because it was supported by NO evidence what-so-ever and is inapposite

28  to the record. The only reliable evidence assessing Petitioner's current

                                         7

dangerousness and parole risk was his forensic pyschological evaluation, which concluded that his risk on parole is negligible ("Low risk of violence and general recidivism.") (Exhibit B, p.7).

The Board has no known forensic psychological training and offered <u>no</u> <u>evidence</u>, just an unsupported conclusory statement that Petitioner's parole would "pose an unreasonable risk of danger". The Board considered exactly the same record - including Petitioner's offense and prior record - considered by the State's forensic experts, who determined that Petitioner would pose a negligible risk of danger if released on parole. Because the forensic evaluation of Petitioner's parole risk are well below the State's codified "unreasonable risk of danger" standard, requiring a grant of parole (P.C. §3041; 15 C.C.R. §§2401, 2402(a)), because no evidence in the record supports the "unreasonable risk" determinant, because the Board lacked the expertise necessary to disregard and/or override the forensic determinations, and because the Board set forth no contrary evidence demonstrating Petitioner's parole to <u>currently</u> pose an unreasonable danger to public safety, denial of parole on this basis flunks the "some evidence" test and violated Petitioner's right to due process. See, In re Smith (2003) 114 Cal.App.4th 343, 369: absent actual evidence negating Governor's assessment of subject's current parole risk, "the governor's view of Smith's propensity for violence ... is unsubstantiated speculation and as such appears to be arbitrary and capricious"; See also, In re Roderick (2007) 154 Cal.App.4th 242, 272, fn.27.

## B. THE FINDINGS

### 1. THE COMMITMENT OFFENSE

THIS OFFENSE WAS CARRIED ON, ESPECIALLY CRUEL, VERY CALLOUS MANNER, MANNER WHICH DEMONSTRATES AN EXCEPTIONAL CALLOUS DISREGARD FOR HUMAN LIFE. (Exhibit A, p.73).

The Board cited codified (15 C.C.R. §2402(c)(1)) criteria modifiers,

"especially" and "exceptional" are crucial because all murders are by definition "dispassionate", requiring pre-meditation, express malice, and the specific intent to kill. More than a dozen times our state courts have chastised the Board and Governor for their recitations of these codified "cruel and callous" and "exceptionally callous disregard for human suffering" factors in every decision in which parole is denied or reversed. See, In re Rosenkrantz (2000) 80 Cal.App.4th 409, review denied. "Rosenkrantz murder did not display exceptionally callous disregard for human suffering", although he laid in wait and fired ten shots into the victim with an Uzi; In re Lee (2006) 143 Cal.App.4th 1400, 1409 (quoting In re Scott (2004) 119 Cal.App.4th 871, 891, and In re Ramirez (2001) 94 Cal.App.4th 549, 570 "murder by definition involves some callousness - i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others .., the inquiry is whether among murders the one committed by Lee was particularly heinous, atrocious or cruel. By that measure, Lee's crimes were more commonplace than egregious (Lee shot the Victims at close range)"; In re Elkins (2006) 144 Cal.App.4th 475, 495, Elkins, a 19-year old addict, shot the victim during a robbery; The Governor reversed based on the offense: "The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. Yet, the predictive value of the commitment offense may be very questionable after a long period of time (citations) ... denial of release based solely on the basis of the gravity of the commitment offense warrants especially close scrutiny (citing In re Scott (2005) 133 Cal.App.4th 573, 594-595); In re Weider (2006) 145 Cal.App.4th 570, 586-587, 589 ... the panel denied parole because "the commitment offense was carried out in an especially cruel and callous manner and showed a callous disregard ... murder is defined as the unlawful killing of a human being with malice aforethought ... malice itself involves an element of viciousness

1   - an extreme indifference to the value of human life (People v. Summers (1983)

2   147 Cal.App.3d 180, 184 ... all ... murders will involve some amount of viciousness

3   or callousness. (Citations) ... The over-arching consideration in the suitability

4   determination is whether the inmate is currently a threat to public safety

5   (Dannenberg, 34 Cal.4th at pp.1071, 1083, 1085-1086; Scott, 133 Cal.App.4th at

6   p.591) ... Weider's (act in the murder) doe not rationally indicate that he will

7   present an unreasonable public safety risk if released from prison (Scott, 133

8   Cal.App.4th at pp.595, 596); In re Scott, supra, 119 Cal.App.4th at pp.891-892:

9   "The manner in which Scott committed his offense does not demonstrate an

10  exceptionally callous disregard for human suffering ... parole is the rule, rather

11  than the exception, and a conviction (of murder) does not automatically render

12  one unsuitable" (quoting In re Smith (2003) 114 Cal.App.4th 343, 366) ... In re

13  Ramirez, supra, 94 Cal.App.4th 549, as in this case, the Board denied a parole

14  release date on the basis of a finding that the nature of the inmate's offense

15  displayed a "callous disregard for human suffering" (Id. at pp.558, 568) ... As

16  the court explained, "all violent crime demonstrates the perpetrator's potential

17  for posing a grave risk to public safety, yet parole is mandatory for violent

18  felons serving determinate sentences (P.C. §3000, subd. (b)(1)) ... and the

19  Legislature has clearly expressed its intent that when murderers - who are the

20  great majority of inmates serving indeterminate sentences - approach their minimum

21  eligible parole date, the Board 'shall normally set a parole release date'. (P.C.

22  §3041(a)) ... The Board's authority to make an exception based on the gravity

23  of a life term inmate's current or past offenses should not operate so as to

24  swallow the rule that parole is "normally" to be granted ... to demonstrate an

25  exceptionally callous disregard for human suffering ... the offense in question

26  must have been committed in a more aggravated or violent manner than that

27  ordinarily shown in the commission of ... murder ... As in In re Smith, supra,

28  114 Cal.App.4th 343, there is no evidence Scott 'tormented, terrorized, or injured'

1  (his victim before deciding to shoot (him), or that he gratuitously increased
2  or unnecessarily prolonged (his) pain and suffering ... Was the crime callous?
3  Yes. However, are the facts of the crime some evidence that (he) acted with
4  exceptionally callous disregard for (the victim's) suffering, or do the facts
5  distinguish this crime from other second degree murders as exceptionally callous?
6  No." (Id. at p.367) ... The Board's use of this factor to conclude that Scott
7  committed his offense "in an especially cruel and callous manner" was arbitrary
8  and capricious"; In re Smith, supra, 114 Cal.App.4th 343, 373-374 ("...the Governor
9  does not specify how Smith manifested exceptionally callous disregard of Garner's
10 suffering. There is no evidence that Smith acted with cold, calculated, dispassion;
11 or that he tormented, terrorized, or injured Garner before deciding to shoot her;
12 or that he gratuitously increased or unnecessarily prolonged her pain and
13 suffering").

14     Petitioner has taken full responsibility for his part in the murder that
15 evening and is deeply sorry and regretful to all persons that were affected by
16 his actions. (Exhibit A & B).

17     The facts of Petitioner's offense of murder are no more cruel, callous or
18 dispassionate than the above entitled cases of Rosenkrantz, Lee, Ramirez, Scott,
19 Smith, Elkins, Weider or Dannenberg. The state courts in these cases did not find
20 this descriptive language to be true and it is not true in Petitioner's case.
21 (Remembering also, that Petitioner was not the actual shooter).

22     As explained below, although Petitioner has changed all that he can change,
23 he can never change the facts of the offense. Importantly, the commitment offense
24 facts recited by the Board have little, if any, bearing on Petitioner's current
25 parole risk, as the commitment offense happened over 22 years ago (January, 1986)
26 and Petitioner has served beyond the maximum time prescribed for his offense.
27 See, In re Elkins, supra, 144 Cal.App.4th at p.502.

28     The Superior Court of Santa Clara County, in In re Donnell Jameison, Case

**11**

1  No. 71194, decision filed August 30, 2007, following a comprehensive compilation

2  of BPH hearings results in 2,690 cases and an evidentiary hearing including expert

3  testimony regarding the statistical interpretation of that exhaustive survey,

4  concluded:

> Thus, it was shown that 100% of commitment offenses reviewed by the
> Board during the 13 months under examination (a total of 2,690 cases)
> were found to be "especially heinous, atrocious or cruel" under Title
> 15 C.C.R. §§2402 (2281(c)(1)) ... (The size of) the samples in each
> case, which consisted of two or three months of Boards decisions, are
> statistically sufficient to draw conclusions about the entire population
> of life term inmates currently facing parole eligibility hearings.

> ...The evidence proves that ... every such offense has been found to
> be "particularly egregious" or "especially heinous, atrocious or cruel."
> (FN) This evidence conclusively demonstrates that the Board completely
> disregards the detailed standards and the criteria of §§2402/(2281))
> ... The evidence shows that the determinations of the Board in this
> regard are not made on the basis of detail guidelines and individualized
> consideration, but rather through the use of all encompassing catch
> phrases gleaned from the regulations ... Because it makes no effort
> to distinguish the applicability of the criteria between one case and
> another, the Board is able to force every case of murder into one or
> more of the categories contained in §2402 (2281(c)).

> "What this reduces to is nothing less than a denial of parole for the
> very reason the inmates are present before the Board - i.e., the
> committed murder (or kidnapping) ..." As stated quite plainly by the
> Sixth District: "A conviction for murder does not automatically render
> someone unsuitable for parole." (In re Smith, 114 Cal.App.4th at p.366,
> citing In re Rosenkrantz, 29 Cal.4th at p.683.) ... The Board's formulaic
> practice of stating §2402 (2281(C)(1)) phrased in a conclusory fashion,
> and then stating "this is derived from the facts" without ever linking
> the two together is insufficient. In re Roderick (2007) ___ Cal.App.4th
> ___ (A113370): "At minimum, the Board is responsible for articulating
> the grounds for its findings and for citing to evidence supporting those
> grounds." (See also, In re Barker (2007) 151 Cal.App.4th 346, 371,
> disapproving "conclusorily" announced findings.)

> "The evidence must substantiate the ultimate conclusion that the
> prisoner's release currently poses an unreasonable risk of danger to
> the public. It violates a prisoner's right to due process when the Board
> or Governor attaches significance to evidence that forewarns no danger
> to the public." (In re Tripp (2007) 150 Cal.App.4th 306, 313.) ... This
> is especially significant when the murder conviction is based on the
> felony murder rule, provocative act doctrine, or accomplice liability
> such that the inmate did not intend to kill or may not have even been
> the actual killer.

> The evidence presented, as discussed above, has established a void for
> vagueness "as applied" to due process violation. That same evidence
> also proves a separate but related constitutional violation - an as

12

applied separation of powers violation.

> ...The Board, by its enactment and interpretation of Title 15 §2402 (2281), has appropriated to itself absolute power over 'lifer' matters. Over-reaching beyond the letter and spirit of Penal Code provisions, Title 15, §2402 (2281(C)(1)) has been interpreted by the Board to supply the power to declare every crime enough to deny parole forever. The fact that Title 15, §2402 (2281), has been invoked in every case, but then sometimes later not invoked, tends to show either completely arbitrary and capricious behavior or that unwritten standards are what really determines outcomes. In either event, all pretenses of taking guidance from, or being limited by, the Legislature's statutes have been abandoned... The Board employs no meaningful yardstick in measuring parole suitability. This is a violation of the separation of powers doctrine. (People v. Wright (1982) 30 Cal.3d 705, 712-713. Also see, Terhune v. Superior Court (1998) 65 Cal.App.4th 864, 872-873.

The Court concluded that the parole criteria utilized by the Board to deny parole in every case is vague and arbitrary, thus unconstitutional. That is precisely the process by which Petitioner was denied parole.

Because the "especially heinous, atrocious or cruel" sub-factors dutifully recited by the Board were inapplicable to Petitioner's conduct, unsupported by evidence, inapposite to the record, and/or inherent in the offense, and were immutable, and irrelevant to Petitioner's current parole risk, denying his parole on this basis was arbitrary and he was denied due process.

## 2. PREVIOUS RECORD OF VIOLENCE AND CRIMINAL CONDUCT

For the Board to continually (9 hearings) use Petitioner's past criminal (juvenile history) conduct to deny parole is a due process violation of his rights and fly's in the face of the goals of rehabilitation and does not support Petitioner's current risk to public safety.

In the case of Hayward v. Marshall, 512 F.3d 536 (9th Cir. 2008) the Court stated: "First, the Governor cited Hayward's "long criminal history". The Governor specifically noted Hayward's history of juvenile mischief and asserted that Hayward was first placed on probation at age eight. Hayward's juvenile conduct, which occurred nearly fifty years ago, provides no basis for a conclusion that Hayward currently poses a risk to public safety. Though Hayward was arrested many times

before he committed the murder in this case, these arrests occurred thirty or more years ago and also do not support a conclusion that Hayward currently poses any threat to public safety.

Petitioner's juvenile misconduct occurred over 22 years ago and his prior juvenile conduct was a direct result of his life as a child in Viet Nam as he was thrown out into the streets at a young age due to cultural issues (being a child of an American soldier and an Asian mother), a "child of the dust" was the appropriate term used for these children. Petitioner had no moral guide or compass to build on and fell in with the wrong crowd. He accepted responsibility for his actions and throughout his incarceration he has seriously turned his life around. Two CDC-115's, one of which was in 2000 for a cell fight, a charge of "mutual combat" when the initiator of the fight cannot be determined, and, the most recent in 2003 for "contraband" which at face value appears to be something that it is not. Petitioner 'converted/modified' a hot pot (an appliance that is permitted to be owned by inmate's for boiling water and minor cooking) into a "hot plate". There is no nexus established as to how these two CDC-115's relate to Petitioner's current parole risk, threat to public safety.

Petitioner has taken NA/AA even though he has no history of such offenses or usage, Petitioner's evaluation by the Board's forensic experts (over the past years) supports the fact that he is <u>not</u> a public safety risk. (Exhibit A & B).

As stated above, Petitioner's previous record as a juvenile is immutable and is over 22 years old. Therefore, the use of this finding to deny him parole is contrary to the record and is arbitrary in the extreme especially after 9 suitability hearings when he was not the actual shooter.

A further issue to be considered by the facts and proceedings of this case is the significance of Petitioner's age at the time of the offense. Petitioner restated, was 16 years old at the time of the offense and therefore had not reached the age of maturity. In Roper v. Simmons, 125 S.Ct. 1183, 543 U.S. 551, 161 L.Ed.2d

1 (2005), the United States Supreme Court recently recognized the predictive value

of the conduct of such a young person is less than that of an adult and invalidated

the sentence imposed on a 17 year old explaining:

> "Three general differences between juveniles under 18 and adults
> demonstrate that juvenile offenders cannot with reliability be classified
> among the worst offenders. First, as any parent knows and as the
> scientific and sociological studies respondent and his amici cite tend
> to confirm, a lack of maturity and an underdeveloped sense of
> responsibility are found in youth more often than in adults and are
> more understandable among the young. These qualities often result in
> impetuous and ill-considered actions and decisions [] The second area
> of difference is that juveniles are more vulnerable or susceptible to
> negative influences and outside pressures, including peer pressure.
> [] The third broad difference is that the character of the juvenile
> is not well formed as that of an adult. The personality traits of
> juveniles are more transitory, less fixed. [] These differences render
> suspect any conclusions that a juvenile falls among the worst offenders.
> The susceptibility of juveniles to immature and irresponsible behavior
> means 'their irresponsible conduct is not as morally reprehensible as
> that of an adult.' Thompson v. Oklahoma, 487 U.S. 815, 835 (1988)
> (plurality opinion). Their own vulnerability and comparative lack of
> control over their immediate surroundings mean juveniles have a greater
> claim than adults to be forgiven for failing to escape negative
> influences in their whole environment. See, Stanford v. Kentucky, 492
> U.S. 361, 395 (1989) (Brennan, J. dissenting). The reality that juveniles
> still struggle to define their identity means it is less supportable
> to conclude that even a heinous crime committed by a juvenile is evidence
> of irretrievably depraved character. From a moral standpoint it would
> be misguided to equate the failings of a minor with those of an adult,
> for a greater possibility exists that minor's character deficiencies
> will be reformed. Indeed, "[t]he relevance of youth as a mitigating
> factor derives from the fact that the signature qualities of youth are
> transient; as individuals mature, the impetuousness and recklessness
> that may dominate in younger years can subside.' Johnson v. Texas, 509
> U.S. 350, 368 (1993)." (Id. 125 S.Ct. at 1195, 161 L.Ed.2d at 21-22,
> 543 U.S. at 561-562; See also, Rosenkrantz, supra, 444 F.Supp.2d 1063,
> 2006 WL2327085 at 16, citing Roper for the same proposition]).

The United States Supreme Court acknowledged that "The qualities that

distinguish juveniles from adults do not disappear when an individual turns 18,"

(Id. at 1197), but decided that for the purpose of a categorical rule, applicable

at the time the sentence is imposed, "a line must be drawn." (Id. at 1198). In

a case involving a 17 year old when the offense occurred and received a sentence

of 15 years to life with the possibility of parole, the above reasons young

offenders "cannot with reliability be classified among the worst offenders," which

1  reasons "do not disappear when the individual turns 18," may preclude a parole

2  denial based solely on an examination of the offense under "some evidence"

3  standard. When the offense has to be seen as an example of youthful ignorance

4  and "underdevelop[ment]," and the inmate's subsequent record shows he has, at

5  age 45, become an adult who has grown past those immaturities, the crime itself

6  is not enough to, alone, permit a parole denial for the fifth time.

7      In the circumstances of Petitioner's case, at bar, the Board's reliance upon

8  its belief's of Petitioner's involvement in the offense (classifying his

9  involvement as more than that of the other crime partners) (NOTE* "ALL" crime

10  partner's which include the actual shooter have already been paroled) for the

11  9th time violates due process. First, continued reliance on the unchanging or

12  unchangeable static factors makes a sham of California's parole system and amounts

13  to an arbitrary denial of Petitioner's "liberty interest in release on parole,"

14  "expectation that he will be granted parole", and his "presumption that parole

15  release will be granted." (See, McQuillion v. Duncan, 306 F.3d 895, 902 (9th Cir.

16  2002); Biggs, supra, 334 F.3d at 914-915; Rosenkrantz, supra, 29 Cal.4th at 654,

17  661).

18

19          C. DENIAL OF PAROLE BASED ON PETITIONER'S MURDER OFFENSE

20          VIOLATED DUE PROCESS BECAUSE HIS ACTS CONSTITUTED THE MINIMAL

21          CRIMINAL CONDUCT NECESSARY TO ESTABLISH THE ESSENTIAL ELEMENTS

22          OF THAT OFFENSE.

23      Petitioner's role in his commitment offense, the murder of a waiter during

24  a restaurant robbery, where Petitioner was not the actual shooter, acting as an

25  accomplice under the felony murder rule, his participation thus constituted but

26  the minimal conduct requisite to establish the elements of the commitment offense.

27      Because it is indisputable that Petitioner's acts constituted but the minimum

28  conduct necessary to establish the elements of his commitment offense, denial

of parole based on the facts of Petitioner's offense violated his right to due process, especially when all other crime partners have been released on parole including the actual shooter. See, In re Dannenberg, supra, 34 Cal.4th at pp.1095, 1098; In re Rosenkrantz, supra, 29 Cal.4th at p.683; In re Barker (2007) 151 Cal.App.4th 346, 372 (the above murder convictions did not involve "circumstances (that) reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense"); In re Lee (2006) 143 Cal.App.4th 1400, 1412-1413 (Lee's attempted premeditated murder and second degree murder perpetrated by shooting two victims at close range "involved no more than was necessary to commit his crimes"); In re Elkins (2006) 144 Cal.App.4th 475, 496-497 (first degree felony robbery-murder did not involve "circumstances (that) could ... reasonably ... be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense"); In re Weider (2006) 145 Cal.App.4th 570, 587-588 (second degree murder of Weider's wife did not involve acts "more than minimally necessary to convict him for the offense for which he is confined"); In re Gray (2007) 151 Cal.App.4th 379, 403 (Gray's second degree murder by shooting the victim in the face not "circumstances of the offense (that) reasonable could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense").

> D. THE DECISION VIOLATED PETITIONER'S DUE PROCESS RIGHTS BECAUSE THE BOARD ARTICULATED NO NEXUS BETWEEN THE IMMUTABLE OFFENSE FACTS ON WHICH IT WAS BASED, AND PETITIONER'S CURRENT PAROLE RISK, THE STATE'S PAROLE DETERMINANT.

The parole determination statute requires that parole "shall normally" be granted (P.C. §3041(a)), unless "the gravity of the current convicted offense or offenses, or the timing and gravity of the current or past convicted offense or offenses, is such that a consideration of the public safety requires a more

17

1   lengthy period of incarceration for this individual, and that a parole date,

2   therefore, cannot be fixed at this meeting." (Subd. (b).) The statute and

3   Petitioner's protected liberty interest in its benefits require more than what

4   the Board did - recite alleged commitment offense factors to presume a current

5   parole risk to public safety. Even the narrow "some evidence" test requires more

6   than a presumption - it requires evidence of a nexus between those facts and the

7   State's parole suitability determinant, the alleged risk to public safety currently

8   posed by Petitioner's parole.

9       Such a nexus of current parole risk to public safety was not established.

10  The Board merely recited the same aggravated verbiage that it applies to all parole

11  suitability hearings (Attempted murder, Second degree murder and First degree

12  murder) to imply that public safety therefore requires Petitioner's continued

13  imprisonment (forever - the offense facts can never change).

14      Reciting 22-year old commitment offense facts without suggesting how those

15  facts render Petitioner a current unreasonable parole risk (all who commit murder

16  pose an unreasonable risk at the time of the offense), does not constitute any

17  evidence of parole unsuitability. The omission was crucial considering the facts

18  that at the time of the 2008 parole hearing Petitioner had served beyond the

19  maximum term prescribed by the Board's regulations for the facts of his offense,

20  and, over twice the amount of years when he was first eligible (MEPD) of 10 years.

21  Furthermore, Petitioner's forensic evaluation by the Board's experts determined

22  (countless times) that he posed a negligible risk to public safety, far below

23  the State's standard of "unreasonable risk", therefore the Board must adhere to

24  "shall" grant parole. (P.C. §3041; 15 C.C.R. §§2401, 2402(a).)

25      The Board's recitation of immutable 22-year old offense facts and further

26  notions unsupported by or inapposite to the record is not "some" - or any -

27  evidence suggesting that Petitioner currently poses an unreasonable public safety

28  risk. Without the Board articulating some minimal nexus to the state's parole

18

1   determinant – his current public safety risk if paroled – such re-iterations are

2   meaningless. See, In re Dannenberg (2007) ___ Cal.App.4th ___, 2007 WL3408290

3   at *6 ("...upholding findings (that offense was "especially heinous" does not

4   mean that due to offense petitioner) currently poses an unreasonable risk of danger

5   to society..."); In re Montgomery (2007) ___ Cal.App.4th ___, 2007 WL3276682 at

6   *8 ("because the over-arching consideration of public safety, the test in reviewing

7   the Board's decision denying parole" 'is not whether some evidence supports the

8   reasons (the Board) cites for denying parole, but whether some evidence indicates

9   a parolee's release unreasonably endangers public safety." (Citation); In re

10  Cooper, 153 Cal.App.4th 1043, 1066-1067 (2007) (Rev. Grntd. August 6, 2007, No.

11  S155130) (not "some evidence" ... establishing that the gravity of Cooper's offense

12  shows him unsuitable for release"); In re Scott (2005) 133 Cal.App.4th 573, 595

13  ("the commitment offense can negate suitability only if circumstances of the crime

14  ... rationally indicate that the offender will present an unreasonable public

15  safety risk if released from prison"); In re Elkins (2006) 144 Cal.App.4th 475,

16  496, 499 ("Thus, a governor, in reviewing a suitability determination, must remain

17  focused not on circumstances that may be aggravating in the abstract but, rather,

18  on facts indicating that release currently poses an unreasonable risk of danger

19  to society"); In re Lee, 143 Cal.App.4th 1400, 1413 (2006) ("... the Board and

20  Governor must focus their parole decisions on whether a prisoner continues to

21  pose an unreasonable risk to public safety"); In re Lawrence, 150 Cal.App.4th

22  1511, 1554-1556 (2007) (Rev. Grntd.. July 2, 2007, No. S154018); In re Gray, 151

23  Cal.App.4th 379 (2007). See also, Willis v. Kane, 485 F.Supp.2d 1126, 135 (N.D.

24  Cal. 2007) ("Notwithstanding the terrible nature of the crime, the critical

25  question the BPH was supposed to decide at the parole suitability hearing was

26  whether 'consideration of the public requires a more lengthy period of

27  incarceration for this individual', See P.C. §3041(b) ... Willis' 1983 crime did

28  not provide sufficient evidence to find him unsuitable for parole in 2003");

1  Nikooseresht v. Curry, 2007 WL2088558 (N.D. Cal. 2007) at *6 ("petitioner's
2  commitment offense cannot by itself constitute some evidence that petitioner
3  continues to pose an unreasonable risk of danger to society); Brown v. Kane, 2007
4  WL 1288448 (N.D. Cal. 2007) at *7; Blankenship v. Kane, 2007 WL1113798 (N.D. Cal.
5  2007) at *10; Thomas v. Brown, 2006 WL3783555 (N.D. Cal. 2006) at *6; Rosenkrantz
6  v. Marshall, 444 F.Supp.2d 1063, 1086 (C.D. Cal. 2006); Hayward v. Marshall, 512
7  F.3d at 545-547 (9th Cir. 2008) ("The court determined that the Governor's findings
8  were either unsupported by evidence in the record, id. at 546, or were based on
9  unchanging factors which occurred twenty-seven to fifty years ago and did not
10 constitute evidence that the prisoner would pose a danger to public safety if
11 released from prison, id. at 545-547.)

12     As these recent state and federal decisions hold, due process and the State's
13 parole scheme (P.C. §3041; 15 C.C.R. §§2401, 2402(a)) clearly require the
14 articulation of a nexus between the offense facts recited and a prospective
15 parolee's current parole risk. Because none was set forth by the Board or exists,
16 denial of parole based on a recitation of offense factors was arbitrary and
17 violated Petitioner's due process, particularly after Petitioner had been evaluated
18 by the Board's forensic experts not to pose an unreasonable risk of danger to
19 public safety is paroled, (many times over the years).

20     Put another way, in order to apply the "some evidence" standard, a reviewing
21 court must ask the pivotal question, "some evidence of WHAT"? The question is
22 answered by the State's parole determination statute: The offense facts must
23 demonstrate that the "timing" or "gravity" of the commitment offense renders the
24 inmate's parole a current public safety risk (every prospective parolee was
25 dangerous when he or she committed their offense). (P.C. §3041(b).) Emphasis added.

26     What did the Board say about the "timing" of Petitioner's offense that makes
27 him a current parole risk to public safety? NOTHING.

28     What did the Board say about how or why the "gravity" of the offense makes

20

1   petitioner a current public safety risk? NOTHING. The Board offered no hint as

2   to how the facts it disputes still serve to make Petitioner a public safety risk

3   if paroled. The omission was crucial because the State's forensic experts have

4   assessed petitioner's impending parole not to pose an "unreasonable risk of danger"

5   to public safety, the State's parole suitability standard below which the Board

6   "shall" grant parole (P.C. §3041(a); 15 C.C.R. §§2401, 2402(a).)

7       Recent Court of Appeal decisions explain in further detail why due process

8   requires that, in order to deny parole the Board must irrespective of the facts

9   of the commitment offense or subsequent events, set forth evidence suggesting

10  that the subject still would pose an unreasonable risk to public safety if paroled.

> Thus, it is not enough that there is some evidence to support the factors
> cited for denial; that evidence must also rationally support the core
> determination required by the statute before parole can be denied, i.e.,
> that a prisoner's release will unreasonably endanger public safety.
> (In re Lee (2006) 143 Cal.App.4th 1400, 1408, 49 Cal.Rptr.3d 931; In
> re Scott (2005) 133 Cal.App.4th 573, 595, 34 Cal.Rptr.3d 905 (Scott
> II) "Some evidence of the existence of a particular factor does not
> necessarily equate to some evidence the parolee's release unreasonably
> endangers public safety." (Lee, supra, 143 Cal.App.4th at p.1408). The
> dissent's proposed standard of review would require affirmation of every
> Board decision if even a single unsuitability factor is found, regardless
> of whether that factor would rationally support a conclusion, based
> on individualized consideration, that the inmate would pose an
> unreasonable risk of danger...If this were the standard, the courts
> would indeed be relegated to the status of potted plants. (Scott I,
> 119 Cal.App.4th at p.898, 15 Cal.Rptr.3d 32).

> The only ground for a parole denial is found in P.C. §3041(b), which
> provides that a release date shall be set "unless (the Board) determines
> that ... consideration of the public safety requires a more lengthy
> period of incarceration." Interpreting that standard, our high court
> has required that the Board's decisions not be arbitrary or capricious
> (Rosenkrantz, supra, 29 Cal.4th at p.677, 128 Cal.Rptr.2d 104, and that
> the Board's decisions be made "on relevant grounds" and supported by
> the evidence (Dannenberg, supra, 34 Cal.4th at p.1071). We read those
> directives as mandating that the Board, in its decisions, must articulate
> reasons that are grounded in evidence and rationally related to the
> statutory basis for denial. The dissent's proposed standard, we think,
> goes beyond even the differential "some evidence" standard and would
> annul any meaningful judicial review. Were we required to engage in
> the kind of prodigious efforts undertaken by our dissenting colleague
> to shore up the Board's decisions denying parole, affirmance would be
> guaranteed in every case. (In re Roderick, supra, 154 Cal.App.4th at
> p.263.)

Finally, as has been recently stated, because the over-arching consideration is public safety, the test in reviewing the Board's decision denying parole "is not whether some evidence supports the reasons (the Board) cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety." (Lee, supra, 143 Cal.App.4th at 1408, 49 Cal.Rptr.3d 931, fn. omitted.) As discussed above, the "overarching" factor determining whether parole should be granted or denied is whether the criminal poses "an unreasonable risk of danger to society." (Scott II, supra, 133 Cal.App.4th at p.591, 34 Cal.Rptr.3d 905; §2281(a); Lee, supra, 143 Cal.App.4th at p.1400, 49 Cal.Rptr.3d 931.) As also discussed above, every psychological evaluation in the record dating back at least to 1999 has concluded Barker would pose little or no danger to public safety if released on parole. (In re Barker, supra, 151 Cal.App.4th at p.375; emphasis added.)

In sum the Board would preclude Petitioner's parole (forever - neither his undisputed maximum parole suitability otherwise and low public safety risk, nor the facts of the offense, can ever improve) for that very reason that he is suitable for parole - he has served more than the term prescribed for the facts of his offense, established an exemplary post-conviction record of reform for more than the past 22 years, and poses no further risk of danger to public safety.

The statutory, regulatory, and decisional law requires a nexus between the unsuitability factors dutifully recited by the Board and a prospective parolee's current risk of danger to public safety is paroled.

Because no nexus was set forth by the Board and none exists in Petitioner's case, denying him parole on this basis violated his right to due process and untenably extinguished his protected liberty interest in parole.

E. INTERMINABLE DENIAL OF PETITIONER'S PAROLE BASED ON ARGUABLY
APPLICABLE BUT IMMUTABLE FACTORS OF HIS COMMITMENT OFFENSE
VIOLATES DUE PROCESS BY AMENDING HIS PRISON TERM TO LIFE
WITHOUT ANY POSSIBILITY OF PAROLE.

The only arguably viable ground for the 2008 Board's finding that Petitioner was unsuitable for parole was the gravity of the offense. (Exhibit A). Although in some cases a parole qualified prisoner like Petitioner may be denied parole

22

1    initially if the commitment offense was particularly egregious compared to other

2    examples of that offense, offense factors alone cannot continue to serve, as here,

3    as the basis for interminably precluding parole. See, Biggs v. Terhune, supra,

4    334 F.3d at pp.916-917.

5        The State's courts warn that "(T)he Board's authority to make an exception

6    based on the gravity of a life term inmate's current or past offenses should not

7    operate so as to swallow the rule that parole is "normally" to be granted..."

8    (Rosenkrantz, 29 Cal.4th at p.683, citing Ramirez, supra, 94 Cal.App.4th at p.570).

9        The Ninth Circuit reviewed the constitutional propriety of a BPH panel's

10   use of first degree murder commitment offense to find a prisoner unsuitable for

11   parole at his first hearing. The Court found no evidence to support most of the

12   Board's grounds for unsuitability, but held that a particularly egregious

13   commitment offense could be an appropriate basis for finding such a prisoner

14   unsuitable for parole at an initial parole hearing. The Ninth Circuit cautioned:

15           As in the present instance, the parole Board's sole supportable reliance
16           on the gravity of the offense and conduct prior to imprisonment to
             justify denial of parole can be initially justified as fulfilling the
17           requirements set forth by state law. Over time, however, should Biggs
             continue to demonstrate exemplary behavior and evidence of
18           rehabilitation, denying him a parole date simply because of the nature
             of Biggs offense and prior conduct would raise serious questions
19           involving his liberty interest in parole...

20           A continued reliance in the future on an unchanging factor, the
             circumstances of the offense and prior conduct to imprisonment, runs
21           contrary to the rehabilitation goals espoused by the prison system and
             could result in a due process violation. (Biggs, supra, 334 F.3d at
22           pp.916-917). See also, Irons v. Carey (9th Cir. 2007) 479 F.3d 658.

23       Bigg's holding has been ratified in addressing the issue here raised by

24   Petitioner's in decisions by the U.S. District Courts for the Northern District

25   and Central District of California, and more recently by several California Courts

26   of Appeal.

27       In a recent decision well known to the Courts, a federal district court

28   ordered the release of a California life term prisoner whose commitment offense

1   was one of the most egregious murders on record – the defendant had purchased

2   and practiced with an Uzi, laid in wait, shot the victim ten times, absconded,

3   and threatened further revenge. In reversing the Board's decision at Rosenkrantz

4   parole hearing and ordering his release from prison, the District Court explained:

> In the circumstances of this case, the BPT's continued reliance upon
> the nature of Petitioner's crime to deny parole [] violated due process.
> First, continued reliance upon the unchanging facts of Petitioner's
> crime makes a sham of California's parole system and amounts to an
> arbitrary denial of Petitioner's liberty interest. Petitioner had been
> denied parole on six occasions prior to the determination he now
> challenges. Continued reliance upon the unchanging characterization
> of Petitioner's offense amounts to converting Petitioner's sentence
> of seventeen years to life to a term of life without the possibility
> of parole. [].
>
> Second, in this case, the circumstances of Petitioner's crime do not
> amount to some evidence supporting the conclusion that Petitioner poses
> an unreasonable risk of danger if released. As discussed, "(i)n the
> parole context, the requirements of due process are met if some evidence
> supports the decision."
> Significantly, the evidence underlying the decision must be supported
> by "some indicia of reliability." Biggs, 334 F.3d at 914 (internal
> quotations omitted) [.] Otherwise, it does not constitute "some
> evidence." [].
>
> While relying upon Petitioner's crime as an indicator of his
> dangerousness may be reasonable for some period of time, in this case,
> continued reliance on such unchanging circumstances – after nearly two
> decades of incarceration and half a dozen parole suitability hearings
> violates due process because Petitioner's commitment offense has become
> such an unreliable predictor of his present and future dangerousness
> that it does not satisfy the "some evidence" standard. After nearly
> twenty years of rehabilitation, the ability to predict a prisoner's
> future dangerousness based simply on the circumstances of his or her
> crime is nil. (Rosenkrantz v. Marshall, supra, 444 F.Supp.2d at 1083-
> 1087; See also,, In re Rosenkrantz (2006), No. BH003529).

22   Petitioner's case is exactly what Biggs envisioned when it stated that

23   repeated refusals to grant a parole release date to an inmate with an exemplary

24   post-conviction record may violate the prisoner's due process rights. The record

25   is replete with evidence of Petitioner's remorse and rehabilitation, including

26   glowing positive psychological reports, extensive self-help improvement through

27   educational and vocational advancements as well as valued service in promoting

28   the penalogical goals of the prison and with only one (1) minor disciplinary action

1 | over the last eight years (2003). The evidence of Petitioner's outstanding
2 | performance while incarcerated is particularly significant. What is also
3 | significant is that during the previous four hearings the county of commitment's
4 | District Attorneys did not oppose a parole date but rather encouraged the Board
5 | to give more consideration to setting one and reiterated to the Board that "all"
6 | of his co-defendants have been previously released on parole. It is this 'instant
7 | cases denial' where the District Attorney now opposed release. Such a
8 | recommendation appears to be the luck of the draw, a flip of a coin as to which
9 | District Attorney comes to represent the county of commitment and as such is
10 | arbitrary and capricious.

11 | As stated by D.D.A. Meehan, from Alameda County, Petitioner's county of
12 | commitment, at his previous parole suitability hearing; At page 47 of the 2007
13 | Transcripts:

14 | "I have had a chance to review Mr. To's file. I also note that my office
has sent letters in the past. I particularly note the letters sent by
15 | my colleagues the late Tom Ross from July 2001 and John Brohard from
May of 3004. I note that Mr. Patten from the District Attorney's office
16 | wrote a letter back on February 3rd, 2006. That was in anticipation
of the January 10th hearing and Mr. Patten at that time did express
17 | that he felt that this was a matter to the discretion of the Board in
terms of further incarceration for Mr. To, and I certainly understand
18 | his position, because I think I understand in reviewing the file that
Mr. To's accomplices have since paroled, and that would include the
19 | young man who was actually responsible for the firing of the weapon
that caused the death of the victim."

20 |
21 | "I would note that this was initially a plea (P.48) bargain that Mr.
To entered into..."

22 | "...so I'm prepared to acknowledge that within the scope of the plea
agreement it was understand (sic) back in 1987 as it is today that there
23 | would certainly be a date at which Mr. To would be best seriously
considered for parole or release."

24 |
25 | (p.49) "I can indicate to the Board that our office is not opposed to
the granting of (p.50) a parole date."

26 | "So, again, I'm mindful of the fact that the other participants to this
crime have already been released on parole. Mr. To should be commended
27 | to the extent that he has by and large remained disciplinary-free, and
this is a matter that I think the Board should very much give serious
28 | consideration to."

25

1    The above excerpts from D.D.A. Meehan are distinctly opposite to the current

2    D.D.A.'s opposition to parole, also, no letters were received in opposition to

3    parole in accordance with P.C. §3042.

4        In In re Viray, 75 Cal.Rptr.3d 190 (Cal.App.4th 2008), at page 197, the court

5    held that:

6            "As a threshold matter, Viray is subject to an "INS hold" and is
7            "conclusively presumed" to be deportable based on his status as a
             murderer. (8 U.S.C. §§1101(a)(43)(A) [murderers classified as aggravated
8            felons for immigration purposes), 1228(c) [aggravated felons are
             conclusively presumed to be deportable].) Even assuming, however that
9            Viray is not deported, he need not have "fail-safe parole plans in two
             different countries." (In re Andrade (2006) 141 Cal.App.4th 807, 817,
10           46 Cal.Rptr.3d 317.) The regulations require that an inmate have
             realistic plans for the future or, alternatively, that the inmate
11           developed marketable skills that can be put to use upon release. (Cal.
             Code Regs. tit., 15 §2402, subd. (d)(8).)"

12       While the Board did require offers of employment, from Hong Kong, China,

13   it is acknowledged in the record (Exhibit A & B) that Petitioner has "marketable

14   skills" and he has family support (Exhibit "C") upon his deportation to Hong Kong,

15   China. To suggest or demand that he have offers of employment from Hong Kong is

16   ludicrous and would be a hurdle that Petitioner could not perform. The Board cannot

17   require nor can parole be based on a requirement that is impossible to obtain.

18   In the 'real' world no one nor any company is going to offer and hold a position

19   of employment open for an unknown amount of time especially 6,000 miles away in

20   a foreign country.

21       §2402(d)(7) dictates that: "Understanding and Plans for Future. The prisoner

22   has made realistic plans for release or has developed marketable skills that can

23   be put to use upon release." Exhibit "B" establishes that the psychological

24   forensic expert was satisfied with Petitioner's parole plans and did address

25   Petitioner's "marketable skills" contrary to the Board's findings.

26       As the Supreme Court has recognized, "[t]he behavior of an inmate during

27   confinement is critical in the sense that it reflects the degree to which the

28   inmate is prepared to adjust to parole release." Greenholtz v. Nebraska, 442 U.S.

1  at 15. Regardless of whether the Board ever was entitled to rely upon the

2  commitment offense to find that Petitioner posed an unreasonable risk of danger

3  and was unsuitable for parole, the Board's continued reliance on the commitment

4  offense and prior criminality violates due process because it resulted in an

5  arbitrary decision and because the facts surrounding the offense do not now

6  constitute "some evidence" with "some indicia of reliability" of Petitioner's

7  dangerousness. See, Hill, 472 U.S. at 455; Biggs, 334 F.3d at 917; Irons, 358

8  F.Supp.2d at 947.

9      The state courts of California have relied identically on this issue in

10  ordering the release of inmates committed for life offenses. See, In re Gray,

11  supra. 151 Cal.App.4th 379; In re Lawrence, supra, 150 Cal.App.4th at pp.1535-

12  1540 (Rev. Grntd., July 2, 2007, No. S154018); In re Elkins, supra, 144 Cal.App.4th

13  at pp.498-499; In re Lee, supra, 143 Cal.App.4th at pp.1412-1413; In re Scott,

14  supra, 133 Cal.App.4th at p.595; In re Barker, supra, 151 Cal.App.4th at p.372;

15  In re Dannenberg, supra, 2007 WL at *9 ["The nature of Dannenberg's commitment

16  offense was the sole basis for the Governor's decision that Dannenberg currently

17  poses an unreasonable risk of danger to society if released. While Dannenberg's

18  commitment offense was grave, the record [] lacks any evidence that now, more

19  than two decades after his offense, the nature of Dannenberg's offense alone

20  continues to support a conclusion that he poses an unreasonable risk of danger

21  to society if released."

22      By the time of the 2008 parole hearing (the 9th), Petitioner had served in

23  excess of the prison term prescribed by the regulations. Because neither those

24  facts nor the maximum parole suitability he has indisputably achieved and

25  maintained can possibly improve, the continued preclusion of Petitioner's parole

26  based on his offense and prior criminal conduct is necessarily interminable. The

27  process has converted his prison term, 15 years to life with the possibility of

28  parole, which P.C. §3041(a) defines as a probability (Board "shall normally set

27

a parole release date"), to life without any possibility of parole – unless, as the District Court in Irons posed – some future panel or Governor arbitrarily decides – before Petitioner's ultimate death in state prison – that all the previous panels and governors were wrong. Irons v. Warden, supra, at p.947. Neither the liberty interest provided by the state's parole laws and regulations nor the due process clause itself permits the possibility of Petitioner's parole to rest entirely on such arbitrary speculation.

## CONCLUSION

The finding set forth by the Board, that Petitioner currently poses an unreasonable risk of danger to society, is supported by no evidence, and is inapposite to the record and governing parole statutes and regulations. The codified factors recited by the Board are inherent in all premeditated murders and bear no nexus to his current parole risk, and the Board's continued use to preclude Petitioner's parole has converted his prison term to life without the possibility of parole, and extinguishes his constitutionally protected liberty interest in parole.

The risk to public safety posed by Petitioner's, parole, as assessed in his forensic psychological evaluation (Exhibit "B"), is negligible. No contrary evidence exists. Nor is that assessment negated by the 23 year old commitment offense facts, which have no further predictive value or bearing upon Petitioner's current parole risk. Not a shred of evidence cited by the Board supports its speculation that Petitioner's parole would pose an unreasonable risk of danger to society. The Board's decision flunks the some evidence test, denies due process, and must be vacated. (Noting* "All" of Petitioner's co-defendants have been released on parole including the actual shooter).

//

//

28

## PRAYER

Petitioner seeks an order from this Court reversing his Board of Parole Hearings decision of February 27 2008, because still further review of the same record (the same record which the psychological evaluation is based) would be unavailing and he has served in excess of his appropriate prison term. That this Court order Petitioner's release for deportation forthwith. See, In re Lee, supra, 143 Cal.App.4th at p.941; In re Elkins, supra, 144 Cal.App.4th at p.503 (vacating decisions denying parole in second-degree murder cases and ordering parole release).

Having set forth a prima facie case for relief, an order to show cause should be issued.

## DECLARATION

I declare under penalty of perjury that the foregoing is true and correct, executed this $\underline{8}$ day of August 2008, at Soledad, California.

Wayland To

29

# EXHIBIT

# A

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life     )     CDC Number:  D-48864
Term Parole Consideration     )
Hearing of:                   )
                              )     INMATE COPY
WAYLAND TO                    )
_____)

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

FEBRUARY 13, 2007

1:12 P.M.

PANEL PRESENT:

JANICE ENG, PRESIDING Commissioner
ROLANDO MEJIA, Deputy Commissioner

OTHERS PRESENT:

WAYLAND TO, Inmate
KATERA RUTLEDGE, Attorney for Inmate
JAMES MEEHAN, Deputy District Attorney

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____No     See Review of Hearing
_____Yes    Transcript Memorandum

Gina L. Lavoie, Capitol Electronic Reporting

# I N D E X

                                                              Page

Proceedings.............................................   3

Case Factors............................................  12

Pre-Commitment Factors..................................  14

Post-Commitment Factors.................................  28

Parole Plans............................................  30

Closing Statements......................................  47

Recess..................................................  57

Decision................................................  58

Adjournment.............................................  64

Transcript Certification................................  65

1 **P R O C E E D I N G S**

2 **PRESIDING COMMISSIONER ENG:** Consideration

3 hearing for Wayland To, T-O, CDC number D48864. Today's

4 date is February 13th, 2007, and the time is 1:12 in the

5 afternoon. We are located at CTF Soledad. Let's see.

6 The inmate was received on March 2nd, 1987 from Alameda

7 County. The life term began on the same date, March

8 2nd, 1987 and his minimum eligible parole date is now

9 December 12th, 1995. The controlling offense for which

10 the inmate has been committed is murder two, case number

11 85646, count one Penal Code section 187. The inmate

12 received a total term of 15 years to life.

13 This hearing is being tape recorded, so for the

14 purpose of voice identification each of us will be

15 required to state our first and last name, spelling out

16 our last name. And, sir, after you spell your last name

17 please provide us with your CDC number. So I will begin

18 and we will move to my left. My name is Janice Eng,

19 E-N-G, Commissioner.

20 **DEPUTY COMMISSIONER MEJIA:** Rolando Mejia,

21 M-E-J-I-A, Deputy Commissioner.

22 **DEPUTY DISTRICT ATTORNEY MEEHAN:** James Meehan,

23 Alameda County Senior Deputy District Attorney,

24 M-E-E-H-A-N.

25 **ATTORNEY RUTLEDGE:** Katera E. Rutledge,

1   R-U-T-L-E-D-G-E, Attorney for Mr. To.

2        **INMATE TO:** Wayland To, T-O, 48864.

3        **PRESIDING COMMISSIONER ENG:**  Thank you.  We also

4   have two correctional officers present for security

5   reasons, and they will not be participating in this

6   hearing.  Before we begin, sir, I'm going to ask for you

7   to please read the ADA statement on the desk in front of

8   you out loud.  You can begin at any time.

9        **INMATE TO:**

10                "The American with Disability Act, ADA, is

11           a law to help people with disabilities.

12           Disabilities are problems that make it harder for

13           some people to see, hear, breathe, talk, walk,

14           learn, think, work, or take care of themselves

15           than it is for others.  Nobody can be kept out of

16           public place or activities because of a

17           disability.

18                "If you have a disability, you have the

19           right to ask for help to get ready for your BT,

20           BT, BPT hearing, get to the hearing, talk, read

21           forms and papers, and understand the hearing

22           process.  BPT will look at what, look at what you

23           ask for to make sure that you have a disability

24           that is covered by the ADA and that you have

25           asked for the right kind of help.

1               "If you do not get help or if you don't

2           think you got the kind of help you need, ask for

3           a BPT 1074 grievance form.  You can also get help

4           to fill it out."

5       **PRESIDING COMMISSIONER ENG**  Okay, thank you, sir.

6   The record also reflects that you did sign a BPT form

7   1073 back on September 7th of 2006, and that form, sir,

8   is the reasonable accommodation notice and request in

9   accordance with the provisions of the Americans with

10  Disabilities Act.  And on this form you checked off that

11  you did not have any disabilities as defined under the

12  ADA, is that correct?

13      **INMATE TO:**  Yes, Ma'am.

14      **PRESIDING COMMISSIONER ENG:**  So this information

15  is still current and correct?

16      **INMATE TO:**  Yes, Ma'am.

17      **PRESIDING COMMISSIONER ENG:**  Okay.  I still have

18  to go through some basic ADA questions with you, though.

19  Hang in there.  Do you have any problems walking up or

20  down stairs or for distances of a hundred yards or more?

21      **INMATE TO:**  No, Ma'am.

22      **PRESIDING COMMISSIONER ENG:**  Okay.  And how about

23  do you need any glasses to read or to see distances?

24      **INMATE TO:**  No, Ma'am.

25      **PRESIDING COMMISSIONER ENG:**  Okay.  Do you have

6

1    any difficulties with your hearing?

2        **INMATE TO:** No, Ma'am.

3        **PRESIDING COMMISSIONER ENG:** Okay. Have you ever

4    been included in the Triple-CMS or the EOP program?

5        **INMATE TO:** No, Ma'am.

6        **PRESIDING COMMISSIONER ENG:** And you know what

7    those are?

8        **INMATE TO:** Triple-C I think I know, but the

9    other one I don't know.

10        **PRESIDING COMMISSIONER ENG:** Okay. Well, you

11    understand both of those programs come under Mental

12    Health.

13        **INMATE TO:** Okay.

14        **PRESIDING COMMISSIONER ENG:** Okay, so as far as

15    you know, you have not been in those?

16        **INMATE TO:** No.

17        **PRESIDING COMMISSIONER ENG:** Okay. So have you

18    taken any psychotropic medications, either in prison or

19    on the streets?

20        **INMATE TO:** No, Ma'am.

21        **PRESIDING COMMISSIONER ENG:** Okay. And while you

22    were going to school, do you recall if you've ever been

23    enrolled in Special Education classes?

24        **INMATE TO:** Well, when I was on the streets, yes,

25    Ma'am.

1      **PRESIDING COMMISSIONER ENG:**  You had Special Ed

2  when you were on the streets?

3      **INMATE TO:**  Yeah.

4      **PRESIDING COMMISSIONER ENG:**  In the US or back --

5      **INMATE TO:**  US.

6      **PRESIDING COMMISSIONER ENG:**  In the US?  When you

7  were going to school?

8      **INMATE TO:**  Yeah.

9      **PRESIDING COMMISSIONER ENG:**  Okay.  You were

10  enrolled in Special Ed?

11      **INMATE TO:**  Special Ed, yes.

12      **PRESIDING COMMISSIONER ENG:**  Okay.  In any

13  particular areas?

14      **INMATE TO:**  English.

15      **PRESIDING COMMISSIONER ENG:**  English?  Okay.

16  That's what I thought.  Okay.  So do you suffer from any

17  disability that would prevent you from participating in

18  today's hearing?

19      **INMATE TO:**  Not that way.  No, Ma'am.

20      **PRESIDING COMMISSIONER ENG:**  Okay.  Counsel, any

21  ADA issues that you believe need further discussion as

22  far as your client's ability to participate today?

23      **ATTORNEY RUTLEDGE:**  No, Ma'am.

24      **PRESIDING COMMISSIONER ENG:**  This hearing is

25  being conducted pursuant to the Penal Code and the Rules

1    and Regulations of the Board of Parole Hearings

2    governing Parole Consideration Hearings for life

3    inmates.  The purpose of today's hearing is to once

4    again consider your suitability for parole.  In doing

5    so, we will consider the number and nature of the crimes

6    for which you were committed, your prior criminal and

7    social history, your behavior and programming since your

8    commitment, and your plans if released.  So we've had

9    the opportunity to review your central file, and you

10   will also have an opportunity to make any corrections or

11   clarify the record for us.  We will consider your

12   progress since your commitment, your counselor's

13   reports, and your mental health evaluations.  However,

14   we will focus on your progress and any new reports since

15   your last hearing.  So any changes in parole plans

16   should be brought to our attention.

17        We will reach a decision today and inform you

18   whether or not we find you suitable for parole and the

19   reasons for our decision.  So if you are found suitable

20   for parole, the length of your confinement will be fully

21   explained to you at that time.  Okay?  Before we recess

22   for deliberations, the District Attorney's

23   representative, who's on video, your legal Counsel, and

24   you yourself have an opportunity to make a final

25   statement regarding your parole suitability, but if you

1 | choose to make a final statement just remember to focus
2 | on why you believe you are suitable for parole today.
3 | **INMATE TO:** Okay.

4 | **PRESIDING COMMISSIONER ENG:** Okay. We'll then
5 | recess, clear the room, and deliberate. And once we
6 | complete deliberations, we will resume the hearing and
7 | announce our decision.

8 | California Code of Regulations states that
9 | regardless of time served a life inmate shall be found
10 | unsuitable for and denied parole if in the judgment of
11 | the Panel the inmate would pose an unreasonable risk of
12 | danger to society if released from prison.

13 | You have certain rights. Those rights include
14 | the right to a timely notice of this hearing, the right
15 | to review your central file, and the right to present
16 | relevant documents. So far, Counsel, have your client's
17 | rights been met?

18 | **ATTORNEY RUTLEDGE:** Yes.

19 | **PRESIDING COMMISSIONER ENG:** Okay. You also have
20 | the additional right to be heard by an impartial Panel.
21 | You've been introduced to this Panel. Do you have any
22 | objections?

23 | **INMATE TO:** No, Ma'am.

24 | **PRESIDING COMMISSIONER ENG:** Okay. Counsel, any
25 | objections to the Panel?

1    **ATTORNEY RUTLEDGE:**  No.

2    **PRESIDING COMMISSIONER ENG:**  You will receive a

3  copy of our written tentative decision today, and that

4  decision becomes final within 120 days.  A copy of the

5  final decision and a copy of the transcript will be sent

6  to you.

7    On May 1st, 2004 the regulations regarding your

8  right to appeal a decision made at this hearing were

9  repealed.  Basically, you have to go to court now.  So

10  if you have any questions about that policy, you can

11  discuss it with your legal Counsel or your can review

12  the policy at your prison law library.  You're not

13  required to admit to or discuss your offense.  However,

14  this Panel does accept as true the findings of the

15  court.  So do you understand what that means?

16    **INMATE TO:**  Yes, Ma'am.

17    **PRESIDING COMMISSIONER ENG:**  Okay.  I'm going to

18  pass this hearing checklist over to your Counsel.

19  That's marked exhibit one, and, sir, we do this to make

20  sure that all of us that are participating in the

21  hearing are operating off the same set of documents.

22    **INMATE TO:**  Okay.

23    **PRESIDING COMMISSIONER ENG:**  Okay.

24    **ATTORNEY RUTLEDGE:**  I have the documents listed

25  here.

1    **PRESIDING COMMISSIONER ENG:** Okay.  Okay.  Mr.

2  Meehan, I'm going to ask you if you have the same

3  hearing checklist that's dated January 24th, 2007?

4    **DEPUTY DISTRICT ATTORNEY MEEHAN:** I do.

5    **PRESIDING COMMISSIONER ENG:** Okay, fine.  So I'll

6  just (inaudible).  Okay.  Okay.  Any additional

7  documents to be submitted to the Panel this afternoon,

8  Ms. Rutledge?

9    **ATTORNEY RUTLEDGE:** Not this time, no.

10    **PRESIDING COMMISSIONER ENG:** Okay.  And any

11  preliminary objections?

12    **ATTORNEY RUTLEDGE:** No.

13    **PRESIDING COMMISSIONER ENG:** Okay.  And will your

14  client be speaking with the Panel?

15    **ATTORNEY RUTLEDGE:** On all issues other than the

16  commitment offense.

17    **PRESIDING COMMISSIONER ENG:** Okay, fine.  Sir,

18  I'll still have to swear you in, so please raise your

19  right hand.  Okay.

20    Do you solemnly swear or affirm that the

21  testimony you give at this hearing will be  the truth,

22  the whole truth and nothing but the truth?

23    **INMATE TO:** Yes, Ma'am.

24    **PRESIDING COMMISSIONER ENG:** Okay, thank you.

25  Sit back and relax.  All right.  First off, what I'm

1    going to do is read into the record the Statement of

2    Facts about the crime. And I am going to take that from

3    the probation officer's report in the back of our

4    packet, I believe it starts on page two and it ends on

5    page three. And actually, you know what, I just noticed

6    that that actually says that that's a defendant

7    statement. So I take that back. I'm going to correct

8    that. I'm actually going to take it from the January

9    2007 Board report. Under summary of crime it states,

10           "About two months before the commitment

11       offense, To met a man by the name of Ming Tran.

12       Tran in parenthesis age 22 had a car and some

13       money. To in parenthesis age 16 and his co-

14       participants, Henry Ho in parenthesis age 15 and

15       Alwyn, A-L-W-Y-N, Chi, C-H-I, age 18, had been

16       with Tran continuously for three or four days,

17       driving around, playing video arcade games, cards

18       and ping pong.

19           "On the evening before the commitment

20       offense, on January 4th, 1986, Tran rented a

21       hotel room in Oakland. Tran told the others that

22       he was out of money since he had spent it all on

23       them. He told the others that they now had to

24       help him out by doing a robbery. They drove

25       around and spotted the Feng F-E-N-G Yen, Y-E-N,

1          restaurant in Albany.  Tran went into the

2          restaurant briefly, came out and said that it was

3          quiet and directed the other three to go in and

4          rob the establishment.

5               "The three others entered the restaurant

6          and ordered a meal.  When they were nearly

7          through eating, Tran came back in and indicated

8          that they should start the robbery.  At this

9          point, the group took various positions in the

10         restaurant.  All of the customers and workers

11         were gathered and placed in the back of the

12         restaurant.  Ho then shot the victim, a waiter,

13         killing him without provocation.  Chi was armed

14         with a knife and Ho had a gun."

15         Again, this is taken from the probation officer's

16    report and a letter from the Deputy DA of Alameda

17    County.  And because Mr. To will not be speaking about

18    the crime, I am going to read into the record his

19    version, also taken from the January 2007 Board report.

20    And this says,

21              "To said that his version remains the same

22         as he previously stated.  He and his co-

23         participants had been with Tran for four days

24         driving around, going to video arcades, playing

25         cards and ping pong.

1           "On the evening before the robbery, they

2       and Tran rented a hotel room in Oakland.  Tran

3       stated that he was out of money because he had

4       spent it all on them.  Tran went on to state that

5       now they had to help him out by doing a robbery.

6           "They drove around and spotted the

7       restaurant.  Tran got out of the car, quote cased

8       unquote the restaurant, and stated that it was

9       quiet.  Tran then directed the other three to go

10      ahead and quote do it unquote.  They went into

11      the restaurant.  Ho had a gun, Chi had a knife,

12      and To had a gun, which he said was unloaded.

13          "About 10 minutes later, Tran came in and

14      indicated that they should start the robbery.  At

15      this point, the group took various positions and

16      Ho took Chao, C-H-A-O, Yen Teng into the kitchen.

17      It was at this point that a gunshot was heard.

18      The four men ran to the car and went back to the

19      hotel.  To was arrested at a coffee shop a few

20      days later."

21      Okay.  Regarding Mr. To's prior record, I see

22  here that, well, actually, you were a juvenile when you

23  committed the life offense.  You were 16, correct?

24      **INMATE TO:**  Yes, Ma'am.

25      **PRESIDING COMMISSIONER ENG:**  Okay.  But at the

1    age of 14, it says in March of 1984, you were made a

2    ward of the court following two felonies, a burglary and

3    assault with a deadly weapon, or a force likely to

4    produce grave bodily injury.  There was also a

5    misdemeanor finding of a violation of trespassing.  Do

6    you recall that?

7         **INMATE TO:**  Can you repeat the deadly weapon?

8    What's the deadly weapon?

9         **PRESIDING COMMISSIONER ENG:**  Well, it said

10   assault with a deadly weapon, or force likely to produce

11   grave bodily injury.  So do you have any recollection --

12        **INMATE TO:**  I don't, I don't recall that.

13        **PRESIDING COMMISSIONER ENG:**  -- of the event?  Do

14   you remember being arrested?

15        **INMATE TO:**  I was, okay.  The one you're talking

16   about is the one I put a lighter in front of girl's

17   face.

18        **PRESIDING COMMISSIONER ENG:**  Okay.

19        **INMATE TO:**  That's the only one.

20        **PRESIDING COMMISSIONER ENG:**  Okay.  All right.

21   Did you do a burglary?

22        **INMATE TO:**  Yes, Ma'am.

23        **PRESIDING COMMISSIONER ENG:**  At the same time?

24        **INMATE TO:**  No.

25        **PRESIDING COMMISSIONER ENG:**  Okay.  So you did a,

*Capitol Electronic Reporting*

16

| | |
|---|---|
| 1 | okay, and the trespassing.  Well, tell me more about |
| 2 | that.  What -- |
| 3 | **INMATE TO:**  I don't recall. |
| 4 | **PRESIDING COMMISSIONER ENG:**  You don't remember |
| 5 | what you -- Were you alone and you -- Why did you pull a |
| 6 | lighter on a girl's face? |
| 7 | **INMATE TO:**  That's when I was in school, you |
| 8 | know.  You know, you was young, you like to tease the |
| 9 | girls.  That's how I was -- I smoked.  I don't know |
| 10 | nothing better.  Just kid, you know, playing around. |
| 11 | That's it. |
| 12 | **PRESIDING COMMISSIONER ENG:**  Okay. |
| 13 | **INMATE TO:**  The one I put the lighter on, she |
| 14 | knows me.  It's the principal in the school.  They know |
| 15 | I'm a troublemaker, so they called the -- |
| 16 | **PRESIDING COMMISSIONER ENG:**  The police? |
| 17 | **INMATE TO:**  -- police on me. |
| 18 | **PRESIDING COMMISSIONER ENG:**  Okay.  So that was a |
| 19 | different time than, was that, were you trespassing at |
| 20 | the same time, or was that something totally different? |
| 21 | **INMATE TO:**  Totally different. |
| 22 | **PRESIDING COMMISSIONER ENG:**  Okay.  And where |
| 23 | were you trespassing? |
| 24 | **INMATE TO:**  I don't know.  It was long time ago. |
| 25 | Can't recall. |

1      **PRESIDING COMMISSIONER ENG:** But you don't

2 remember anything about the burglary, or attempted

3 burglary?

4      **INMATE TO:** Yeah, I did that, but it's the same,

5 it's the same crime. Same charge.

6      **PRESIDING COMMISSIONER ENG:** Yeah. You were

7 trying to break in? Did you break in to someplace?

8      **INMATE TO:** Yeah. Through a window.

9      **PRESIDING COMMISSIONER ENG:** Somebody's home?

10      **INMATE TO:** Yeah.

11      **PRESIDING COMMISSIONER ENG:** Okay. You have

12 anything to do with a gang back in those days?

13      **INMATE TO:** No, Ma'am.

14      **PRESIDING COMMISSIONER ENG:** Okay. And in terms

15 of your adult arrests, obviously you didn't have it

16 because when you committed the life crime you were still

17 a juvenile. So let's talk about your personal

18 background which, you know, I've read over and it's

19 very, very interesting. You were born in August of 1969

20 in Saigon, Kampong, but it states here that you never

21 knew who your father was but you believe that he was one

22 of the American soldiers that was in Vietnam. Okay.

23 And you have no memory of your mother, is that correct?

24      **INMATE TO:** Yeah, I know my sister wrote to me

25 from Hong Kong.

1    **PRESIDING COMMISSIONER ENG:**  Okay, when you were

2  born in Saigon, you had a sister there, too?

3    **INMATE TO:**  Yeah.  They're all in Hong Kong right

4  now.  My sisters.

5    **PRESIDING COMMISSIONER ENG:**  How many do you

6  have?  How many siblings?

7    **INMATE TO:**  One died.

8    **PRESIDING COMMISSIONER ENG:**  Just one.  So this

9  sister, is she older or younger?

10    **INMATE TO:**  She's older.  She about 50-something

11  right now.

12    **PRESIDING COMMISSIONER ENG:**  So you remember her

13  in Vietnam?

14    **INMATE TO:**  Yeah, whatever she told me.  She

15  wrote me letters.

16    **PRESIDING COMMISSIONER ENG:**  Okay.

17    **INMATE TO:**  Whatever she say in the letter.

18    **PRESIDING COMMISSIONER ENG:**  Okay.  Well, it

19  states here at one point, you know, that your mother had

20  abandoned you at a very young age.  Correct?  And then,

21  when you were about five or six --

22    **INMATE TO:**  Yeah.

23    **PRESIDING COMMISSIONER ENG:**  -- somehow you sort

24  of got caught up in this crowd and ended up on a ship to

25  Taiwan?

1       **INMATE TO:** Yes, Ma'am.

2       **PRESIDING COMMISSIONER ENG:** Okay. And you lived

3   in an orphanage there until you were about nine? So you

4   were there for a few years, in the orphanage?

5       **INMATE TO:** Yes.

6       **PRESIDING COMMISSIONER ENG:** Okay. And that's

7   when you met Mr. Ming Wa To and sort of became his son.

8       **INMATE TO:** No, he say he's my father.

9       **PRESIDING COMMISSIONER ENG:** He claimed that he

10  was your father?

11      **INMATE TO:** Yeah.

12      **PRESIDING COMMISSIONER ENG:** Okay.

13      **INMATE TO:** And he brought me over here from

14  Taiwan.

15      **PRESIDING COMMISSIONER ENG:** Did you see him as

16  your father?

17      **INMATE TO:** We don't look alike.

18      **PRESIDING COMMISSIONER ENG:** Okay.

19      **INMATE TO:** No. Right now, no.

20      **PRESIDING COMMISSIONER ENG:** But he, but he got

21  you out of the orphanage, correct?

22      **INMATE TO:** I wish I was there longer.

23      **PRESIDING COMMISSIONER ENG:** At the orphanage?

24      **INMATE TO:** Yeah.

25      **PRESIDING COMMISSIONER ENG:** But so did you

 1  leave?  You left the orphanage when you were nine and

 2  you went with Mr. To?

 3          INMATE TO:  I came to the United States when I

 4  was 12 years old.

 5          PRESIDING COMMISSIONER ENG:  When you were 12.

 6  Okay.  With Mr. To?

 7          INMATE TO:  No, by myself.

 8          PRESIDING COMMISSIONER ENG:  Okay.

 9          INMATE TO:  They just put me on the plane and

10  brought me over here.

11          PRESIDING COMMISSIONER ENG:  All right.  Okay.

12  So when you came here, did you, when you first came over

13  to the US, where did you end up?  In San Francisco?

14          INMATE TO:  Yeah, San Francisco.

15          PRESIDING COMMISSIONER ENG:  So you stayed in San

16  Francisco and then, were you with Mr. To or not?

17          INMATE TO:  Yeah.

18          PRESIDING COMMISSIONER ENG:  Okay.  You came with

19  Mr. To.  Okay.

20          INMATE TO:  Yeah -- No.  I came by myself to

21  United States.

22          ATTORNEY RUTLEDGE:  Mr. To was in San Francisco

23  already.

24          PRESIDING COMMISSIONER ENG:  Mr. To was already

25  here.

1          **INMATE TO:**  Yes.

2          **PRESIDING COMMISSIONER ENG:**  Okay, okay.  So you

3    came here by yourself and then you lived with Mr. To in

4    San Francisco.

5          **INMATE TO:**  Yes, Ma'am.

6          **PRESIDING COMMISSIONER ENG:**  Okay, okay.  So then

7    did you go to school in San Francisco?

8          **INMATE TO:**  Yeah.

9          **PRESIDING COMMISSIONER ENG:**  Right?  Okay.  And

10   you developed a close relationship with one of your

11   teachers?

12         **INMATE TO:**  Yes, Ma'am.

13         **PRESIDING COMMISSIONER ENG:**  Judy, how do you

14   pronounce her last name?

15         **INMATE TO:**  Peart.

16         **PRESIDING COMMISSIONER ENG:**  Peart, P-E-A-R-T?

17         **INMATE TO:**  Yes, Ma'am.

18         **PRESIDING COMMISSIONER ENG:**  Okay.  Okay, so you

19   stayed in school and it says you became involved in a

20   series of out of home placements.

21         **INMATE TO:**  Yeah.

22         **PRESIDING COMMISSIONER ENG:**  It started in 1984,

23   so things weren't working out with Mr. To?

24         **INMATE TO:**  No.

25         **PRESIDING COMMISSIONER ENG:**  And so then you were

1   placed in a group home in Aptos?

2         **INMATE TO:**  I don't know.  Somewhere.

3         **PRESIDING COMMISSIONER ENG:**  Okay.  You did spend

4   a lot of time in group homes.  Did Mr. To abuse you?

5         **INMATE TO:**  I don't know.  Too young.

6         **PRESIDING COMMISSIONER ENG:**  Okay.  So, okay.

7   And it said that you did well, and you were relatively

8   happy, but you were bouncing around from group home to

9   group home, a lot of different ones.

10        **INMATE TO:**  Yeah.

11        **PRESIDING COMMISSIONER ENG:**  So it says that, and

12  probably as a result of that, you weren't doing very

13  well in school.  And you became involved in juvenile

14  criminal activity.  It says that you were placed in a

15  group home in Englewood and you ran away from that

16  program.  And when you ran away from that program, did

17  you leave the area that you were in?

18        **INMATE TO:**  I come back to San Francisco.

19        **PRESIDING COMMISSIONER ENG:**  Okay.  So you were

20  working as a dishwasher in a Mexican restaurant in San

21  Francisco?

22        **INMATE TO:**  Yeah.

23        **PRESIDING COMMISSIONER ENG:**  Okay.  So you pretty

24  much dropped out of school and came back to San

25  Francisco?

1          **INMATE TO:**  Yeah.

2          **PRESIDING COMMISSIONER ENG:**  So, sort of, the

3   system lost you?

4          **INMATE TO:**  I don't know.

5          **PRESIDING COMMISSIONER ENG:**  You were, were you

6   living off the streets?

7          **INMATE TO:**  Yeah.

8          **PRESIDING COMMISSIONER ENG:**  So basically even

9   though you were very young, 12 or 13 years old,

10  somehow --

11         **INMATE TO:**  Survival.

12         **PRESIDING COMMISSIONER ENG:**  You weren't in the

13  system.

14         **INMATE TO:**  No.

15         **PRESIDING COMMISSIONER ENG:**  You weren't in

16  foster care or anything else.  You just sort of walked

17  away from it.  And you were just surviving it seems.  Is

18  that correct?

19         **INMATE TO:**  Yes.

20         **PRESIDING COMMISSIONER ENG:**  Okay.  Okay.  Did

21  you hitchhike around?

22         **INMATE TO:**  No.

23         **PRESIDING COMMISSIONER ENG:**  Is that how you got

24  to be familiar with the area?

25         **INMATE TO:**  No, never hijacked.

1    **PRESIDING COMMISSIONER ENG:**  Never had to?

2    **INMATE TO:**  No.

3    **PRESIDING COMMISSIONER ENG:**  Okay.  You were

4    underage but working as a dishwasher in a Mexican

5    restaurant, so you were making money.  Is that how you

6    were able to travel around?  Because how did you get

7    down to Gilroy?

8    **INMATE TO:**  Well, I was in the last place, group

9    home, I went school there, and I pick up some friends.

10   When I told them I want to come run away, they pay me

11   bus fare so I took a Greyhound bus back to San

12   Francisco.

13   **PRESIDING COMMISSIONER ENG:**  So you told the

14   group home that you wanted to go away and they said all

15   right.

16   **INMATE TO:**  No, not the group home.  The people

17   at the school.

18   **PRESIDING COMMISSIONER ENG:**  So they helped you

19   out.

20   **INMATE TO:**  Yeah.

21   **PRESIDING COMMISSIONER ENG:**  To go away.  Okay,

22   okay.  Okay, have I missed anything?  So you've pretty

23   much been a loner?

24   **INMATE TO:**  Yeah.

25   **PRESIDING COMMISSIONER ENG:**  How did you

1   reconnect with your sister?

2           **INMATE TO:**  She found me in here.

3           **PRESIDING COMMISSIONER ENG:**  She found you?

4           **INMATE TO:**  Yeah.

5           **PRESIDING COMMISSIONER ENG:**  When was the last,

6   do you remember the last time you saw her?

7           **INMATE TO:**  I left Vietnam when I was -- in '77,

8   I don't know.  But I seen her and Mom in Taiwan, but

9   they don't, they don't take me out of the group home,

10  the orphanage.  I stay in there.

11          **PRESIDING COMMISSIONER ENG:**  You saw your -- Wait

12  a minute.  You saw your sister?

13          **INMATE TO:**  Yeah, sister and Mom.

14          **PRESIDING COMMISSIONER ENG:**  And your mother?

15          **INMATE TO:**  Yeah, in Taiwan.

16          **PRESIDING COMMISSIONER ENG:**  But you --

17          **INMATE TO:**  She wrote the letter told me that we

18  was together in Taiwan, but I don't stay with them, you

19  know.  I was in the orphanage.

20          **PRESIDING COMMISSIONER ENG:**  Right.  But when you

21  left, when you left Vietnam, that day that you sort

22  of --

23          **INMATE TO:**  No, we split up.

24          **PRESIDING COMMISSIONER ENG:**  -- ran with the

25  crowd, was your sister in that crowd, also?

1      **INMATE TO:**  No.  No.

2      **PRESIDING COMMISSIONER ENG:**  And did she have any

3   idea that you sort of wandered off and ended up on a

4   boat?

5      **INMATE TO:**  I don't know.

6      **PRESIDING COMMISSIONER ENG:**  Okay.  So you are in

7   touch with your sister, and she's back in Hong Kong?

8      **INMATE TO:**  Yeah, she's in Hong Kong.

9      **PRESIDING COMMISSIONER ENG:**  Is your mother

10   there, too?

11      **INMATE TO:**  No, my Mom passed away.

12      **PRESIDING COMMISSIONER ENG:**  She did?  Okay.  But

13   you still haven't seen your sister since you were a

14   little boy there.  Okay.  You have anybody else here?

15   Any other relatives?

16      **INMATE TO:**  Teacher, teacher.

17      **PRESIDING COMMISSIONER ENG:**  And you're still in

18   touch with Judy Peart?

19      **INMATE TO:**  Yes.

20      **PRESIDING COMMISSIONER ENG:**  And where is she?

21      **INMATE TO:**  She's in San Francisco.

22      **PRESIDING COMMISSIONER ENG:**  She is in San

23   Francisco?

24      **INMATE TO:**  Yeah, retired now.

25      **PRESIDING COMMISSIONER ENG:**  Okay.  You ever get

1  to see her?

2          **INMATE TO:**  Yeah.

3          **PRESIDING COMMISSIONER ENG:**  So she comes to

4  visit?

5          **INMATE TO:**  Yeah.

6          **PRESIDING COMMISSIONER ENG:**  Okay.  Are you okay?

7          **INMATE TO:**  Yeah, just little bit nervous.

8          **PRESIDING COMMISSIONER ENG:**  I don't know if it's

9  thinking about the past that brings up, stirs up --

10          **INMATE TO:**  Because I don't know what to talk

11  about.

12          **PRESIDING COMMISSIONER ENG:**  -- a lot of anxiety.

13  I know, I noticed that.  And I don't mean to upset you

14  in any way, but sometimes it's good for you to be able

15  to pull out some of this.  I just get this feeling that

16  you do have some bitterness and anger there that's built

17  up, so, okay.  But we'll move on, and my fellow

18  commissioner will now go over your post-conviction

19  factors.

20          **DEPUTY COMMISSIONER MEJIA:**  Okay, Mr. To, I will

21  be covering your institutional adjustment this portion

22  of this hearing since your last Board appearance.  I had

23  to read the central file and board reports and

24  psychological reports.  If I miss anything, I'll give

25  you and your Attorney the opportunity to make comments

*Capitol Electronic Reporting*

1   at the end of my presentation.

2         Your last Board appearance was on January 10th,

3   2006.  You received a one-year denial.  Our

4   recommendations were for you to refrain from having any

5   more 115s and 128s, get self-help and stay disciplinary-

6   free, and positive chronos.  Custody level is Medium A,

7   classification score is 19.  Last assignment, your

8   Attorney gave me some most recent supervisor's report.

9   You're now assigned as an officer porter.  What's an

10  FMGR?

11        **INMATE TO:**  Food Manager's Office.

12        **DEPUTY COMMISSIONER MEJIA:**  Okay, so you're still

13  connected to the culinary.

14        **INMATE TO:**  Yes, Sir.

15        **DEPUTY COMMISSIONER MEJIA:**  You have an above

16  average work report.  September 30, 2006.  June 2006,

17  and when I look at your work history based on the C

18  file, you do have an average of above average and

19  satisfactory.  There's just a few unsatisfactory, but

20  most of the time it's positive.  You have completed your

21  GED.

22        **INMATE TO:**  Yes, Sir.

23        **DEPUTY COMMISSIONER MEJIA:**  In 1999.  I see your

24  persistence in getting that, you actually got it in

25  1999, 9.9 GPL.  And I'm looking at your vocational

1   history.  I saw that you did some machine shop.

2   However, I don't think you completed that.

3        **INMATE TO:**  No, I was transferred.

4        **DEPUTY COMMISSIONER MEJIA:**  Yeah.  And any

5   completion of vocation while in prison?

6        **INMATE TO:**  No, I took watch repair, too.  But

7   never complete.

8        **DEPUTY COMMISSIONER MEJIA:**  Okay.  And do --

9        **INMATE TO:**  Well, I did complete the silk screen

10  when I was in Tracy.

11       **DEPUTY COMMISSIONER MEJIA:**  Silk screen in Tracy?

12  What year was that?  Yeah, I was looking for it because

13  I saw it somewhere in the report that you completed it.

14       **INMATE TO:**  Yeah.

15       **DEPUTY COMMISSIONER MEJIA:**  I'm looking for some

16  chronos or certificates that you, I couldn't find it.

17  What year, what year is that?

18       **INMATE TO:**  I don't know how long, how -- about

19  six years back.  Six or seven years back.

20       **DEPUTY COMMISSIONER MEJIA:**  So you're talking

21  about 1998?

22       **INMATE TO:**  I think.  I'm not sure.

23       **DEPUTY COMMISSIONER MEJIA:**  Do you happen to have

24  a copy of your certificate?

25       **INMATE TO:**  No, not with me.  No.

*Capitol Electronic Reporting*

1        **DEPUTY COMMISSIONER MEJIA:** Yeah, because I

2    couldn't find it.  I know you went to machine shop, and

3    you went to GED.  You have a lot of time in GED, trying

4    to get your GED.

5        So tell me, what are you -- If you are given a

6    parole date?  What would you do out there on the street?

7        **INMATE TO:**  I have been --

8        **DEPUTY COMMISSIONER MEJIA:**  What will be your

9    source of livelihood, marketable skill?

10       **INMATE TO:**  Cooking.

11       **DEPUTY COMMISSIONER MEJIA:**  What?

12       **INMATE TO:**  Cooking.

13       **DEPUTY COMMISSIONER MEJIA:**  Cooking.  Okay.

14       **INMATE TO:**  I would, I would like to take a

15   culinary art class when I come out, and the teacher I

16   was in contact right now, she's going to help me out

17   with that.

18       **DEPUTY COMMISSIONER MEJIA:**  You do have a lot of

19   experience in the culinary area.  You were also a sewing

20   machine operator before.

21       **INMATE TO:**  Yes.

22       **DEPUTY COMMISSIONER MEJIA:**  What kind of machine

23   did you run?

24       **INMATE TO:**  We make those posting for those

25   things like this?  Sew them together.

1    **DEPUTY COMMISSIONER MEJIA:**  PIA?

2        **INMATE TO:**  Yeah, PIA.

3    **DEPUTY COMMISSIONER MEJIA:**  How long did you stay

4    there?

5        **INMATE TO:**  For a while.

6    **DEPUTY COMMISSIONER MEJIA:**  So that's your first

7    choice of work, culinary?

8        **INMATE TO:**  Yeah.

9    **DEPUTY COMMISSIONER MEJIA:**  What kind of cooking?

10       **INMATE TO:**  All kind.

11   **DEPUTY COMMISSIONER MEJIA:**  All kind?  Where did

12   you learn that?

13       **INMATE TO:**  I picked up.

14   **DEPUTY COMMISSIONER MEJIA:**  Where?

15       **INMATE TO:**  Because I like to cook myself, so,

16   you know.

17   **DEPUTY COMMISSIONER MEJIA:**  Is that connected to

18   the 115 in 2003 where you had the hot plate?

19       **INMATE TO:**  Yeah, yeah, yeah.

20   **DEPUTY COMMISSIONER MEJIA:**  Okay.  Anyway, so

21   what kind of cooking, food do you know how to cook?

22       **INMATE TO:**  Different kind.  I know how to cook,

23   but I would like to learn more.

24   **DEPUTY COMMISSIONER MEJIA:**  Yeah.

25       **INMATE:**  You know, that's why I took the job in

1   food manager's office, because I'd like to open my own

2   restaurant, too.

3        **DEPUTY COMMISSIONER MEJIA:**  Right, right, that's,

4   yeah.  You can learn from that, you know, how to keep

5   inventory, and what to order and all this stuff.

6        **INMATE TO:**  Yes, Sir.

7        **DEPUTY COMMISSIONER MEJIA:**  All right.  How about

8   self-help?  I know you submitted your most recent ones

9   here, but looking at your history, there wasn't enough

10  self-help participation.

11       **INMATE TO:**  I did anger management and --

12       **DEPUTY COMMISSIONER MEJIA:**  I have this here.

13  Yeah, I will read it to you.  But these are not for this

14  year.  You went in 2007, February you enrolled in the

15  undercover class by the Protestant chapel.

16       **INMATE TO:**  Yes.

17       **DEPUTY COMMISSIONER MEJIA:**  It's a 12-week media

18  course.

19       **INMATE TO:**  And I'm on a waiting list for another

20  one, too.

21       **DEPUTY COMMISSIONER MEJIA:**  Alternative to

22  violence, February 7th, 2007.

23       **INMATE TO:**  Yes.

24       **DEPUTY COMMISSIONER MEJIA:**  Okay.  These are most

25  current.  But the time from the time that you were

1  incarcerated and between this time, I'm looking in your

2  file.  You don't have much self-help.  What other self-

3  help do you participate in?

4        **INMATE TO:**  I've got a lot between --

5        **DEPUTY COMMISSIONER MEJIA:**  Like what?  Just tell

6  me, I'll put it in the record here.

7        **INMATE TO:**  Impact.

8        **DEPUTY COMMISSIONER MEJIA:**  Okay.

9        **INMATE TO:**  I took some in Tracy, too.

10       **DEPUTY COMMISSIONER MEJIA:**  What year?  How many

11  files do you have?  Do you have two?

12       **INMATE TO:**  It's been a while.  I don't know what

13  year.

14       **DEPUTY COMMISSIONER MEJIA:**  When did you take

15  Impact?

16       **INMATE TO:**  Two years ago.

17       **DEPUTY COMMISSIONER MEJIA:**  Okay.  So three years

18  ago?

19       **INMATE TO:**  Yeah.  Two or three years.

20       **DEPUTY COMMISSIONER MEJIA:**  Okay, what else.

21       **INMATE TO:**  American I can, something like that.

22  That was in Tracy.

23       **DEPUTY COMMISSIONER MEJIA:**  Do you make copies of

24  those, documentation of those things that you attend?

25  Did you keep copies of those?

1          **INMATE TO:**  It all should be in there, because I
2  gave to a counselor.

3          **DEPUTY COMMISSIONER MEJIA:**  Yeah.

4          **INMATE TO:**  The old ones.  The recent ones I
5  attended to by now.

6          **DEPUTY COMMISSIONER MEJIA:**  You been down 19
7  years.  How much, how many self-help?  You got Impact.
8  What else?

9          **INMATE TO:**  The anger management.

10          **DEPUTY COMMISSIONER MEJIA:**  Anger management.

11          **INMATE TO:**  Early self-help group things.

12          **DEPUTY COMMISSIONER MEJIA:**  Okay, how long did
13  you stay in, did you go to AA?

14          **INMATE TO:**  I finished the program.

15          **DEPUTY COMMISSIONER MEJIA:**  What do you mean?

16          **INMATE TO:**  When I was in Tracy.

17          **DEPUTY COMMISSIONER MEJIA:**  How many, how many
18  meetings did you attend?

19          **INMATE TO:**  How many weeks?

20          **DEPUTY COMMISSIONER MEJIA:**  Meetings.

21          **INMATE TO:**  Twelve steps.

22          **DEPUTY COMMISSIONER MEJIA:**  Yeah.

23          **INMATE TO:**  I finished my steps.

24          **DEPUTY COMMISSIONER MEJIA:**  What do you mean,
25  finished your steps?

1    **INMATE TO:**  The whole 12 steps.  Meeting.  AA

2    **DEPUTY COMMISSIONER MEJIA:**  Okay, how long did

3    you attend AA?  How many years, how many months?

4    **INMATE TO:**  I finished the whole thing.

5    **DEPUTY COMMISSIONER MEJIA:**  So tell me what the

6    12 steps are.  Normally you do not finish the 12 steps,

7    you practice that.  First time I heard of 12 steps being

8    finished.

9    **INMATE TO:**  I finished at Tracy.

10   **DEPUTY COMMISSIONER MEJIA:**  Well, maybe you

11   attended 12 AA?

12   **INMATE TO:**  Yes, Sir.

13   **DEPUTY COMMISSIONER MEJIA:**  You don't remember

14   how long?

15   **INMATE TO:**  When I was in Tracy.

16   **DEPUTY COMMISSIONER MEJIA:**  Okay, you don't

17   remember how long?

18   **INMATE TO:**  No, Sir.

19   **DEPUTY COMMISSIONER MEJIA:**  Okay.  So you told me

20   you finished the 12 steps.  Do you know any, can you

21   recite to me any of the 12 steps?

22   **INMATE TO:**  No.

23   **DEPUTY COMMISSIONER MEJIA:**  Okay, let me ask you

24   a question.  What do you think got you in trouble in the

25   first place?  I'm looking for insight.

| | |
|---|---|
| 1 | **INMATE TO:**  I hang around with the wrong people. |
| 2 | **DEPUTY COMMISSIONER MEJIA:**  Okay. |
| 3 | **INMATE TO:**  When I was on the street. |
| 4 | **DEPUTY COMMISSIONER MEJIA:**  What else? |
| 5 | **INMATE TO:**  Just the wrong crowd, that's all. |
| 6 | **DEPUTY COMMISSIONER MEJIA:**  Just the wrong crowd. |
| 7 | **INMATE TO:**  Yes. |
| 8 | **DEPUTY COMMISSIONER MEJIA:**  Let me go to your -- |
| 9 | Did I miss anything in self-help, Counsel?  Anything |
| 10 | that you want to add to self-help? |
| 11 | **ATTORNEY RUTLEDGE:**  I think he said the Amer-I- |
| 12 | Can, and I have in my notes that he completed the silk |
| 13 | screening program, too. |
| 14 | **DEPUTY COMMISSIONER MEJIA:**  If it's in one of the |
| 15 | -- I'll look for it later.  I don't doubt what you're |
| 16 | saying, but it's just I'm looking in the files. |
| 17 | **ATTORNEY RUTLEDGE:**  Other than that, nothing. |
| 18 | **DEPUTY COMMISSIONER MEJIA:**  Okay, let me go to |
| 19 | the psychological report.  There's no gang affiliation |
| 20 | noted, 115s you actually have because there's completely |
| 21 | -- there you go.  One, two, three, four, five 115s, a |
| 22 | total of five 115s from 1988 through the last being |
| 23 | 10/22/06, possession of contraband.  No gang affiliation |
| 24 | noted.  You have nine 128s, custodial counsel in conduct |
| 25 | from 1989 to the last dated 7/15 2001.  On November |

1   29th, 2005, doctor, a psychological report by Dr. Zika,
2   Z-I-K-A. Actually the staff psychologist that conducted
3   the vital issues is Dr. Macomber, and diagnostic
4   impression on the 11th of 9/05, Axis I, no contributory
5   clinical disorder, Axis II, no contributory personality
6   disorder, Axis III, no contributory physical disorder,
7   Axis IV, life term incarceration, Axis V, GAF of 90.
8   Doctor said there's no indication of mental or emotional
9   problems or personality disorders that would warrant a
10  current diagnostic classification.
11          Assessment of dangerousness, in considering his
12  potential for dangerous behavior in an institution,
13  inmate does not have a history of violence or gang
14  activities or threats to correctional staff. He does
15  not have a serious disciplinary pattern. He has matured
16  and changed over 20 years of incarceration. He is not
17  at all criminally oriented. His potential for violence
18  is definitely below average in comparison to the general
19  population. In considering his potential for
20  dangerousness if released to the community, his violence
21  is no more than the average citizen in the community at
22  this point in his life. The two prior psychological
23  often made this statement. There are no significant
24  risk factors in this case at this point in his life.
25  Prognosis for successful community adjustment is

1  excellent.

2       Is there any additions, Counsel, to make on my

3  presentation?

4       **ATTORNEY RUTLEDGE:** Not at this time,

5  Commissioner.

6       **DEPUTY COMMISSIONER MEJIA:** I will return this

7  back to the Chair.

8       **PRESIDING COMMISSIONER ENG:** Okay.  Thank you.

9  Let's talk about your -- I have a question to ask you,

10 first.  When was the last time you looked at your C

11 file?

12      **INMATE TO:** A couple months ago.

13      **PRESIDING COMMISSIONER ENG:** A couple months ago?

14      **INMATE TO:** Yeah.  Before the Board.

15      **PRESIDING COMMISSIONER ENG:** Okay.  Okay.  So

16 when you went through it, did you notice that there may

17 be things missing?

18      **INMATE TO:** Because when I gets too much, it's

19 hard for me already to read everything.  I just look and

20 give it back to the counselor.

21      **PRESIDING COMMISSIONER ENG:** Okay.  Because I

22 think it's important.  This central file is all to do

23 with you.

24      **INMATE TO:** That's too much for me.

25      **PRESIDING COMMISSIONER ENG:** Okay.  Let's talk

1 about your parole plans. What are they?

2      **INMATE TO:** Parole plans?

3      **PRESIDING COMMISSIONER ENG:** I'm trying to get

4 you to talk a little, because I can't get a feel for you

5 unless you open up a little bit. Yeah. What are your

6 parole plans?

7      **INMATE TO:** Well, I have a job waiting, you know.

8 Well, actually, I'd like to go to culinary art class to

9 study more.

10      **PRESIDING COMMISSIONER ENG:** Where?

11      **INMATE TO:** Open my own restaurant.

12      **PRESIDING COMMISSIONER ENG:** Where?

13      **INMATE TO:** San Francisco.

14      **PRESIDING COMMISSIONER ENG:** In San Francisco?

15 Okay. So have you made up an application, do you know

16 what it's going to take for you to go there?

17      **INMATE TO:** I got the address and stuff like

18 that, but my teacher's taking care of that for me right

19 now, and I don't go sign up for the class when I get

20 out. You need money for that.

21      **PRESIDING COMMISSIONER ENG:** Okay. So in terms

22 of a residence, what are you planning on?

23      **INMATE TO:** Right now I have a place to stay.

24      **PRESIDING COMMISSIONER ENG:** Well, tell me.

25      **INMATE TO:** Mrs. Peart. She's looking.

1       **PRESIDING COMMISSIONER ENG:**  Is this with Mrs. or

2   -- is this Miss or Mrs. Peart?

3       **INMATE TO:**  Mrs. Peart.

4       **PRESIDING COMMISSIONER ENG:**  Mrs. Peart.

5       **INMATE TO:**  And my sister have a place for me,

6   too, to stay.

7       **PRESIDING COMMISSIONER ENG:**  You sister that's in

8   Hong Kong?

9       **INMATE TO:**  Yes.

10      **PRESIDING COMMISSIONER ENG:**  Okay.  Does she have

11  a place for you back in Hong Kong, or in San Francisco?

12      **INMATE TO:**  Hong Kong, and she have friends over

13  here, so they can take care, help me out, too.  But

14  right now all I need is a place to stay and a job

15  waiting for me.  And I have all that.  Not just one job.

16      **PRESIDING COMMISSIONER ENG:**  Okay.  What I have,

17  I've got a couple letters in our packet.  One is dated

18  October 11th, 2006 and it's from Thieu Hoa Tran.

19      **INMATE TO:**  That's my sister.

20      **PRESIDING COMMISSIONER ENG:**  Okay.  T-H-I-E-U

21  H-O-A, and then last name T-R-A-N.  Your sister in Sha

22  Tin.  She lives in Sha Tin territories in Hong Kong,

23  correct?

24      **INMATE TO:**  Yes.

25      **PRESIDING COMMISSIONER ENG:**  Okay.  She's writing

1  this letter to support my younger brother, Wayland To's

2  upcoming parole hearing. States that, Wayland will

3  receive my family's total and complete support upon his

4  release, including financial, living and moral guidance

5  to help insure that he will be guaranteed a much

6  smoother transition back into a real work setting where

7  he can become the productive citizen we all wish him to

8  be. Is your sister hoping that you will come back to

9  Hong Kong?

10      **INMATE TO:** I don't know. I don't know.

11      **PRESIDING COMMISSIONER ENG:** Actually, that's the

12  only, that's the only other letter. Because the other

13  letter I have is a September 1986 letter from the

14  Alameda County DA's office.

15      **ATTORNEY RUTLEDGE:** He has a card he received

16  from Mrs. Peart that he wanted to show you.

17      **PRESIDING COMMISSIONER ENG:** Sir, this Panel

18  can't read your mind. If you don't communicate with us,

19  you know, we have no idea what's going on in your head.

20  So, you know, this is your hearing. I need you to relax

21  a little and open up. So if you, if you want to get

22  out, okay, you've got to step up to the plate and take

23  some responsibility for your life and your future. So

24  what is the, what's your first choice? What are your,

25  what are your plans?

1    **INMATE TO:**  My plans is get a job.  Have my own
2    restaurant.  That's my plan.  But the longer you keep me
3    in here, the longer, you know, ain't nobody going to
4    support me.  Because my sister have a family, and I
5    don't like to bother them and, you know, my teacher's
6    getting, you know, that age, you know.  Ain't nobody
7    going to help me, you know, if I keep staying in here,
8    you know.  That's all the people that can help me right
9    now.  And they do have a job and a place for me to stay,
10   and, you know.  And I'd like to start my own family.

11   **PRESIDING COMMISSIONER ENG:**  I know it's very
12   difficult for you, because number one, okay, this is not
13   your native land.  Number two, you know, you did the
14   life crime at a very young age, and you've been
15   incarcerated pretty much your whole adult life.  But it
16   still doesn't excuse you taking responsibility for your
17   future.  Now, you said that somebody else is looking
18   into some things for you, like the culinary school.  You
19   know, we have, and you know, all you have to do is look
20   around in the yard.  You have a lot of fellow inmates
21   here that do reach out and write to places and do some
22   research on their own to try to find, to inquire.

23   **INMATE TO:**  The things I wrote to, they don't
24   respond.

25   **PRESIDING COMMISSIONER ENG:**  A lot of them will

1   not, but have you written up a log so that you know who

2   you've written to and when?  Because that's

3   documentation to show the Panel that you're actually

4   doing something.  Because we understand that, you know,

5   a lot of people with, they have a lot of education, that

6   have never been incarcerated when they go out looking

7   for a job, you can send out a thousand resumes to

8   people, and you're lucky if you get, you know, a few

9   dozen responses sometimes.  So we recognize that.

10      **INMATE TO:**  Okay, but now I do have a job waiting

11   for me, though.

12      **PRESIDING COMMISSIONER ENG:**  Okay, so is there a

13   letter stating that who's hiring you?

14      **INMATE TO:**  I got a whole bunch letters that say

15   people will hire me if I did get out, but, you know,

16   people not going to just wait for you.

17      **ATTORNEY RUTLEDGE:**  Okay, wait.  Do you have the

18   past letters that are in the file?

19      **INMATE TO:**  No.

20      **ATTORNEY RUTLEDGE:**  I'm going to object to the

21   questioning about him.  There is no requirement that he

22   open up and talk to the Board.  The facts are in the

23   file, and he's answered all the pertinent questions for

24   his parole.

25      **PRESIDING COMMISSIONER ENG:**  I know your

1   objection.  I'm trying to do this for him to help him
2   out a bit, because I cannot read his mind.  Sir, I don't
3   have any other letters, okay.  So all I'm asking is if
4   there is anything concrete, any kind of documentation
5   that you might have in terms of a letter from, for
6   instance, the people that are offering you a place to
7   live, the people that are offering you a job.  Okay.  If
8   you can think of anything, then please let us know.

9        We sent out Penal Code section 3042 notices,
10  those are the notices that go to agencies that have a
11  direct interest in your case.  I don't believe that we
12  are in receipt of any written responses.  However, we do
13  have a representative from the Alameda County District
14  Attorney's Office who I'm sure will be making a
15  statement regarding your parole suitability prior to
16  recessing for deliberation.

17       Now I'm going to ask my fellow Commissioner if he
18  has any further questions to ask of this inmate.

19  **DEPUTY COMMISSIONER MEJIA:**  Well, just the silk
20  screen portion that you attended from 1990 to 1992.  It
21  does not say, it didn't indicate that he completed it.
22  It says here that he requested reassignment, so I don't,
23  I don't see any completion chrono.  The date of the last
24  one I see was April 2nd, 1992.  Reassignment to
25  education at his request.  Maybe he went there for his

1  GED.

2       **PRESIDING COMMISSIONER ENG:**  I'm sorry.  What was

3  that about the GED?

4       **DEPUTY COMMISSIONER MEJIA** He went to GED from

5  silkscreen.  He asked for reassignment.  That's the only

6  thing I have.  I don't see any completion.  I got no

7  further questions for this gentleman, here.

8       **PRESIDING COMMISSIONER ENG:**  Okay.  I don't,

9  either.  If there are no additional questions then I'll

10  just close it at this time.  I'm now going to ask if Mr.

11  Sheehan from the District Attorney's Office has any

12  questions to be posed to the inmate?

13       **DEPUTY DISTRICT ATTORNEY MEEHAN:**  I do not have

14  any specific questions for the inmate.  For the record,

15  it's Meehan, M-E-E-H-A-N.

16       **PRESIDING COMMISSIONER ENG:**  I'm sorry.

17       **DEPUTY DISTRICT ATTORNEY MEEHAN:**  That's okay.

18       **PRESIDING COMMISSIONER ENG:**  Meehan?

19       **DEPUTY DISTRICT ATTORNEY MEEHAN:**  Meehan.  Yes.

20       **PRESIDING COMMISSIONER ENG:**  Okay, thank you.

21       **DEPUTY DISTRICT ATTORNEY MEEHAN:**  And I do not,

22  thank you.

23       **PRESIDING COMMISSIONER ENG:**  Okay.  Ms. Rutledge,

24  do you have any questions you would like posed to your

25  client?

1      **ATTORNEY RUTLEDGE:**  Yeah. How many years

2  experience do you have cooking, Mr. To?

3      **INMATE TO:**  I just like to cook, you know.  I

4  ain't got no experience, but I just like to cook.

5      **ATTORNEY RUTLEDGE:**  How many years did you work

6  in culinary?  At least five?

7      **INMATE TO:**  No, more than that.  More than five.

8      **ATTORNEY RUTLEDGE:**  Okay.  And have you

9  consistently written to Mrs. Peart?

10      **INMATE TO:**  Yes, ma'am.

11      **ATTORNEY RUTLEDGE:**  The entire time you've been

12  incarcerated?

13      **INMATE TO:**  Yes.

14      **ATTORNEY RUTLEDGE:**  All right.  Now the letter

15  you got from your sister pretty much says she's willing

16  to provide everything that you need.  Is there any doubt

17  in your mind that upon your release whether you get

18  deported, because you do have an INS hold, to China,

19  which is more likely.

20      **INMATE TO:**  Yeah.

21      **ATTORNEY RUTLEDGE:**  I do know that you're not

22  required to have parole plans in the United States if

23  you've got parole plans elsewhere, you know, an INS

24  hold.  Any doubt in your mind your sister's not going to

25  be there for you when you parole?

1    **INMATE TO:**  No, I ain't got any doubt she'll be
2    there for me, you know.

3    **ATTORNEY RUTLEDGE:**  No further questions.

4    **PRESIDING COMMISSIONER ENG:**  Okay.  We'll go to
5    closing statements.  Mr. Meehan.

6    **DEPUTY DISTRICT ATTORNEY MEEHAN:**  Thank you.  I
7    would like to thank the Board for the opportunity for my
8    office to be present at this hearing.

9    I have had a chance to review Mr. To's file.  I
10   also note that my office has sent letters in the past.
11   I particularly note the letters sent by my colleagues
12   the late Tom Ross from July of 2001 and John Brohard
13   from May 7th of 2004.  I note that Mr. Patten from the
14   District Attorney's office wrote a letter back on
15   January 3rd, 2006.  That was in anticipation of the
16   January 10th hearing and Mr. Patten at that time did
17   express that he felt that this was a matter to the
18   discretion of the Board in terms of further
19   incarceration for Mr. To, and I certainly understand his
20   position, because I think I understand in reviewing the
21   file that Mr. To's accomplices have since paroled, and
22   that would include the young man who was actually
23   responsible for the firing of the weapon that caused the
24   death of the victim.

25   I would note that this was initially a plea

```
 1   bargain that Mr. To entered into, and I reviewed that
 2   transcript where he was represented by Lincoln Minsk who
 3   was a very capable defense attorney, and he laid out
 4   what he believed to be, you know, potential problems
 5   with the case if they were to try to fight.  Our office,
 6   of course, you know, did agree to the second degree
 7   murder plea bargain, understanding at the time that
 8   under the felony murder rule could very well have been a
 9   first degree murder, so I'm prepared to acknowledge that
10   within the scope of the plea agreement it was understand
11   back in 1987 as it is today that there would certainly
12   be a date at which Mr. To would be best seriously
13   considered for parole or release.
14        I am encouraged by the positive psychological
15   report that Mr. To has received and I'm glad to hear
16   that the treating psychologists are indicating that
17   there's an excellent prognosis for his success and that
18   his violence potential is not particularly,
19   significantly below average I think is the quotation.
20        I must acknowledge nevertheless that this was a
21   commitment offense that was carried out in an especially
22   heinous manner and carried out in a manner that
23   exhibited a callous disregard for the life or suffering
24   of others.  It would appear that in reality Mr. To
25   certainly would not necessarily have been aware in
```

1   advance that his co-participant was going to discharge

2   the firearm and go down the road that led to the death

3   of the restaurant worker.  However, there were, you

4   know, multiple potential victims there, with not only

5   customers but restaurant workers as well, and the motive

6   for the offense just being to get money to pay back the

7   so-called generosity of the older gentleman, I say

8   older, 22 years old, that set this up.

9       You know, all these things are obviously very

10  tragic in terms of the way all the events transpired.

11  I'm not insensitive to the hurdles that Mr. To had to

12  clear, you know, as a young child coming to this

13  country, and perhaps inadequate supervision that he was

14  receiving.

15      I note in terms of the support from Judy Peart

16  that he was receiving her support at the time that he

17  was essentially running the streets, especially now that

18  she's at a much older age I don't know what type of

19  support network she's really in a position to provide

20  for inmate To.

21      I am concerned about what I would characterize as

22  inadequate parole plans and I'm sure that's something

23  that the Board's going to be concerned about as well.  I

24  don't know at this point whether I can indicate to the

25  Board that our office is not opposed to the granting of

1   a parole date.  I think it comes back to the nature of

2   the commitment offense.

3       I am concerned that Mr. To really has only

4   programmed in a limited manner, and I'm not sure,

5   notwithstanding his desires to be a cook, that he's

6   really developed what can be characterized as marketable

7   skills that can be put to use upon release.  The parole

8   plans do appear to be quite vague.

9       Another matter that causes me concern is that the

10  Board had recommended to him back in January of 2006

11  that he participate in self-help programs and group

12  therapy, and it doesn't appear from what I'm hearing

13  this afternoon that he has really attempted to be

14  proactive with regard to participating in self-help

15  programs and group therapy.  The fact that he is on a

16  couple of waiting lists that perhaps he even signed up

17  for fairly recently doesn't really fill me with

18  confidence that he is looking at parole plans in a

19  realistic manner.

20      So, again, I'm mindful of the fact that the other

21  participants to this crime have all ready been released

22  on parole.  Mr. To should be commended to the extent

23  that he has by and large remained disciplinary-free, and

24  this is a matter that I think the Board should very much

25  give serious consideration to.  If the court, excuse me,

1    if the Board is to deny the granting of a parole date, I

2    would ask that they encourage Mr. To to, you know,

3    further try to participate in self-help programs and to

4    really try as much as he can to come up with realistic

5    parole plans because I'm not sure at this point that

6    those plans are particularly realistic.

7         And thanks for the opportunity of giving this

8    statement.

9         **PRESIDING COMMISSIONER ENG:**  Thank you.  Ms.

10   Rutledge, final statement.

11        **ATTORNEY RUTLEDGE:**  Thank you.  Turning to the

12   factors that determine suitability, I would note that

13   looking at the commitment offense the shooter was 15

14   years of age, Mr. To 17, and as to --

15        **INMATE TO:**  No, no, no.  I was --

16        **ATTORNEY RUTLEDGE:**  You were 15?

17        **INMATE TO:**  I was 16.

18        **ATTORNEY RUTLEDGE:**  You were 16.  I'm sorry.  He

19   was 16.  The actual shooter was 15, and as Mr. Meehan

20   noted, the adult responsible for hatching of the scheme

21   and involving the juveniles who at that time Mr. To was

22   basically helpless, were in their 20s, and he's the only

23   person that's still incarcerated because of this

24   offense, and I think that to me is the biggest issue in

25   this case, a huge factor to be weighed as far as the

1   original agreement between the District Attorney's
2   Office and Mr. To was for a second degree murder charge,
3   and for a juvenile, a young man who was at the time 16,
4   and he has now served 20 years while the shooter is out
5   of custody, and I think that says so much about this
6   case.

7        He has done self-help.  There's nothing in the
8   psych report that says he needs any type of special
9   psychological training.  He doesn't have any long-term
10  psychological issues.  He's going to, he'll speak on the
11  issue of remorse to the Board during his closing.  The
12  motivation for the crime at this time, he -- and talk
13  about significant stress in his life.  He never knew his
14  mother, you know.  He ended up on a boat.  He's living
15  in orphanages, he's living with somebody who, and
16  there's a letter in the C file from Mrs. Peart that
17  indicates that when she was his teacher that he often
18  came to school very disheveled and that his guardian,
19  Mr. To, according to Mrs. Peart did not care for him, he
20  did not brush his teeth, the very basic hygienic, I
21  don't know if hygienic is the word.  So I think that
22  goes to the state of mind at the time of the commitment
23  offense.  He was a desperate kid, bounced around from
24  place to place.  And when he says the wrong crowd, I
25  know when I hear that I think, yeah, right, wrong crowd.

1  But he was like a child in many ways, and he kind of

2  gravitated toward people that he thought, I don't know

3  what was in his mind, but he gravitated toward people

4  that basically, it's very well-documented, elicited him

5  to participate in this crime.  And I don't think the

6  adult that hatched the plan even anticipated a shooting

7  as a result of the case.  It was an isolated incident.

8  He himself has not demonstrated any type of predator

9  behavior in prison.  His age now, he's 37 years of age.

10        **INMATE TO:**  Thirty-eight.

11        **ATTORNEY RUTLEDGE:**  Thirty-eight.  You're 38, the

12  crime happened when you were 16, okay.  And with regard

13  to his parole plans, I know that the people made some

14  comments about that.  Mr. To has two people on the

15  outside.  That is Mrs. Peart, and she did, we did hand a

16  card to the Commissioner indicating that she was

17  actively looking for a job for him.  And although he has

18  an INS hold, and it's more likely that he's going to be

19  deported and his sister who lives in China offers him

20  full support.

21        **INMATE TO:**  Hong Kong.

22        **ATTORNEY RUTLEDGE:**  Hong Kong.  Offers full

23  support as far as all of his needs, she outlines all of

24  these needs to be met.  She also notes in her letter

25  that he has matured, he's ready to be paroled, and that

1   letter covered everything that he needs.

2        He has a marketable skill of cooking, and he

3   loves to cook.  And, you know, you can get somebody in

4   here with 10 letters of jobs lined up, and I was in the

5   Bay area this weekend and there's a million restaurants

6   there, and you can get somebody that has a bunch of

7   letters lined up and that's one thing, but you can get a

8   man who says, look, I love to cook, and that's what he

9   enjoys doing.  He's managed to do well in that position

10  in prison and now he's trying to learn the business part

11  of it because his dream is to open his own restaurant

12  and I think says a lot more about what he's actually

13  going to do when he gets out than any type of letters

14  that anybody else could bring in, because his history

15  consistently has been with cooking.

16       And his institutional behavior has been positive

17  and, again, he did the self-help, and more recently he

18  participated in very pro-social things like he has a

19  softball certificate since his last hearing.  He also

20  has a chrono for serving the Thanksgiving meal last

21  year.  He worked very hard to earn his GED, so he is

22  trying to improve upon himself.  He's on the wait list

23  for alternatives to violence.

24       The psych report on page two notes there is no

25  indication of antisocial thinking or values and as far

1    as social stability goes, the last, he has spent more

2    years in contact with Mrs. Peart than he did before he

3    was, I mean, that has really been, most of his life has

4    been spent behind bars, more than the years he spent on

5    the outside.  And he still has a GAF score of 90 and

6    shows stability as far as maintaining relationships with

7    his sister, and I'm not sure how they managed that, but

8    he was able to keep in contact with her, and also Mrs.

9    Peart.  All that said, I would ask that the Board grant

10   him a parole date today.  Thank you.

11       **PRESIDING COMMISSIONER ENG:**  Mr. To, final

12   statement.

13       **INMATE TO:**  I would like to read a letter for the

14   family, Mr. Teng's family.

15           "Dear family.  Although I have experienced

16       loss and the emotional pain which one must endure

17       through the course of time, I cannot know your

18       pain and can only imagine the suffering from my

19       action or lack thereof have caused you.  Yen Teng

20       was a young man who was robbed of fully and

21       meaningful life.

22           "Despite that I did not actually pull the

23       trigger that terrible night, I was an active

24       participant, and for that I must take full

25       responsibility for my own reckless, irresponsible

1    and immature behavior.  When you are so young you

2    don't know how quickly things can turn upside

3    down.  I was only 16.  I did not want your loved

4    one to die.

5          "When I heard the gunshot, I just panicked

6    and ran as fast as I could.  I was so scared.  I

7    didn't know what to do.  I didn't know that Ho

8    had killed Mr. Teng until I saw it in the

9    newspaper a day later.  I feel like I was in a

10   bad dream from which I could not awake from.  I

11   wish I could wake up and find everything back to

12   normal.  I did not want to be a part of this.

13         "Ever since that fearful night, I replay

14   it all over and over again in my mind, trying to

15   fully comprehend how I have become so entwined in

16   this terrible, thoughtless event.  I now know

17   that it boiled down to choice, bad decision I

18   have made resulting from a lack of any real moral

19   compass and direction.

20         "I know holidays and other the so-called

21   special events such as anniversary, birthdays,

22   and so forth, now only serve as reminders of Yen

23   Teng's thoughtless murder and that there never

24   will be any real closure.  How can a mother or

25   father answer the simple question, how many

1    children do you have?

2          "I know one can never truly forget and

3    move on.  I know that nothing can remove or undo

4    your hurt and suffering as the result of the too

5    early loss of someone so dear to your heart as

6    your loved one Yen Teng so many people were hurt.

7          "I now realize, like a branch on the tree,

8    people's lives are entwined and touch so many

9    others.  So many people were traumatized by what

10   me and the other man and boys I was with have

11   done.

12          "It's not enough to say I'm sorry, for

13   which I truly am.  I wish there was some special

14   way that I could make amends to everyone and

15   especially you, the Teng family, and the loved

16   ones.  I would absolutely do anything I possible

17   could if it would possibly help you find peace,

18   joy and happiness once more.  I hope someday that

19   you can find peace in your heart and learn some

20   way to have a better life.  Sincerely and

21   Respectfully."

22   **PRESIDING COMMISSIONER ENG:**  Anything else?

23   Okay, we'll now recess for deliberation.  The time is

24   2:18.

25                **R E C E S S**

1   **CALIFORNIA BOARD OF PAROLE HEARINGS**

2   **D E C I S I O N**

3       **DEPUTY COMMISSIONER MEJIA:**  We're now on record.

4       **PRESIDING COMMISSIONER ENG:**  Okay.  The time is

5   2:55.  Everyone who was present prior to us taking a

6   recess for deliberations has since returned.  In the

7   matter of Wayland To, T-O, CDC number D-48864.  The

8   Panel has reviewed all the information received from the

9   public and relied on the following circumstances in

10  concluding that the prisoner is not suitable for parole

11  and would pose an unreasonable risk of danger to society

12  or a threat to public safety if released from prison.

13  We find that the commitment offense was carried out in a

14  very, very callous manner, very cold.  Multiple victims

15  were involved in this particular offense, whereby one

16  young waiter ended up losing his life by being shot to

17  death.

18       The offense was carried out, we find in a very

19  calculated manner in that the inmate and his crime

20  partner, basically, were driving around and spotted this

21  particular restaurant in order to go in and rob.  And

22  then one of the crime partners, Tran, actually went in

23  and cased the restaurant prior to them committing the

24  life offense.  The motive for the crime was plain and

25  **WAYLAND TO    D-48864    DECISION PAGE 1    02/13/07**

1  simple robbery, because they were basically out of

2  money.

3      These conclusions are drawn from the Statement of

4  Facts wherein the prisoner and his crime partners after

5  sort of hanging around for three or four days, driving,

6  playing video games, et cetera, had basically ran out of

7  money and one of the older crime partners, Tran, had

8  told the others, all pretty much minors and juveniles,

9  that they had to help him get more money by doing a

10  robbery.  That's when they drove around and spotted this

11  particular restaurant, the Feng Yuan, in Albany.

12      Tran went into the restaurant briefly, came out

13  and said that it was fine and directed the other three

14  to go in and rob the establishment.  The three others

15  entered the restaurant and ordered a meal.  When they

16  were nearly through eating, Tran came back in and

17  indicated that they should start the robbery.

18      At this point, the group took various positions

19  in the restaurant.  All the customers and workers were

20  gathered and placed in the back of the restaurant.  One

21  of the younger crime partners who was age 15 shot the

22  victim, a waiter, killing him without provocation.  One

23  of the other crime partners, Chi, was armed with a knife

24  and Inmate To was also armed with a gun.

25  **WAYLAND TO    D-48864    DECISION PAGE 2    02/13/07**

1      We find that the prisoner has failed to profit

2  from society's previous attempts to correct his

3  criminality and these attempts include juvenile

4  probation.  Apparently, Mr. To was on probation at the

5  time of the incident.

6      He does have a somewhat unstable social history

7  in that Mr. To was born in Saigon, Vietnam, and never

8  knew his father and pretty much was abandoned by his

9  mother at a very, very young age.  And according to the

10  history that we read, that when he was either five or

11  six, somehow he ended up getting corralled onto a boat

12  and taken to Taiwan, where he lived in an orphanage for

13  quite a few years and then was later was semi-adopted by

14  this older gentleman, who ended up bringing him to the

15  United States.  Basically, according to our discussions

16  with Mr. To, he had been, and what we read into the

17  record, that he had been in and out of different group

18  homes and was basically living on his own all the way up

19  until he became involved with his crime partners and

20  ended up in prison.

21      Prior criminality, does include three separate

22  incidences as a juvenile.  And one was for trespassing,

23  which involved breaking in a kitchen window.  Another

24  one was for burglary and that was, that had to do with

25  **WAYLAND TO    D-48864    DECISION PAGE 3    02/13/07**

1  Mr. To and two others entering a home during school

2  hours and taking approximately 2,000 dollars worth of

3  jewelry and currency.  And the third event involved the

4  defendant thrusting a lighted cigarette into the face of

5  a passing student in the hallway of the school.

6         Mr. To's institutional behavior, we find that he

7  has programmed in a very limited manner while

8  incarcerated, that he's failed to develop a marketable

9  skill that could be put to use upon release.  He has

10  failed to upgrade vocationally and he has not

11  sufficiently participated in beneficial self-help and

12  his misconduct while incarcerated includes nine 128(a)

13  counseling chronos, the last one being on July 15th of

14  2001, for performance and six 115's, the last one being

15  October 28th of 2003 for possession of contraband.

16         Regarding Mr. To's parole plans, this Panel found

17  that they were marginal at best.  We did note that we

18  had a letter from his sister, who resides in Sha Tin

19  Territory, Hong Kong, and she did state that she is

20  willing to provide her brother with housing and

21  financial support, any type of support that she could

22  offer him.  So, that does exist, but we don't find that

23  there is any acceptable employment for him and he

24  doesn't really have a marketable skill.  Regarding 3042

25  **WAYLAND TO    D-48864    DECISION PAGE 4    02/13/07**

62

1  responses, we did note that the representative from the

2  District Attorney's Office of Alameda County did state

3  their opposition to parole at this time.

4       The Panel makes the following findings. That

5  Inmate To does need to do additional documented

6  self-help in order to face, discuss, understand and cope

7  with stress in a non-destructive manner. Until progress

8  is made, this prisoner continues to be unpredictable and

9  a threat to others.

10      Sir, it's one thing to go to something like AA

11 and to, you know, get a documentation, get a certificate

12 that states that you went. And it's a whole other thing

13 to be able to discuss or show how it's helped or how

14 doing any type of self-help has actually helping you

15 into living your life on a daily basis. And to help

16 ensure that you wouldn't make the same bad mistakes as

17 you did when you were a youngster. So, that's really

18 what we're trying to stress with you is that there's

19 different types of self-help. It doesn't meant that you

20 have to go to group. It could mean that you could find

21 a book or a tape or to watch or to listen to and maybe

22 just write something very brief about what it means to

23 you and how you'd use that into making you a better

24 person, into making, you know, helping you to become,

25 **WAYLAND TO     D-48864     DECISION PAGE 5     02/13/07**

1   you know, an active member of the community in some way.

2        But we do commend you, for you did get your GED

3   back in '99 and for the years that you've been working

4   in Culinary. And you stated that this appears to be an

5   area that you're very, very interested in. So, we're

6   giving you, well, we're not there yet.

7        The Panel recommends that the inmate does remain

8   disciplinary free, that, if available, that you do

9   upgrade vocationally and you continue to try to upgrade

10  educationally. That is only going to help you. The

11  more vocations you can gain and complete, the more

12  marketable you're going to be on the outside. If you

13  were to throw all your eggs in one basket, if that

14  doesn't come through for you, then what are you going to

15  do? You know, your old way was to go and rob and steal

16  to get money. So, everybody wants you to succeed and

17  wants you to be able to make it without falling back on

18  the old habits. And, if available, that you do

19  participate in any and all types of self-help.

20       We're also going to ask that you do cooperate

21  with the clinicians. We have ordered you a new

22  psychological evaluation. We're giving you a one-year

23  denial at this point. That concludes the reading of the

24  decision. I'm going to ask if my fellow Commissioner

25  **WAYLAND TO     D-48864     DECISION PAGE 6     02/13/07**

1  has anything to add.

2      **DEPUTY COMMISSIONER MEJIA:**  I want to repeat,

3  Mr. To, the need for you to review your C-File so that

4  you will know if there's something there that's missing

5  that you have already completed.  I've noticed that you

6  did not, you declined to review your C-File for this

7  hearing.  And when things are not here, it doesn't

8  happen.  It's got to be documented.  So, when you start

9  reviewing your C-File, you'll see they didn't have this

10  documented and you can make some assertion.  But if you

11  need it to be here, at least you can have a chance to

12  get something, to get it, to send it to the Board.  It's

13  really needed.  It's just a suggestion.  You have to

14  remember, it didn't happen if it's not in your C-File.

15  Make sure you have it (inaudible).  That's it.

16      **PRESIDING COMMISSIONER ENG:**  Okay.  Thank you.

17  That concludes this hearing.  The time is now 3:05.

18                          --oOo--

19

20

21  **PAROLE DENIED ONE YEAR**

22  **THIS DECISION WILL BE FINAL ON:**___**JUN 1 3 2007**___

23  **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

24  **DATE, THE DECISION IS MODIFIED.**

25  **WAYLAND TO    D-48864    DECISION PAGE 7    02/13/07**

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, MICHELLE M. MADISON, as the Official Transcriber,

hereby certify that the attached proceedings:

| | |
|---|---|
| In the matter of the Life ) | CDC Number: D-48864 |
| Term Parole Consideration ) | |
| Hearing of: ) | |
| ) | |
| WAYLAND TO ) | |
| _____) | |

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

FEBRUARY 13, 2007

1:12 P.M.

were held as herein appears.  Further, this transcript

is a true, complete and accurate record, to the best of

my ability, of the recorded material provided for

transcription.

_Gina Lavoie_ (ügs)
_____
Gina Lavoie
March 12, 2007
Capitol Electronic Reporting

# EXHIBIT

# B

## PSYCHOLOGICAL EVALUATION
### FOR THE BOARD OF PAROLE HEARING
### FEBUARY 2008 SUBSEQUENT CALENDAR
### FORENSIC ASSESSMENT DIVISION
### **CTF-SOLEDAD**

## I. IDENTIFYING INFORMATION

| | |
|---|---|
| **Inmate Name:** | **To, Wayland** |
| **CDC Number:** | **D-48864** |
| **DOB (Current Age):** | **August 12, 1969 (*38 years old*)** |
| **Controlling Offense:** | **PC 187- Murder, 2nd Degree** |
| **Date of Offense (Age at time):** | **January 4, 1986 (*16 years old*)** |
| **Sentence:** | **Base Term 15/00 to Life +** |
| | **Enhancement 0/00 = Total Term of** |
| | **15/00 To Life** |
| **County of Commitment:** | **Alameda County** |
| **Date Entered into CDCR:** | **September 21, 1987** |
| **Date Received at CTF-Soledad:** | **September 13, 1995** |
| **Placement Score:** | **19** |
| **CDCR Forensic Evaluator:** | **Richard A. Atwood, Psy.D.** |
| **Date of Evaluation:** | **January 2, 2008** |

## II.  SOURCES OF INFORMATION

The inmate's Central File and Unit Health Record (UHR) were reviewed. This review included a full psychological evaluation report on the inmate for the Board of Parole Hearings (BPH) authored by Dr. Macomber (dated 11/29/05). Additionally, the undersigned also reviewed all previous evaluation reports on the inmate. For the purpose of the current evaluation, the inmate was interviewed on 1/2/08 for approximately two hours and thirty minutes. He was informed that the interview was not confidential and that a report with the results of the evaluation would be submitted to the BPH to assist in determining his eligibility for parole. The inmate appeared to understand the nature of the evaluation and the possible consequences of the interview to the best of the inmate's ability. For reasons not limited to the possibility that an individual may have a mental disability or condition, which may qualify under the Americans with Disabilities Act, the evaluation was conducted by a licensed psychologist. It is the conclusion of the undersigned examiner that it was not necessary to provide auxiliary aids or assistance to achieve effective communication. This evaluator is not responsible for any inaccurate statements, or subsequently changed opinions, expressed by the inmate or as taken from the records.

This current report is an addendum for update to the BPH, and only information relevant to the current assessment, and more recent to prior reports, will be addressed.  The reader is directed to Dr. Macomber's report (from 2005), for a detailed account of the inmate's psychosocial history.

## III.  QUESTIONS POSED BY MOST RECENT FEBRUARY 2007 BPH

The undersigned reviewed the (2/13/07) BPH 1000 (a), which requested an updated Psychological Evaluation to include the following:
1) The prisoner's violence potential in the free community;
2) The significance of alcohol/drugs as it relates to the commitment offense and an estimate of the prisoner's ability to refrain from the use/abuse of same when released;

3) The prisoner's psycho-sexual problems;

4) The extent to which the prisoner has explored the commitment offense and come to terms with the underlying causes (insight and responsibility for his actions); and

5) The need for further therapy programs while incarcerated.

## IV.   INTERVIEW INFORMATION

From the outset of the interview, the planned focus was to update any information relative to the most recent full evaluation, as well as to deal with any unexamined issues relative to intrapersonal functioning at the time of the index offense, in order to provide a report to the BPH.

CURRENT MENTAL STATUS:

The inmate is a 35-year old, single biracial male of Asian/Caucasian decent, of average height and slightly below average weight. He is currently serving a 15 year to life term for one count of Second Degree Murder [PC 187(A)]. The essence of the offense was that the inmate, with co-defendants robbed a restaurant. During the course of the robbery a co-defendant of the inmate shot the victim resulting in his death.

The inmate has been placed in three institutions since his incarceration. As a juvenile the inmate entered SACC/YA on 3/2/87, and was rejected due to a policy change at the California Youth Authority and then entered into the California Department of Corrections and Rehabilitation, on 9/21/87, where the inmate was assessed to NRC-California Medical Facility. He was sent to San Quentin State Prison on 10/20/87. The inmate was then transferred to Deuel Vocational Institution on 8/24/89, was then transferred to California Training Facility- Soledad (CTF) on 9/13/95, where he is currently housed. The inmate's initial placement score was 68 (dated 3/3/94), rose to 74 (dated 4/13/88), declined to 16 (dated5/4/94), rose to 20 (dated 2/3/95), declined to 0 (dated 10/01/98), rose to 2 (dated 10/17/00). Due to an institution-wide reclassification system, the inmate's placement score was adjusted to 19 (dated 10/17/02); it has remained 19 since 2002. The inmate has received six CDC 115's and nine128A's during his incarceration. His 115's were for Obeying Rules, Regulations & Procedures (3/12/88), Refused to Work/Foul Language (12/11/89), Participating in Work Strike (7/05/94), and Refusing to Work (10/02/99), Mutual Combat (10/21/00), and Contraband (10/28/03). His 128A's were for Failed to Report to Acad. Assignment (12/08/89), Sleeping in Class (11/30/89), Failed to stand for count (6/27/90), Absent from Education (7/26/96), and Failed to Report to Acad. Assignment (11/24/98-8/4/99-8/6/99), Left job site without permission (10/21/00), and Failure to Report (7/15/01).

The inmate presented for the clinical interview appropriately dressed in an institution-issued uniform, well-groomed, and on time. The inmate appeared fully oriented to his surroundings (including to person, place and time/situation), and his speech tone and pace were within normal limits although his speech production was at times was slow, due to wording finding difficulties as English as a second language. He did not appear to be suffering from any thought disturbances (such as auditory or visual hallucinations, or paranoia) or mood instability (clinical depression, mania or anxiety). The inmate's thought process was goal-directed, appropriate to the conversation and reflected a clear understanding of questions being asked of him. His psychomotor functioning and memory appeared to be intact, with no difficulty in concentration, or any evidence of neurological disturbance. The inmate denied any current or history of suicidal ideation or thoughts of self-harm. He maintained direct eye contact throughout the interview and

was able to communicate intelligibly. The inmate verbally expressed his remorse and sorrow for the crime and his affect was congruent. The inmate did not appear to avoid the undersigned's questions, and did not respond impulsively with his answers. He presented himself in a manner consistent with an individual who is interested in being released to the community.

INSTITUTIONAL PROGRAMMING:
At present, and since his last report prior to his BPH hearing, the inmate has generally been programming well. He currently works in the area of ordering / distribution of food for the prison in the kitchen managers' office. He has received six 115's and nine 128's disciplinary infractions since incarceration. His placement score is 19, where it has been since 2002. The inmate does not appear to have been a behavior management problem for the institution throughout most his incarceration. As well, he has not been involved in the Mental Health Services Delivery System (MHSDS).

The inmate completed his GED on 11/17/99. When asked about further education the inmate stated, "I learn best by watching, not by books" and admitted difficulty with reading technical / educational material. Yet, the inmate was to overcome this difficulty and received his GED. He completed Tabe Testing in 1999 resulting in following respective scores: Reading 9.1, Math 9.5, Language 9.9 and total equivalency 9.9. Records suggest that he successfully passed a Cognitive Screen and required no services from the Developmental Disabilities Program (DDP).

The inmate reported that he has received Vocational training certificates in Machine Shop, Watch Repair, Silk Screen, although he has not received a certificate of completion.

Additionally other activities the inmate has been involved in include; Alternative to Violence Workshop, Impact Workshop, Stress and Anger Management Class, Alcoholics Anonymous 12 Step and 12 Traditions, Time and Money Management, Ethics and Values, A-MER-CAN, Science of Mind Treatment and Meditation, and Under Cover Class.

INSIGHT / SELF ASSESSMENT:
The inmate appears to now view him self as a changed person, someone who is mature and better able to make decisions that are not impulsive, or without thinking of the possible consequences. He stated that he now sees himself as "As a better person, my whole thinking about life and my attitude has changed." The inmate stated that his most significant accomplishments are "getting my GED, settle on a career, and the goals I have." The inmate fully acknowledges the seriousness of the life crime and accepts full reasonability for his role in the commitment offense. He reported that he was physically abused by his alcoholic adopted father, stating "He didn't take care of me, he drank a lot, and beat me" which resulted in the inmate running away from home. He was then removed from the home, made a ward of the court, and in turn was placed in several group homes in which all resulted in placement failure. At this time, the inmate appears to have explored the internal causes and factors that led to the commitment of the life crime, including the role of his early chaotic history and the risk of his antisocial associations, and how they may have played a part in the controlling offense. The inmate stated that his main failure in life was "did not stay in school and not learning more." He stated that "I think before I react, I 'm mature now, and staying away from bad influences" would help keep him out of future trouble.

## PLANS IF GRANTED RELEASE:

The inmate's current plans for parole include living in or returning to a community where his social support resides. This consists of the inmate preparing two separate plans for release. If the inmate is deported to Hong Kong, he plans on living with his sister. The inmates immediate and extended family have sent recent letters offering assistant in employment, housing, and financial support for the inmate living in Hong Kong or the United States. If he remains in the United States, he plans on living with his former teacher and friend a Ms. Judy Pearl, in San Francisco, California. Additionally, Ms. Pearl has also offered employment, and two friends of hers have also offered both housing and employment assistance. Additionally, the inmate has inquired about the Delancey Street Foundation, and Le Gordon Blue Program at the California Culinary Academy, both located in San Francisco. In reference to occupational goals he stated, "cooking is my passion." He reported that he has wanted to due this for the past fifteen years. The inmate stated that for this occupation he would "need to go to culinary school at night, or learn on the job." He believes that his criminal conviction is likely to pose difficulties for him stating, "the people who hire me, they see what I did, but I won't let that stop me." The undersigned found multiple letters of support from the inmate's immediate and extended family, confirming that he has housing available to him, employment offers, and a social support network. The inmate reported that he is in the process of receiving more current / updated dated letters from Ms. Pearl and her friends. The inmate stated that he communicates regularly thru letters with Ms. Pearl and members of his immediate and extended family and had received regular visits when located closer to San Francisco. It should be noted that the inmate currently has an INS hold for possible deportation to the Republic of China.

## INMATE UNDERSTANDING OF LIFE CRIME:

Relative to the life crime, the inmate acknowledged full responsibility for his role in the commitment offense, and did not disagree with the official record describing the offense. When describing the life crime the inmate stated, "This guy named Tran said we ran out of money. He told us we need to find a place to rob, he drove around. He went in and came back out and said ok. We got in and we robbed the place. I heard a gunshot and ran out. Next day I found out in newspaper. I asked why you do it, he said the gun just went off." When asked about the life crime, he stated, "I was wrong, I was immature, I hung around the wrong crowd." When asked what he could have done to avoid the life crime, he stated, "If I do not run away from group home, I could have walked away." When asked about what impact, if any, he felt the controlling offense has had on the victim's family he stated, "it took a family member, took a son's life, wife lose husband, kids lose father, I apologize to them and ask forgiveness." When asked what he would say to the victims he stated, "I don't think anything can make it right, I'm sorry is not good enough for the victims."

The inmate's affect, while somewhat subdued, appeared remorseful for his past behavior and his participation the life crime. The inmate did not avoid the undersigned's questions regarding the life crime, and demonstrated a sense of empathy that appeared emotional and internal, rather than intellectual and detached. His judgment and insight was good in reference to his level of responsibility and his role in the life crime. His insight appeared good with an affective understanding of empathy and remorse rather than having an intellectual perspective. He wanted to emphasize to the BPH that, "I 've got a good heart."

LIFE CRIME, ACCORDING TO RECORDS:
The Life Prisoner Evaluation Report (dated January 2007 indicated that "About two months before the commitment offense, To met a man by the name of Ming Tran. Tran (age 22) had a car and some money. To (age 16) and his co-participants, Henry Ho (age 15) and Alwyn Chi (ahe 18) had been with Tran continuously for three or four days driving around, playing video arcade games, cards and ping pong. On the evening before the commitment offense on 1/4/86, Tran rented a hotel room in Oakland. Tran told the others that he was out of money since he had spent it all on them. He told the others that they now had to help him out by doing a robbery. They drove around and spotted the Feng Yen Restaurant in Albany. Tran went into the restaurant briefly, came out and said that it was quiet and directed the other three to go in and rob the establishment. The three others entered the restaurant and ordered a meal. When they were nearly through eating, Tran came back in and indicated that they should start the robbery. At this point, the group took various positions in the restaurant. All of the customers and workers were gathered and placed in the back of the restaurant. Ho then shot the victim, a waiter, killing him without provocation. Chi was armed with a knife and To had a gun.

MENTAL HEALTH CONCERNS OR PERSONALITY DISORDERS:
The inmate does not appear to suffer from a major mental illness, or demonstrate traits or patterns consistent with a personality disorder. There do not appear to be any documented mental health symptoms or incidents. The inmate has not been a behavior management problem since 2003, demonstrating a general ability to follow rules and abstain from aggression and impulsive behavior in a structured environment.

## V.  DIAGNOSTIC IMPRESSION

| Axis I:   | V71.02 | Adolescent Antisocial Behavior |
|-----------|--------|--------------------------------|
| Axis II:  | V71.09 | No Diagnosis                   |
| Axis III: |        | None                           |
| Axis IV:  |        | Incarceration for life term.   |
| Axis V:   |        | GAF: 80                        |

The inmate has no documented history of experiencing symptoms warranting an Axis I diagnosis of a thought or mood disorder, as identified by the Diagnostic and Statistical Manual- Fourth Edition, Text Revised (DSM-IV TR). The undersigned found no evidence, by history or self-report, of a thought disorder (e.g., hallucinations, paranoia, or disorganized thinking), mood disorder (e.g., mood instability, mania, or depression), or anxiety disorder (e.g., phobias, avoidance of activities based on fears or anxiety, inattention/hyperactivity, or obsessive/compulsive thoughts/behaviors).

In regards to Axis II, the DSM-IV-TR indicates that in order to diagnose a personality disorder, there must be present "an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture…this enduring pattern is inflexible and pervasive across a broad range of personal and social situations…the pattern is stable and of long duration, and its onset can be traced back at least to adolescence or early adulthood." In regards to Mr. To, this evaluator does not believe that such a pattern exists. The inmate was an Adolescent when he committed his offense therefore the criteria for a V-code diagnosis of Adolescent Antisocial Behavior is met.

## VI.  PREVIOUS EVALUATION SUMMARY

A prior psychological evaluation (by Dr. Macomber in 2005) suggested that the inmate did not have a severe mental disorder, or personality traits consistent with a diagnosis of a specific personality disorder. In this Psychological Evaluation, Dr. Macomber in the Assessment of Dangerousness section paragraph B stated," In considering his potential for dangerous behavior if released to the community, his violence is no more than the average citizen in the community at this point in his life. The two prior psychological evaluations also made this statement." The reader is referred Dr. Macomber's report for the complete assessment of dangerousness and clinical observations /comments / recommendations.

## VII.  ASSESSMENT FOR RISK OF VIOLENCE

The current research literature indicates that an empirically based approach is the most reliable and valid method for assessing risk of future violence. In the present evaluation, three separate assessment guides were used to help estimate this individual's risk for future violence in the community:  the Psychopathy Check List – Revised (PCL-R), the History – Clinical – Risk – 20 Version 2 (HCR-20), and the Level of Service/Case Management Inventory (LS/CMI).  The data for scoring these instruments were obtained from information derived in both the inmate interview and the files reviewed. These measures are widely used and are supported by years of research in the risk assessment field. They have been cross-validated with various forensic populations, including United States males in correctional settings; however, the following results need to be regarded with some level of caution since some individuals may possess idiographic differences that could limit the applicability of these instruments. The evaluator has taken these factors into consideration in determining how much weight to allot each of the measures and in formulating an overall estimate of risk for future violence in the community. Estimates of risk for violence will be presented categorically: low, moderate, or high.

### PCL-R

The inmate's PCL-R interview was conducted by the undersigned evaluator on 1/2/08. His score placed him in the Low range. Scores in the low range suggest that this individual does not possess traits or patterns consistent with a psychopathic profile. The inmate's score, although low, did suggest the following personality characteristic: Juvenile Delinquency. The inmate's scores also suggested to a lesser degree: Criminal Versatility.

### HCR-20

The inmate's HCR-20 interview was conducted by the undersigned on 1/2/08. His score placed him in the Low range.  The inmate attained scores which would suggest that his risk for future violence is more significantly influenced by state factors rather than trait factors. An example of state factors would be the economic and environmental influences. An example of trait factors would be an antisocial personality or a tendency toward violating the rights of others.

Within the "historical" domain of assessing likelihood of future violence, records indicate that the inmate had a criminal conviction history of: burglary, trespassing, assault with deadly weapon or force likely to produce great bodily injury, and the life crime, all of which occurred when the inmate was young. Also, the inmate has a history of early maladjustment and failure while on supervised release.



Within the "clinical" or more current and dynamic domain of risk assessment, the inmate does not appear to possess any risk factors. His lack of risk is supported by his ongoing participation in various programs since being incarcerated, as well as the absence of any psychiatric disorders. The inmate had no history of psychiatric difficulty while living in the community, nor does his record identify any past history of mental health treatment. Also, he has not received mental health treatment during his incarceration.

Within the "management of future risk" domain, the inmate's risk is most significant because of the environmental stressors he is likely to experience upon release. The inmate has taken several steps to develop him self as evidenced by increasing his level of education, and refraining from significant violence since incarceration. Given the environmental stressors he will face upon parole, it is reasonable to conclude that the inmate will face challenges related to economic instability, and the difficulties encountered by life-term inmates attempting to reintegrate into society following a long period of incarceration. In addition to the number of years he has been incarcerated, it is important to note that the inmate has been institutionalized his entire adult life. Never having lived as an adult in the community, having committed the life crime at the age of sixteen will increase his stress as he re-enters society with the daily expectations placed on adults in our society. The inmate may be exposed to a variety of situations that, historically, may have led to antisocial associations. Without adequate coping skills to manage these stressors, the inmate may be at risk of relapsing back into his past behavioral patterns.

LS/CMI:
The Level of Service Inventory/Case Management Inventory (LS/CMI) is an actuarial instrument designed to evaluate levels of risk to recidivate. This instrument is focused on risk of general recidivism and not violence per se. The inmate's LS/CMI interview was conducted on 1/2/08. His overall LS/CMI score indicates that he is in the Low category, having scored lower than 97.8% of North American sample of incarcerated male offenders.

OVERALL RISK ASSESSMENT:
Based on the findings of the above risk assessment measures, a thorough record review and a forensic clinical interview of the inmate, the undersigned's opinion is that this inmate represents a Low risk of violence and general recidivism.

The following factors increase the inmate's risk of violence in the community. The inmate committed the life crime at a relative young age. The inmate has a past history of antisocial associations, if he were to find himself continuing to affiliate with such individuals in the community, this reasonably increases his chances of recidivism and behavioral acting out.

It is important to note, however, that the following factors decrease the inmate's risk of violence in the community. The inmate does not have an Axis I major mental illness, which has been shown to increase one's risk of violence. He has a social support network which has been shown to insulate his risk of future violence. The level of contact with these individuals has been regular and steady during his incarceration. The inmate's social support does not appear to have been involved in criminal and or gang activities. The inmate does not currently appear to associate with individuals in the community who have engaged in antisocial behavior. He has a tangible vocational skill that may translate to stable work, protecting him from some of the effects of poverty. While the inmate has no history of substance abuse, he has participated in substance abuse treatment, and appears to have abstained from drug and alcohol use despite readily

available access to substances within the institution. The inmate expressed a consistent regret and remorse for his actions, and was able to identify the impact his actions have had on the victim and the victim's family. Finally, he received low scores on the PCL-R, HCR-20, and LS/CMI, psychological measures that have been well-correlated with future risk of violence and general recidivism.

## VIII. CONCLUSIONS/RECOMMENDATIONS
The Board of Parole Hearings' questions will be addressed for each issue presented, as noted in an earlier section of this report.

### 1) *The prisoner's violence potential in the free community;*
At this time, it appears that the inmate is focused on enhancing and continuing with his current programming. The inmate appears to have fully explored the internal causes and factors that led to the commitment of the life crime, including the role of his antisocial associations which played a part in the commission of the controlling offense. Generally, he has demonstrated a pattern of institutional programming aimed at bettering himself in anticipation that one day he may return to the community. The inmate's parole plans appears to be realistic, and he appears to be somewhat aware of how difficult it will be to transition back to the community. The undersigned found multiple letters of support in his C-file. Various clinical factors mentioned throughout this report provide an overall risk assessment estimate which suggests that the inmate poses a low likelihood of becoming involved in a violent offense if released into the free community. This estimate takes into account the inmate's cultural background, language issues (if any), personal, social and criminal history, institutional programming, community/social support, release plans, and current clinical presentation. In addition, there is the caveat that such an assessment is at least partially based on the likelihood of continued abstinence from any substance abuse.

### 2) *The significance of alcohol/drugs as it relates to the commitment offense and an estimate of the prisoner's ability to refrain from the use/abuse of same when released;*
The inmate did not have a pattern of substance use consistent with an abusive pattern while in the community. It does appear that substance use was an aggravating factor in his commission of the controlling offense.

### 3) *The prisoner's psycho-sexual problems;*
The inmate does not appear to have any psychosexual problems.

### 4) *The extent to which the prisoner has explored the commitment offense and come to terms with the underlying causes;* (insight and responsibility for his actions)
The inmate appears to have spent sufficient time exploring his thought process leading up to the life crime, as well as identifying his errors in judgment that led to the victim's murder. He appears to have spent significant time considering the victim, as well as how his actions have affected the victim's family's lives, and the significance of him taking part in the murder of another human being. The inmate's expression of regret and remorse appeared internal and emotional. The undersigned opines that the inmate has taken full responsibility for the controlling offense. Additionally, the undersigned found that the inmate has good insight into the underlying causes for the commitment offense and was able to verbalize the seriousness of his past antisocial associations.

It should be explained that "insight" and "responsibility" are abstract concepts and do not lend themselves to quantifiable measurement; thus, in both instances, there is no solid research that can identify such concepts, or arbitrary "levels" thereof, as causal or requisite factors in behavior change or prediction. The opinions offered in the preceding paragraph, therefore, should be interpreted with this caveat in mind.

### 5) *The need for further therapy programs while incarcerated.*
The inmate appears to have spent time examining his own behaviors and has identified some goals for the future, were he to be released to the community. Ongoing education, and involvement in self-help, self study (bibliotherapy), or introspective treatments groups is encouraged, but his group treatment (if available to life term inmates without mental health issues) should not be considered mandatory. Such treatment may provide the inmate an opportunity to better understand his past behavior.


_____          **1/04/08**
Richard A. Atwood, Psy.D., CA License # PSY-19157          Date Submitted
Forensic Psychologist / Forensic Assessment Division
Board of Parole Hearings
California Department of Corrections and Rehabilitation


Reviewed by: _____
Jasmine A. Tehrani, Ph.D., CA Psychologist License# PSY 18932
Senior Psychologist, Supervisor
Board of Parole Hearings
California Department of Corrections and Rehabilitation


CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use, or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act and the Health Insurance Portability and Accountability Act (HIPAA). If you are not the intended recipient, please contact the sender and destroy all copies of this communication.



LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
JANUARY 2007 CALENDAR

TO, WAYLAND                                                    D48864

I.    **COMMITMENT FACTORS:**

A.    **Life Crime:** Murder 2nd (PC 187), Alameda County Case #ALA85646.
      Sentence: 15 years to Life. Weapon: Handgun. MEPD: 12/12/95. Received in
      CDCR: 10/20/87. Victim: Yen Ting, age: unknown.

1.    **Summary of Crime:** About two months before the commitment offense,
      To met a man by the name of Ming Tran. Tran (age 22) had a car and
      some money. To (age 16) and his co-participants, Henry Ho (age 15) and
      Alwyn Chi (age 18) had been with Tran continuously for three or four days
      driving around, playing video arcade games, cards and ping pong. On the
      evening before the commitment offense on 1/4/86, Tran rented a hotel
      room in Oakland. Tran told the others that he was out of money since he
      had spent it all on them. He told the others that they now had to help him
      out by doing a robbery. They drove around and spotted the Feng Yen
      Restaurant in Albany. Tran went into the restaurant briefly, came out and
      said that it was quiet and directed the other three to go in and rob the
      establishment. The three others entered the restaurant and ordered a meal.
      When they were nearly through eating, Tran came back in and indicated
      that they should start the robbery. At this point, the group took various
      positions in the restaurant. All of the customers and workers were
      gathered and placed in the back of the restaurant. Ho then shot the victim,
      a waiter, killing him without provocation. Chi was armed with a knife and
      To had a gun. [POR, pages 2-3 and 9/3/86 letter from Deputy DA,
      Alameda County]

2.    **Prisoner's Version:** To said that his version remains the same as
      previously stated. He and his co-participants had been with Tran for four
      days driving around, going to video arcades, playing cards and ping pong.
      On the evening before the robbery, Ming Tran rented a hotel room in
      Oakland. Tran stated that he was out of money because he had spent it all
      on them. Tran went on to state that now they had to help him out by doing
      a robbery. They drove around and spotted the restaurant. Tran got out of
      the car, "cased" the restaurant and stated that it was quiet. Tran then
      directed the other three to go ahead and "do it". They went into the
      restaurant. Ho had a gun, Chi had a knife and To had a gun which he said

Inmate Copy

was unloaded. About ten minutes later, Tran came in and indicated that they should start the robbery. At this point, the group took various positions, and Ho took Chao Yen Ting into the kitchen. It was at this point that a gunshot was heard. The four men ran to the car and went back to the hotel. To was arrested at a coffee shop a few days later.

3.    **Aggravating/Mitigating Circumstances:**

   a.    **Aggravating Factors:**

   - Victim was particularly vulnerable.
   - Prisoner had opportunity to cease but continued with crime.
   - Circumstances of crime created potential for serious injury to others.
   - Murder was senseless and served no purpose in completing the crime.
   - Nature of crime exhibited viciousness, cruelty or callousness.

   b.    **Mitigating Factors:**

   - Prisoner was induced by others to participate.
   - Prisoner has minimal history of criminal behavior.
   - Prisoner was a passive participant.

B.    **Multiple Crime(s):** N/A.

   1.    **Summary of Crime:** N/A.

   2.    **Prisoner's Version:** N/A.

II.    **PRECONVICTION FACTORS:**

A.    **Juvenile Record:** In March of 1984 (at age 14), To was made a ward of the court following two felonies, Burglary, 459 PC, and Assault with Deadly Weapon or Force Likely to Produce Great Bodily Injury, 245(a) PC. There was also a misdemeanor finding of a violation of 602(j) PC, Trespassing.

B.    **Adult Convictions and Arrests:** None. To was arrested on the instant offense when he was seventeen years old and was tried as an adult.

C.    **Personal Factors:** Wayland To was born on August 12, 1969 in Saigon, Vietnam. He never knew his father, who apparently was an American Soldier. He has no memory of his mother, who abandoned him at a young age. At one point, when he was approximately five or six years old, he heard a lot of yelling and

LIFE PRISONER EVALUA⁣ REPORT                                            3
PAROLE CONSIDERATION HEARING
JANUARY 2007 CALENDAR

shouting from people running for the harbor. He ran along with the crowd and
jumped onto a boat. He was picked up by a ship and transported to Taiwan,
where he lived in an orphanage until he was nine years old. At the orphanage, he
met an elderly gentleman named Ving Wha To who attached himself to To and
claimed to be his father, which allowed the two of them to immigrate to the
United States in 1979. The two were supported by Aid to Families with
Dependent Children. The alleged father used the money, drank to excess and beat
To. He was enrolled in the fifth grade in San Francisco, and developed a close
relationship with his teacher, Judy Peart and her parents. Ms. Peart acted as a
surrogate maternal figure, and her parents as godparents. Ms. Peart is the one who
gave To his first name of Wayland. To became involved in a series of out-of-
home placements starting in May of 1984. He was originally placed in a group
home in Aptos. In December, 1984, he was placed in another group home. He
did well and was relatively happy. His school work was poor, and he became
involved in juvenile criminal activity. He was then placed in a group home in
Inglewood. To ran away from that program. Sometime around October of 1985,
To left the area. His whereabouts were unknown. He worked as a dishwasher for
several months at a Mexican restaurant in San Francisco when he was 12 and 13
years old. He also worked as a dishwasher in Gilroy while he was living in a
near-by group home. To has no record of military services. His file shows no
indication of sexual deviation or mental disorder.

III.    **POSTCONVICTION FACTORS:**

A.    **Special Programming/Accommodations:** N/A.

B.    **Custody History:** All documents from the previous hearing remain the same.
Since To's last Board Report he has been assigned to the Culinary. To was
received at CTF on 9/13/95 and has remained at CTF in the general population
with Medium A custody. (See Post Conviction Progress Report)

C.    **Therapy and Self-Help Activities:** Since To's last BPH Hearing he has not
participated in any groups or therapy. (See Post Conviction Progress Report)

D.    **Disciplinary History:** Since To's last BPH Hearing he has remained disciplinary
free.

E.    **Other:** To attended his Subsequent #7 Parole Consideration Hearing on 1/10/06.
Parole was denied for 1 year. The Board recommended that To remain
disciplinary free; earn positive chronos and participate in self-help programs and
group therapy.

IV.    **FUTURE PLANS:**

LIFE PRISONER EVALUA⌐ ▸ EPORT         4
PAROLE CONSIDERATION HEARING
JANUARY 2007 CALENDAR

    A.    **Residence:**  To stated he would be able to live with his friend and former teacher, Judy Peart, who lives at 509 Park Way in South San Francisco.  The telephone number at that address is (650) 588-8787.

    B.    **Employment:**  To has offers of employment from Judy Peart.  He also has offers of employment assistance and housing assistance from friends of Ms. Peart, Benjamin Benavides (409 Park Way, South San Francisco 94080) and Joanne Tsang (310 Maple Avenue, South San Francisco, 94080).

    C.    **Assessment:**  In review of To's parole plans, this counselor does not foresee any problems, however, it is recommended that To update his support letters prior to his hearing.

**V.**    **USINS STATUS:** To has a USINS hold (A24499393), with an AKA listed as Mei Lian Su, to the Republic of China.

**VI.**    **SUMMARY:**

    A.    Prior to release the prisoner could benefit from:

        1.  Continuing to be disciplinary free.
        2.  Participation in self-help and therapy programs.
        3.  Upgrading vocationally.

    B.    This report is based upon an interview with the prisoner on 9/7/06 lasting approximately 1 hour and a complete review of the Central File lasting 2 hours.

    C.    Per the Olson Decision, To was afforded an opportunity to examine his Central File.  On 9/7/06 To did not examine his Central File.  (Refer to CDC 128-B dated 9/7/06 in the General Chrono Section of the Central File.)

    D.    No accommodation was required per the Armstrong vs. Davis BPH Parole Proceedings Remedial Plan (ARP) for effective communication.

LIFE PRISONER EVALUA~ ╰EPORT
PAROLE CONSIDERATION HEARING                                          5
JANUARY 2007 CALENDAR


_____        10/16/06
T. Verdesoto                   Date
Correctional Counselor I


_____  CC2    10-16-06
D. Carnazzo                    Date
Correctional Counselor II


_____         10
I. Guerra                      Date
Facility Captain


_____  CdPR   10-17-06
D. S. Levorse                  Date
Classification and Parole Representative

BOARD OF PRISON TERMS
LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

STATE OF CALIFORNIA

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

INSTRUCTIONS
TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 3/05 to 3/06 | | | **PLACEMENT:** Remained at CTF in the general population. <br> **CUSTODY:** Medium A. <br> **VOC. TRAINING:** None noted during this period. <br> **ACADEMICS:** None noted during this period. <br> **WORK RECORD:** To was assigned to the Culinary with above average grades as reflected by CDC 101's dated 5/1/05, 8/1/05, 11/1/05 and 1/24/06. <br> **GROUP ACTIVITIES:** To did not participate in any groups or activities this period. <br> **PSYCH. TREATMENT:** None noted during this period. <br> **PRISON BEHAVIOR:** To remained disciplinary free during this period. <br> **OTHER:** To received a Laudatory Chrono for his positive example to other inmates and staff in serving the Thanksgiving Holiday Meal. To was commended for his work ethics, CDC 128-B dated 11/28/05. |

| CORRECTIONAL COUNSELOR'S SIGNATURE | | DATE |
|---|---|---|
| _A. Corona._ CCI (A) | | 10/14/06 |

| TO | D48864 | CTF-SOLEDAD | JAN/2007 |

BPT 1004 (REV 7/86)

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 4/06 to 9/06 | | | **PLACEMENT:** Remained at CTF in the general population. **CUSTODY:** Medium A. **VOC. TRAINING:** None noted this period. **ACADEMICS:** None noted this period. **WORK RECORD:** To continues his assignment in the Culinary with no current CDC 101's. **GROUP ACTIVITIES:** To did not participate in any groups or activities this period. **PSYCH. TREATMENT:** None noted during this period. **PRISON BEHAVIOR:** To remained disciplinary free during this period. **OTHER:** N/A. |

ORDER:

☐ BPT date advanced by    months.
☐ PBR date advanced by    months.

☐ BPT date affirmed without change.
☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.
☐ Add or modify

☐ Schedule for Progress Hearing on appropriate institutional calendar

| TO | D48864 | CTF-SOLEDAD | JAN/2007 |

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

BPT 1004 (REV 7/86)

# UPDATED MATERIAL FOR:
# COMMISSIONER

INMATE: TO, WAYLAND                 CDC#: D48864

DATE: JANUARY 10, 2006                 TIME: 8:30



Alameda County
**District Attorney's Office**
Thomas J. Orloff, District Attorney

January 3, 2006

Board of Prison Terms

Re:    **Wayland To – D48864**
        Alameda County Superior Court Docket no. 85646A
        BPT Hearing Date: January 3, 2006.

Dear Members of the Board,

I will be unable to attend the scheduled Parole Consideration Hearing for Wayland To. I am sending you this letter in lieu of a personal appearance. I have reviewed the packet of information prepared for this hearing. The packet sets out the circumstances of the take over robbery that led to the shooting death of Chao Yen Ting and Wayland To's participation in that robbery. Wayland To, Henry Ho and Alwyn Chi all participated in a robbery of the Feng Yen Restaurant in Albany, California on January 4, 1986. Mr. Ting was shot and killed by To's 15 year-old accomplice Henry Ho during the commission of the robbery.  Mr. To was apparently in a different room within the restaurant when Ho killed Ting.

Mr. To admitted to being armed with a firearm during the commission of the robbery while Mr. Chi was in possession of a knife. The "mastermind" of this robbery according to Mr. To was an adult male by the name of Ming Tran. Mr. Tran was at the restaurant encouraging the juveniles to commit the robbery, but was never arrested or prosecuted. Mr. To was 16 years old at the time of this crime but his case was prosecuted in adult court. Mr. Chi was 17 years old when the robbery occurred and he was also prosecuted as an adult. Mr. Ho's case proceeded in juvenile court.  Mr. Ho and Mr. Chi have been paroled from incarceration for several years according to the information provided to me in preparation for To's Parole Consideration Hearing.

Mr. To pled guilty to 2nd degree murder at an early stage of the criminal proceeding prior to a preliminary examination being held. Mr. To's criminal history as a juvenile prior to this offense did not involve violence. ~~The People will submit to the discretion of the BPT whether further incarceration of Mr. To within the CDC is in furtherance of justice and serves to protect the citizens of California given the facts of the commiting offense, Mr. To's performance while in prison and the to prody status his coo participaments.~~

Sincerely,

THOMAS J. ORLOFF
District Attorney

By:    Scott Patton
        Deputy District Attorney

December 2, 2007

Dear Members of the Board of Parole Hearings

SUBJECT:    PAROLE APPLICATION OF WAYLAND TO (D48864)

I am TRAN, Thieu-hoa, sister of Wayland. Please allow me to briefly share with you our family background. Wayland's natural parents were in the US military and a Chinese girl living in Vietnam. Since my stepfather, TO, Van-hoa and my mother LY, Tu-huy did not have a boy they adopted Wayland when he was one year old. They loved Wayland very much and we all treated him as family.

Our family moved to Taiwan in 1975. Again in 1979, when Wayland was 10 years old, he left Taiwan and resided with my father in the US, whereas my mother moved to Hong Kong with me. Due to his old age and language barrier, my father had to devote most of his time and energy to provide a living for the family and left him very little resources in teaching Wayland. As a result Wayland violated the law and was convicted.

He has been institutionalized since he was 14, which was 24 years ago. All those who were convicted in the same case were released. Now he is older, able to reason much better, he has been feeling very sorry for the wrong that he had done and is committed to start afresh if given the opportunity.

It hurts me very much to see that he applies for parole every year but has been denied very time. The only way I could help him is to write this letter to ask if you will please consider his application favorably. If his application is successful, I will

1.    Write and call him often to show my concern and support to him.
2.    My whole family will support him financially. We will send money to him every month until he can make it on his own.
3.    I will ask my friends and families in the US to help him find a job and also to help him in whichever way that he might need.

Please let me know if there is any other ways that I could help Wayland to obtain his parole and I will be most happy to do them.

Yours sincerely                                    Address
                                                   1727 Tai Wo House
                                                   Wo Che Estate
                                                   Shatin
                                                   Hong Kong

TRAN, Thieu-hoa



December 2, 2007

Dear Members of the Board of Parole Hearings

SUBJECT:   PAROLE APPLICATION OF WAYLAND TO (D48864)

I am a friend of TRAN, Thiru-hoa. I translated the letters written by her and her family regarding the parole of Wayland TO. I feel I would do her injustice if I do not add my own observation in this matter. I feel I could translate her words but not her love for Wayland.

I have known Thiru-hoa in church for over 10 years and witness the love she has for her family. Finding and helping her brother was one of her mother's wish at dead bed and something that Thiru-hoa has put in a lot of effort to accomplish.. She had solicited help from her friends in the US to locate Wayland but with no success until recent years. She kept contact with him since. I remember a couple of years back when Wayland didn't call her at the usual time of the year, she became very worried and she tried to call CTF herself. Unfortunately she was unable to make herself understood due to language barrier. Reluctantly she has to ask me to make the call for her. It was a great comfort for her and her family when they could get in touch with Wayland again.

Thiru-hoa is a very capable, loving and family-oriented person. Though I don't know Wayland, I think anyone would have a much better chance of leading a purposeful life with the support and love from Thiru-hoa and her family than living in an institution. Thus I write in support of Wayland's parole.

Yours sincerely,

Carol Lu Wong

Carol Lu Wong

Address:
1B, Block 15
City One Shatin
Hong Kong

December 2, 2007

Dear Members of the Board of Parole Hearings

SUBJECT:    PAROLE APPLICATION OF WAYLAND TO (D48864)

I am LEE Yam-cho. My wife, TRAN, Thiru-hoa is the sister of Wayland To. I am a Chinese who has lived in Hong Kong all my life. Although I do not know the law system in the US, I believe they are just, sound and fair as the system in Hong Kong. I only hope Wayland could get a fair hearing about his parole. Wayland was only 14 years old when he committed a crime. It was 24 years ago. Half of his life is already gone. I beg you to please let him out so he can be with his families. This is also the wish of my whole family.

Every time Wayland's application for parole is denied, it has brought great disappointment to my whole family. I would ask you please to consider giving him a chance this time.

My whole family is always ready to give him our full support, including our love and full financial assistance.

Yours sincerely

LEE, Yam-cho    *Lee Yam Cho*

Address
1727 Tai Wo House
Wo Che Estate
Shatin
Hong Kong

December 2, 2007

Dear Members of the Board of Parole Hearings

SUBJECT:    PAROLE APPLICATION OF WAYLAND TO (D48864)

l am LEE, Kin-yu. Wayland To is my uncle, brother of my mother, TRAN, Thiru-hoa. I am 29 years old and I am now working for my father in his printing business.

I am writing to beg you please to accept my uncle's application for parole. If so, I plan to go to the US to meet him in person. I will also investigate the possibility of him coming to Hong Kong to live with us.

Please consider his parole as favorable. I believe the laws of the US are fair

Yours sincerely,

LEE Kin Yu

Address
1727 Tai Wo House
Wo Che Estate
Shatin
Hong Kong

December 2, 2007


Dear Members of the Board of Parole Hearings

SUBJECT:    PAROLE APPLICATION OF WAYLAND TO (D48864)

I am LEE, Lai-chung. Wayland To is my uncle, brother of my mother, TRAN, Thiru-hoa. I am 27 years old and I am a nurse working in a public hospital in Hong Kong.

I beg you honorable members to please give a chance to my uncle and let him out on parole. My whole family will be grateful to you all. My mother has always taught me to love my uncle. I hope his application will be successful this time.

I have faith in the US laws.



Yours sincerely,

*Lee Lai Chung*

LEE Lai-chung




Address
1727 Tai Wo House
Wo Che Estate
Shatin
Hong Kong

Ms. Thieu Hoa Tran
Tai Wo House, Suite 1727
Wo Che Estate
Shatin NT
Hong Kong, China

October 11, 2006

Board of Parole Hearings
1515 K Street, Suite 600
Sacramento, CA 95814

Re: Mr. Wayland To, CDC# D-48864

Dear Chairperson and Commissioners:

I am writing this letter in support of my younger brother, Wayland To's, upcoming parole consideration hearing. I know that my brother is truely a good person who has done a considerable amount of maturing over the many long years of his incarceration. He is very remorseful for his crime which he commited as a youngster. He has learned his lesson and paid his debt to society. I strongly believe that he is ready to be released from prison.

Wayland will receive our families total and complete support upon his release, including financial, living and moral guidance, to help ensure that he will be guaranteed a much smoother transition back into a "real-world" setting, where he can become the productive citizen we all wish him to be.

Thank you very much for your time, understanding and consideration regarding my dearest brother Wayland, who our family loves and hopes to have returned.


Sincerly,

Thieu hoa - Tran

Ms. Thieu Hoa Tran

December 30, 2005

Letter of Support for Wayland To, D-48864

To Whom It May Concern:

Wayland To, D-48864, was a student in my 5th grade class some years ago.  From all that I've observed over the years, Wayland has done everything that he is expected to do in the prison system. I feel that with his language limitations, Wayland has shown great persistence to get an education and receive his GED.  As far as I know he has co-operated with the rules and requirements of the system, and has patiently waited through many years of hearings.  He has worked in the kitchen and told me that he would like to become a chef when he is released. He has worked in various other jobs there, participated on athletic teams, and has done his best to maintain his few belongings in good condition and to keep his area clean.

After teaching 37 years in San Francisco, I just retired in August.  I have an extra room in my house where Wayland can live until he is financially able to move out on his own.  I will have free time now to help him learn basic skills for getting along outside the prison system, (managing a bank account, learning to drive, or showing him how to use the transit system, etc.)  There are many odd jobs and much yard work at my house that I am willing to pay him to do.  A friend of mine will be starting to build an addition on my house this year and would hire Wayland to help with the construction work.  I am willing to take care of Wayland financially until he gets adjusted and able to care for himself.

For your consideration, a bit of Wayland's history: He came to our school soon after arriving in San Francisco from Taiwan where he had been in an orphanage school and doing quite well there as I understand. He was a very good student and had been on the swimming and diving team. He had become an orphan because members of his family were refugees from Vietnam and were separated in their rush to get in the boats to leave near the end of the war. When he entered my class he was fluent in Mandarin Chinese, going to Chinese school to learn Cantonese after regular classes, and living with a man who spoke an even different dialect of Cantonese. Wayland understood and spoke <u>very</u> little English, and had great difficulty keeping up with 5th grade work. The man he lived with, who said he was his father, but wasn't, was an alcoholic and chain smoker. They lived in a small hotel room above a nightclub, with a shared bathroom and kitchen down the hall. From living in that small room, and having to sleep in the same bed with his chain-smoking guardian, Wayland came to school reeking of cigarette smoke and appeared to be sad and poorly taken care of. His gums were swollen and bleeding. I took him several times to a friend of mine who was a dentist to have his mouth taken care of. Wayland is one of a few of my students over the years to whom my heart went out, and I wanted to help him. Wayland had mentioned that he would like to go horseback riding, so my sister and I took her son and Wayland to my cousins' ranch to go riding. The boys swam at my parents' neighbor's pool. Wayland and my nephew enjoyed the outing and I took him and my nephew to my parents' home a few other times. Wayland started calling my folks Grandma and Grandpa. After Wayland went to middle school I didn't see much of him, but he did come by school to visit now and then. He told me how unhappy he was living with the old man, and later that he had been placed in a group home because he had run away from "home." The next thing I heard was that he had been arrested for the crime for which he has been imprisoned now for so very many years.

The three boys who had been forced to rob a restaurant that night were all sixteen years old. The man who set them up was never caught and the other two boys were freed from prison many, many years ago. It is beyond my comprehension as to why the boy from Sacramento who killed the waiter has been free for so many years and Wayland, who was an accomplice, is still in prison. It seems extremely unjust that just because the other two boys had their parents there to support them that they were released and Wayland, who was pretty much of an orphan, has had to serve so many years of his life in prison.

Please, consider the facts of this case and know that I will give my help and support to Wayland in whatever he needs in order to start his new life. I do strongly feel that Wayland is a kind and decent person and that he deserves to be given a chance to prove that he will be a useful person in our society. I'm certain that he will abide by the law, that he's more than learned his lesson.

If you have any questions, please contact me.

Sincerely,

Judy D. Peart
509 Park Way
South San Francisco, CA 94080-2644

(650)588-8787
(650)784-6137

1

DECLARATION OF SERVICE BY MAIL

2

I Wayland To, Declare that; I am over 18 years of age, that I am the pro
per petitioner to the attached cause of action, that, my complete mailing address
3   is: Wayland To, D-48864, Box 689, Z-212U, California State prison at Soledad,
California, 93960-0689.

4

That I have served a true and complete copy (original to the Court) of the
instant PETITION FOR WRIT OF HABEAS CORPUS WITH ATTACHED EXHIBITS, in sealed
5   envelopes with postage fully prepaid and said documents were placed in the hands
of Petitioner's Counselor for executing the check for the Court fee and mailing
6   of documents to this Court.

Addressed to the following parties:

7

CLERK OF THE COURT
8   UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
9   450 GOLDEN GATE AVE.
SAN FRANCISCO, CA 94102-3483

10

DECLARATION

11

I declare under penalty of perjury that the foregoing is true and correct,
12   executed this _8_ day of August, 2008 at Soledad, California.

13

14                        Wayland To
Petitioner, in pro per
15

16

17

18

19

20

21

22

23

24

25

26

27

28

Wayland To D-48864
P.O. Box 688        Z-212 u
Soledad, CA 93960-0688

Confidential Mail
Legal

To: Clerk of the Court
United States District Court
Northern District of California
450 Golden Gate Ave.
San Francisco, CA 94102-3483

